David W. Rivkin, Esq.
Nwamaka G. Ejebe, Esq. (*Not admitted in SDNY*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000
dwrivkin@debevoise.com
nejebe@debevoise.com

Attorneys for Petitioners

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CIMC RAFFLES OFFSHORE (SINGAPORE) LIMITED AND YANTAI CIMC RAFFLES OFFSHORE LIMITED, | ) ) ) ) |
| Petitioners, | ) ) |
| v. | ) ) |
| SCHAHIN HOLDING S.A., SCHAHIN ENGENHARIA S.A., SEA BISCUIT INTERNATIONAL INC., BLACK GOLD DRILLING LLC, BAERFIELD DRILLING LLC AND SORATU DRILLING LLC, | ) ) ) ) ) ) ) |
| Respondents. | ) ) |

13 CV 0052

_____ Civ. _____
ECF Case

RECEIVED
2013 JAN -2 P 6: 50
U S DISTRICT COURT SDNY

RECEIVED
JAN 0 2 2013

## PETITION TO CONFIRM A FOREIGN ARBITRATION AWARD
## AND FOR AN ENTRY OF JUDGMENT

Petitioners CIMC Raffles Offshore (Singapore) Limited and Yantai CIMC Raffles

Offshore Limited, by and through their undersigned counsel Debevoise & Plimpton LLP,

petition for relief requested herein and say:

1

## PARTIES

1.       Petitioner CIMC Raffles Offshore (Singapore) Limited ("CROL") is a company

incorporated under the laws of Singapore.  CROL is an integrated offshore builder that

engineers, constructs and commissions state-of-the-art oil platforms, drill rigs and support

vessels.

2.       Petitioner Yantai CIMC Raffles Offshore Limited ("YCROL") is majority-owned

and operated by CROL.  YCROL is incorporated in China and operates China's largest offshore

construction yard.

3.       Petitioners, collectively referred to as "CIMC Raffles," were the claimants in an

arbitration (the "Arbitration") conducted in New York City, in accordance with an agreement to

arbitrate between Petitioners and Respondents, and captioned *CIMC Raffles Offshore*

*(Singapore) Limited and Yantai CIMC Raffles Offshore Limited v. Schahin Holding S.A, Schahin*

*Engenharia S.A., Sea Biscuit International Inc., Black Gold Drilling LLC, Baerfield Drilling*

*LLC, and Soratu Drilling LCC,* Case No. 50 148 T 00348 12.  The Arbitration concluded with

transmittal of the final award (the "Award") to the Parties on December 28, 2012 at New York

City, New York.  A true and correct copy of the Award is attached to the Declaration of David

W. Rivkin, dated January 3, 2012 ("Rivkin Declaration"), as Exhibit 1.

4.       Respondent Schahin Holding S.A. is a holding company incorporated in Brazil.

Schahin Holding owns and manages offshore drilling rigs and vessels through subsidiary entities.

5.       Respondent Schahin Engenharia S.A. is a company incorporated in Brazil.

6.       Respondent Sea Biscuit International Inc. ("Sea Biscuit") is an international

company organized under the laws of the British Virgin Islands.

7.     Respondent Black Gold Drilling LLC ("Black Gold") is organized under Delaware law and is a wholly-owned subsidiary of Sea Biscuit.

8.     Respondent Baerfield Drilling LLC ("BDL") is a company registered in Delaware and is a wholly-owned subsidiary of Black Gold and a second-tier subsidiary of Sea Biscuit.

9.     Respondent Soratu Drilling LLC ("SDL") is a company registered in Delaware and is a wholly-owned subsidiary of Black Gold and a second-tier subsidiary of Sea Biscuit.

10.    All Respondents were defendants in the Arbitration and are jointly referred to herein as the "Schahin Entities."

## JURISDICTION AND VENUE

11.    This Petition seeks confirmation of the Award pursuant to 9 U.S.C § 207 under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention"), implemented by the United States under Chapter 2 of the Federal Arbitration Act, and codified at 9 U.S.C. §§ 201-208.

12.    This Court has jurisdiction pursuant to 9 U.S.C. § 203, because the Parties' agreement to arbitrate and the Award fall under the Convention within the meaning of 9 U.S.C. § 202. The Award and the agreement to arbitrate involve Parties that are not U.S. citizens. Additionally, the contractual relationship between the Parties involves property located abroad, envisages performance abroad, and has a reasonable relation with one or more foreign states (including Brazil and Singapore).

13.    This Court has personal jurisdiction over Respondents because Respondents agreed to arbitration in New York City, the underlying contract is governed by New York law, the arbitration took place in this District, and the Award was rendered in this District. Fed.R.Civ.P. 4(k)(1)(A); N.Y. C.P.L.R. §302.  In the alternative, the Court has personal

3

jurisdiction over Respondents because Respondents regularly and continuously do business in the State of New York and maintain significant assets in New York City. N.Y. C.P.L.R. § 301. This business includes, on information and belief, holding multiple project finance accounts, in which Respondents take in millions of dollars in revenue, service debts, and pay millions of dollars in operational and maintenance costs, including payments for payroll, insurance costs, government fees, and professional fees.

14.     This Court is the proper venue because the Parties designated New York City as the place of arbitration and the arbitration took place in this District. 9 U.S.C. § 204 and 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

15.     On August 23, 2010, Petitioners and Respondents entered into two contractual agreements: the SDL Advance and Equity Conversion Agreement and the BDL Advance and Equity Conversion Agreement (the "Agreements"). True and correct copies of the Agreements are attached to the Rivkin Declaration as Exhibits 2 and 3.

16.     The Agreements contained, in Article 22.2, arbitration agreements that required Parties exclusively and finally to resolve disputes through arbitration proceedings administered by the American Arbitration Association's International Centre for Dispute Resolution. The Agreements selected New York law as the governing law and required that arbitrations be conducted in English and take place in New York City, New York.

17.     Respondent BDL was party to the BDL Advance and Equity Conversion Agreement. Respondent SDL was party to the SDL Advance and Equity Conversion Agreement. The remainder of the Parties were parties to both Agreements.

18.    The substantive terms of the Agreements required CIMC Raffles to make loans to Respondents, and Respondents to repay the loans, plus interest at a rate of per annum equal to two percent above the six-month LIBOR.

19.    In accordance with the terms of the Agreements, Petitioners made loans of US$66,125,587.00 to Respondents between August 2010 and April 2011.

20.    Respondents were obligated to repay the loans on or about July 29, 2011 and November 21, 2011, but failed to do so.

21.     In compliance with Article 22.2 of each Agreement, on May 4, 2012, Petitioners filed a Notice of Arbitration and Statement of Claim in order to obtain repayment of their loans plus interest.

22.    The Arbitral Tribunal was properly appointed according to the terms of the Agreements.  Following discovery and prehearing submissions, the Arbitral Tribunal conducted a full-day hearing on November 8, 2012 in New York City, New York.  The Arbitral Tribunal heard live testimony from two witnesses and arguments from both sides.

23.    On December 28, 2012, the Arbitral Tribunal, in a 22-page decision, unanimously awarded CIMC Raffles US$69,470,777.41 for repayment of the loans and pre-award interest, and US$13,206.28 in arbitration costs.

## **RELIEF**

WHEREFORE, Petitioners CIMC Raffles move this Court for an Order:

a.    Confirming the Award issued by the Arbitral Tribunal;

b.    Entering judgment on the Award in the amount of US$46,094,027.32 in favor of Petitioners and against Baerfield Drilling LLC, Schahin Holding

S.A., Schahin Engenharia S.A., Sea Biscuit International Inc, and Black and Gold Drilling LLC, jointly and severally;

c.      Entering judgment on the Award in the amount of US$23,376,750.09 in favor of Petitioners and against Soratu Drilling LLC, Schahin Holding S.A., Schahin Engenharia S.A., Sea Biscuit International Inc, and Black and Gold Drilling LLC, jointly and severally;

d.      Entering judgment on the Award for post-award, pre-judgment interest at 9% per annum starting January 1, 2013, for any amount described in subparagraphs b and c above not paid by January 27, 2013;

e.      Entering judgment on the Award in the amount of US$13,206.28 in favor of Petitioners and against Respondents, jointly and severally;

f.      Granting Petitioners post-award, pre-judgment interest in line with the rate under 28 U.S.C. § 1961 for the amount described in subparagraph e;

g.      Granting Petitioners post-judgment interest on all amounts owed running from entry of judgment until payment in full, pursuant to 28 U.S.C. § 1961;

h.      Granting Petitioners their costs of this application; and

i.      Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
     January 2, 2013

DEBEVOISE & PLIMPTON LLP


By: _____
David W. Rivkin
dwrivkin@debevoise.com
Nwamaka Ejebe (Not admitted in the SDNY)
nejebe@debevoise.com


919 Third Avenue
New York, New York 10022
(212) 909-6000

Attorneys for Petitioners

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **CIMC RAFFLES OFFSHORE (SINGAPORE) LIMITED AND YANTAI CIMC RAFFLES OFFSHORE LIMITED,** | )<br>)<br>) |
| **Petitioners,** | )<br>)<br>) |
| **v.** | )<br>)<br>) |
| **SCHAHIN HOLDING S.A., SCHAHIN ENGENHARIA S.A., SEA BISCUIT INTERNATIONAL INC., BLACK GOLD DRILLING LLC, BAERFIELD DRILLING LLC AND SORATU DRILLING LLC,** | )<br>)<br>)<br>)<br>)<br>) |
| **Respondents.** | )<br>)<br>) |

13  CV  0052

Civ. _____
ECF Case

RECEIVED
JAN 0 2 2013

---

**DECLARATION OF DAVID W. RIVKIN IN SUPPORT OF THE PETITIONERS'**
**MEMORANDUM OF LAW IN SUPPORT OF THE PETITON TO CONFIRM**
**ARBITRATION AWARD**

I, David W. Rivkin, declare as follows:

1.       I am a member of the law firm of Debevoise & Plimpton LLP, counsel to CIMC Raffles Offshore (Singapore) Limited and Yantai CIMC Raffles Offshore Limited (collectively, "CIMC Raffles").  I am fully familiar with the facts and circumstances underlying this action based on personal knowledge and a review of the files in my possession.

2.    I make this Declaration to put before the Court certain exhibits related to the memorandum of law being filed today by CIMC Raffles.

3.    Attached to this Declaration as Exhibit 1 is a true and correct copy of the Arbitration Award transmitted to the Parties on December 28, 2012 at New York City, New York.

4.    Attached to this Declaration as Exhibit 2 is a true and correct copy of the SDL Advance and Equity Conversion Agreement, entered into by the Parties on August 23, 2010.

5.    Attached to this Declaration as Exhibit 3 is a true and correct copy of the BDL Advance and Equity Conversion Agreement, entered into by the Parties on August 23, 2010.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 2, 2012.

David W. Rivkin

# Exhibit 1

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

---

CIMC Raffles Offshore (Singapore) Limited, and
Yantai CIMC Raffles Offshore Limited,

                Claimants,

           vs.

Schahin Holding S.A.,
Schahin Engenharia, S.A.,
Sea Biscuit International Inc.,
Black Gold Drilling LLC,
Baerfield Drilling LLC, and
Soratu Drilling LLC,

                Respondents.

Case No:

50 148 T 00348 12

---

### FINAL AWARD OF ARBITRATORS

    We, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated August 23, 2010, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, AWARD, as follows:

### OPINION

### Preliminary Statement

1. This arbitration was commenced by Claimants' filing of a Notice of Arbitration and Statement of Claim dated May 3, 2012. Respondents served a Statement of Defense dated June 4, 2012. No counterclaims were asserted. Claimants responded with a Reply to Statement of Defense dated July 2, 2012. The International Centre for Dispute Resolution ("ICDR") confirmed appointment of the three members of the Tribunal by letter dated July 10, 2012.

2. Claimant CIMC Raffles Offshore (Singapore) Limited ("CROL"), formerly known as Yantai Raffles Shipyard Ltd., is a company incorporated under the

1

laws of Singapore. CROL is an integrated offshore builder that engineers, constructs, and commissions state-of-the-art oil platforms, drill rigs, and support vessels. Claimant Yantai CIMC Raffles Offshore Limited ("YCROL"), formerly known as Yantai Raffles Offshore Limited, is majority owned and operated by CROL. YCROL is incorporated in China and operates the country's largest offshore construction yard. (Claimant's Pre-Hearing Submission, ¶ 7)("Cl. P-H Submission")

3. Respondent Schahin Holding S.A. ("Schahin Holding") is a holding company incorporated in Brazil. Schahin Holding owns and manages offshore drilling rigs and vessels through subsidiary entities. Respondent Schahin Engenharia, S.A. ("Schahin Engenharia") is a company incorporated in Brazil. Respondent Sea Biscuit International Inc. ("Sea Biscuit") is an international company organized under the laws of the British Virgin Islands. Respondent Black Gold Drilling LLC ("Black Gold") is organized under Delaware law and is a wholly-owned subsidiary of Sea Biscuit. Respondent Baerfield Drilling LLC ("BDL") is a company registered in Delaware and is a wholly-owned subsidiary of Black Gold and a second-tier subsidiary of Sea Biscuit. Respondent Soratu Drilling LLC ("SDL") is a company registered in Delaware and is a wholly-owned subsidiary of Black Gold and a second-tier subsidiary of Sea Biscuit. (Cl. P-H Submission, ¶ 8) Respondents are part of Grupo Schahin, or Schahin Group, which is headquartered in Brazil and is controlled by brothers Milton Taufic Schahin, Salim Taufic Schahin, and Rubens Taufic Schahin. Each of the Respondents is separately incorporated and maintains its own accounts, books and records. Rubens Taufic Schahin has no involvement in the overseas entities, including Respondents Sea Biscuit, Black Gold, BDL and SDL. The Schahin Group, which employs more than 6,500 people and has been operating in the Brazilian market for more than 45 years, is active in the engineering, oil and gas, real estate development, telecommunications, and energy sectors in Brazil. (Respondents' Memorial in Response to Claimants' Pre-Hearing Submission, ¶ 6)("Resp. Memorial")

**Arbitral Proceedings**

4. An initial preliminary hearing in this matter took place by teleconference on July 26, 2012, resulting in Procedural Order No. 1. Among other things, that Procedural Order set out a Timetable which described agreed discovery and a procedure for resolving disputes, identified and set deadline for all future submissions, and reserved November 7-8, 2012 for the hearing.

5. Thereafter discovery took place without incident. In accordance with the agreed Timetable, Claimants served their Pre-Hearing Submission on September 2012. Respondents submitted their Memorial in Response on October 5, 2012. Claimants served a Reply on October 15, 2012, and Respondents then concluded these filings with their Sur-Reply on October 22, 2102. In all instances, the exhibits and authorities relied upon were annexed to these submissions. Some 80 exhibits were submitted in all.

6. Claimants and Respondents each submitted one witness statement, LUI Yet Chow for Claimants (Ex. CE-79) and Fernando Schahin for Respondents (Ex. RE-78).

7. Paragraph 15 of Procedural Order No. 1 provided that on or before October 26, 2012 the parties were to raise any objections they had as to the authenticity or admissibility of any of the other parties' evidence, and advise as to whether they wished to cross examine the other parties' witnesses. Respondents raised objections to certain of Claimants' evidence in a filing dated October 26, 2012, and both sides advised that they wished to cross examine the other parties' witness.

8. Paragraph 16 of Procedural Order No. 1 provided that there would be a teleconference on October 30, 2012 to resolve any objections as to evidence, and to settle the conduct of the hearing. This conference call was postponed by agreement and then occurred on November 2, 2012. The conduct of the hearing was established during the conference call. After hearing counsel, the Tribunal concluded that all of the exhibits would remain as part of the record during the course of the hearing, and that the Tribunal would determine the admissibility of the challenged exhibits, and/or the weight to be given to them, during its deliberations following the hearing. At that time all of the exhibits were deemed admitted, but none waselied upon in reaching a decision.

9. The hearing took place in New York on November 8, 2012. Counsel for Claimants and Respondents each made opening statements. Both witnesses appeared at the hearing, and were examined and cross examined by counsel and the Tribunal. A packet of six additional exhibits was offered by Respondents, and accepted by the Tribunal for the purposes displayed during Respondents' cross examination of Claimants' witness. (Tr. pp. 228-31) Counsel for each side then had the opportunity to make, and did make, whatever closing remarks they wished. At that point the evidentiary phase of this proceeding was closed, and all issues were submitted to the Tribunal for resolution. Counsel did thereafter submit three letters or emails to the Tribunal which were accepted and were made part of the record – a letter from Linklaters dated November 14, 2012, a

second letter from Linklaters dated November 15, 2012, and an email from David W. Rivkin, counsel for Claimants, dated November 17, 2012.

10. The governing arbitration agreement provides that any arbitration commenced thereunder "shall be completed and a ruling thereon issued within one hundred eighty (180) days of the appointment of the tribunal." (Exs. CE-1, ¶ 22.2; CE-2, ¶ 22.2) This deadline expires on or about January 3, 2013. (Tr. p. 29)

## Claimants' Allegations

11. In 2006, SDL and BDL entered into separate Shipbuilding Contracts to purchase semi-submersible drilling units (the "Vessels") from CROL.   Under the contracts, CROL (the "Builder") agreed to construct, launch, complete, test, commission, sell and deliver to SDL and BDL (the "Buyers") the Vessels SS Pantanal and SS Amazonia. (Cl. P-H Submission, ¶ 9)

12. In the original Shipbuilding Contracts, entered into on July 12, 2006, SDL and BDL were to purchase the Vessels for US$234,000,000 each, subject to contractual adjustments, and to make payments through a series of milestone installments. (Cl. P-H Submission, ¶ 10)

13. SDL and CROL were the only two parties to the SDL Shipbuilding Contract and BDL and CROL were the only two parties to the BDL Shipbuilding Contract until YCROL was added as the "Co-Builder" in amendments dated September 12, 2006 for BDL Shipbuilding Contract and February 15, 2007 for the SDL Shipbuilding Contract. (Cl. P-H Submission, ¶ 11)

14. SDL and BDL financed their purchase of these Vessels through credit agreements—the "Senior Facility Agreement" and the "Sub-Debt Facility Agreement"—with a consortium of banks ("Bank lenders"). (Cl. P-H Submission, ¶ 12)

15. Construction of the Vessels commenced in September 2006, but progress was delayed for a number of reasons, including changes requested by SDL and BDL, contractually permissible delays, and difficulties at the construction site.   To resolve disputes over the delays, the Parties amended the Shipbuilding Contracts multiple times. (Cl. P-H Submission, ¶ 13)

16. On April 3, 2009, Black Gold, SDL and BDL defaulted on their credit agreements with the Bank lenders allegedly because of the construction delays, and the Bank lenders halted their payment of project funds. As a result,

Respondents had difficulty paying project costs and approached CIMC Raffles for assistance. (Cl. P-H Submission, ¶ 14)

17. CIMC Raffles had a vested interest in the successful completion of the project and a desire to maintain and to develop its relationship with Respondents, potential partners in future endeavors in the Brazilian oil exploration market. To ease financial pressures on SDL and BDL, and thus support the project, CIMC Raffles agreed to two final amendments to the Shipbuilding Contracts on September 27, 2009 and May 24, 2010. The September 2009 amendments, the Seventh and Eleventh Amendments for the BDL and SDL Shipbuilding Contracts respectively, granted SDL and BDL the ability to defer, until after the delivery of the Vessels, a portion of their final milestone payment as well as the right to deduct from their last milestone payment any liquidated damages incurred by Claimants pursuant to the Shipbuilding Contracts. (Cl. P-H Submission, ¶ 15)

18. Claimants contend that the May 2010 amendments, the Eighth and Twelfth Amendments for the BDL and SDL Shipbuilding Contracts, respectively, deferred and combined all of the outstanding milestone payments with the final milestone payment and changed the delivery dates of the Vessels (except for the purposes of calculating liquidated damages for delay which were capped at US$11.7 million) from April 2, 2009 for SDL and December 7, 2009 for BDL to October 30, 2010, and April 15, 2011, respectively. (Cl. P-H Submission, ¶ 15)

19. Claimants further assert that Respondents, in order to address their cash flow problems, sought financing directly from CIMC Raffles in the event that there were any additional delays and proposed separate contractual arrangements to that end. In September 2009, as they completed the negotiations of the September 2009 amendments to the Shipbuilding Contracts, the Parties began negotiating the SDL Advance and Equity Conversion Agreement ("SDL ECA") and the BDL Advance and Equity Conversion Agreement ("BDL ECA"), which would provide Respondents short-term loans (the "Advances") if a Vessel was not delivered by a certain date. The Parties negotiated the terms of the ECAs for almost a year and signed them on August 23, 2010. Unlike the Shipbuilding Contracts, which only included SDL and BDL, the ECAs involved all six Respondents. CIMC Raffles' parent company, China International Marine Containers (Hong Kong) Limited ("CIMC"), also signed the agreements as a guarantor of CIMC Raffles' Advances. (Cl. P-H Submission, ¶ 16)

20. The agreements were "contingent equity structures," so that when Claimants delivered the Vessels, Sea Biscuit (Respondents' company that received the

loans) had the option either to repay the loans with interest or to provide CIMC Raffles with shares in SDL and BDL to compensate for its Advances to Respondents. By entering into the ECAs, Claimants provided Respondents with much needed financing for the future of the project; the Bank lenders gained further assurances the project would be completed in time; and CIMC Raffles obtained the opportunity to enter the Brazilian market. (Cl. P-H Submission, ¶ 17)

21. On their face, the terms of the ECAs are straightforward. In the event that CIMC Raffles did not deliver to SDL its Vessel by July 31, 2010, or to BDL its Vessel by September 30, 2010, CIMC Raffles would loan Sea Biscuit monthly Advances in an amount of US$5,777,010 (SDL ECA) or US$6,404,910 (BDL ECA) up to a possible maximum of US$50,000,000 per Vessel. (Cl. P-H Submission, ¶ 18)

22. CIMC Raffles was required to make these payments until the "Trigger Date," defined as the earliest of these events: (1) the date when the Vessels were delivered and accepted; (2) April 19, 2011 for the SDL ECA and May 24, 2011 for the BDL ECA; or (3) termination of the relevant ECA. On each Trigger Date, Sea Biscuit had to notify CIMC Raffles of its decision either to repay CIMC Raffles the Advances or to convert the aggregate amount of the Advances into newly issued equity in SDL (on the "SDL Trigger Date") or BDL (on the "BDL Trigger Date"). (Cl. P-H Submission, ¶ 19)

23. If Sea Biscuit elected to repay the Advances, it had five business days to repay the aggregate amount of all the Advances made prior to the Trigger Date, plus interest on the amount of each Advance from the date it was made through, but excluding, the date on which such amount was paid in full at an annual rate of two percent above the six-month LIBOR rate applicable to the Advance. (Cl. P-H Submission, ¶ 20)

24. If Sea Biscuit elected to convert into equity the Advances for a particular ECA, Black Gold had 120 days from the Trigger Date to secure consents for the conversions from the specified "Consenting Parties," which included the Bank lenders. (Cl. P-H Submission, ¶ 21)

25. If Black Gold failed to acquire all of the consents by the end of the 120-day period, Sea Biscuit had 90 days to repay CIMC Raffles the aggregate amount of all of the Advances plus interest, calculated in the same manner as if it had initially elected to repay the Advances. (Cl. P-H Submission, ¶ 22)

26. Schahin Holding and Schahin Engenharia were primary obligors, guaranteeing Sea Biscuit's and Black Gold's obligations to perform the equity conversions or promptly repay CIMC Raffles. All Respondents that were party to each ECA were jointly and severally liable for the obligations contained therein. (Cl. P-H Submission, ¶ 23)

27. What happened is the following. Delivery of the vessels was further delayed and in August 2010, CIMC Raffles began providing Advances to Sea Biscuit under the SDL ECA, and in October 2010, it began providing them under the BDL ECA. They payments stopped shortly after CIMC Raffles delivered the SS Pantanal to SDL on November 15, 2010, and the SS Amazonia to BDL on April 25, 2011. (Cl. P-H Submission, ¶ 24)

28. In total, CIMC Raffles made twelve monthly Advances to Sea Biscuit: five Advances from August 2010 to December 2010 relating to the SS Pantanal, and seven Advances from October 2010 to April 2011 relating to the SS Amazonia. The total sum of the Advances CIMC Raffles paid to Sea Biscuit was US$66,125,587, as displayed in the table below (Cl. P-H Submission, ¶ 25):

| Date of SDL Advance | Amount Paid | Date of BDL Advance | Amount Paid |
|---|---|---|---|
| August 31, 2010 | $5,777,010 | October 29, 2010 | $6,404,910 |
| September 30, 2010 | $5,777,010 | November 30, 2010 | $6,404,910 |
| October 29, 2010 | $5,777,010 | December 31, 2010 | $6,404,910 |
| December 1, 2010 | $3,415,952 | January 31, 2011 | $6,404,910 |
| December 6, 2010 | $1,398,223 | February 28, 2011 | $6,404,910 |
| **Total:** | **$22,145,205** | March 31, 2011 | $6,404,910 |
| | | April 26, 2011 | $5,550,922 |
| | | **Total:** | **$43,980,382** |

29. Pursuant to what Claimants contend were the amended delivery dates under the Shipbuilding Contracts, the deliveries of both the SS Pantanal to SDL on November 15, 2010, and of the SS Amazonia to BDL on April 25, 2011, were late—sixteen days in the case of the SS Pantanal and ten days in the case of the SS Amazonia. Accordingly, separate from the Advances it provided, CIMC

Raffles deducted US$11,700,000 in liquidated damages from the amounts owed by SDL and BDL pursuant to Article IV(1)(i) of the Shipbuilding Contracts. (Cl. P-H Submission, ¶ 26)

30. Under the SDL ECA, the Vessel delivery date—November 15, 2010—became the SDL Trigger Date. Respondents, however, needed more time to make their decision regarding conversion or repayment, so CIMC Raffles agreed to Amendment No. 1 to the SDL ECA, which extended the deadline for Sea Biscuit to make that determination to December 31, 2010. (Cl. P-H Submission, ¶ 27)

31. On that date, Sea Biscuit emailed CIMC Raffles its Notice of Conversion, which stated its intention to convert the SDL Advances into equity. The Notice triggered the 120-day consent period in which Black Gold had to obtain consents from the Consenting Parties to convert the SDL Advances into SDL shares. On January 4, 2011, SDL and Black Gold sent letters to obtain these consents. (Cl. P-H Submission, ¶ 28)

32. On April 25, 2011—the BDL Trigger Date—Sea Biscuit emailed CIMC Raffles its BDL Notice of Conversion. This Notice triggered the 120-day consent period for the BDL conversion. Black Gold sent letters requesting consents from the Consenting Parties for the BDL conversion on that day. (Cl. P-H Submission, ¶ 29)

33. The "Consenting Parties" failed to respond to the consent requests under either the SDL ECA or the BDL ECA. (Ex. CE-35 at 18:13 - 19:19; Tr., pp. 182-84) When the 120-day consent periods ended under the SDL ECA and the BDL ECA on or about April 30, 2011, and on or about August 23, 2011, respectively, Respondents had failed to obtain the consents. (Cl. P-H Submission, ¶ 30)

34. Respondents' failure to obtain consents required them to repay the Advances within 90 days of the end of the consent period. The 90-day repayment periods ended on or about July 29, 2011, for the SDL ECA, and on or about November 21, 2011, for the BDL ECA. Respondents did not repay the Advances under either agreement during the required period. They continued to fail to do so despite CIMC Raffles' various requests for repayment. (Cl. P-H Submission, ¶ 31)

35. For example, in a letter from Lui Yen Chow, CIMC Raffles' Legal Department Head, dated July 12, 2011, CIMC Raffles informed Respondents that the 120-day consent period under the SDL ECA had expired without the provision of proper consents. (Ex. CE-3) CIMC Raffles demanded repayment of the SDL Advances, along with interest, and requested information on the status of

obtaining consents from the consenting parties under the BDL ECA. Respondents did not respond. (Cl. P-H Submission, ¶ 32)

36. CIMC Raffles' Finance Manager, Pang Mei Yan, again tried to obtain repayment in an August 5, 2011, email, which also anticipated the failure to obtain the required consents for the BDL conversion: "As there was no conversion of equity, can you please let us know the plan for the repayment of both the SDL and BDL Advances?" (Ex. CE-37) Respondents again failed to respond. (Cl. P-H Submission, ¶ 33)

37. On September 10, 2011, Mai Bo Liang, CIMC Raffles' Chairman and CEO, wrote to Schahin Holding. He urged Respondents to halt their "continued lack of a meaningful response and constructive discussions," so both parties could resolve their disputes without legal action. (Ex. CE-38)

38. Respondents responded on September 23, 2011, by email to Diane Chen, CIMC Raffles' Deputy CFO, explaining that Respondents were experiencing "difficult times" due to the delay in the delivery of the Vessels. Nevertheless, they "kn[e]w [their] obligations in the contracts and . . . [would] work with CIMC Raffles to find a plausible solution in a timely matter to be able to resolve them." (Ex. CE-39)

39. Fernando Schahin conveyed the same message in a subsequent formal letter which he sent on October 7, 2011, in response to Mr. Liang's demand letter. (CE-40) He went on to explain that because Respondents were experiencing "cash flow capacity" problems, they wished to renegotiate the payment terms of the Shipbuilding Contracts and the conversion terms of the ECAs:

> "[P]lease understand that currently we are entirely focused on concluding the financing for the two drillships under construction with Samsung, which are scheduled to be delivered in the coming months in the midst of a severely constrained financing market. We must conclude the financing for this project before we can realistically turn to satisfying our obligations to CIMC Raffles."

40. Mr. Schahin proposed a restructured schedule for the payments under the Shipbuilding Contracts and a "6 (six) month extension to complete the

conversion under the Equity Conversion Agreements (ECAs)," even though the deadline for conversion had long since passed. (Ex. CE-35 at 39:10-39:26)[1]

41. Claimants refused these requests and denied Fernando Schahin's suggestions that earlier delays in the construction process could alter Respondents' contractual obligations:

> "It is unclear whether you are suggesting that you are entitled to refuse payment of the outstanding sums because of the earlier delays to the Pantanal and Amazonia projects. If that is suggested, then it is clearly incorrect. The new delivery dates for the rigs were agreed between the parties in the various agreements entered into during the project. In those agreements, we gave very significant concessions to Schahin, and agreed [to] the deduction of substantial liquidated damages. In the event, both rigs were delivered very shortly after the contractual delivery dates provided in the $8^{th}/12^{th}$ Amendments to the Shipbuilding Contracts. There can therefore be no question of any liability on behalf of the Builder for the matters that you refer to in your letter. Nor can those matters give Schahin any grounds for not paying the sums that are clearly due to us." (Ex. CE-42)

42. Respondents did not respond to this letter. CIMC Raffles wrote to Respondents again in letters dated December 21, 2011 and February 23, 2012, demanding repayment of the Advances together with interest (Ex. CE-43, 44), but Respondents never repaid the Advances or any interest. (Cl. P-H Submission, ¶ 39)

43. Therefore, according to Claimants, the aggregate principal amount owed under the ECAs is US$66,125,587. With interest calculated through December 31, 2012, pursuant to Article 4.6 of each ECA, Respondents now owe US$69,470,777.41, as reflected in the table below (Claimants' Email dated December 5, 2012; Respondents' Confirmation dated December 7, 2012):

---

[1] Claimants asked about this letter and the belated request for an extension during a New York court hearing. CIMC Raffles' lawyer: "This was written October 2011. The first Notice of Equity Conversion was December 31st, 2010. So this is ten months later, that's well more than 120 days. It's already too late to convert, isn't it?" Mr. Fernando Schahin: "It is, but we were still trying to convince CIMC that the best option would be to convert and that they give time for the conversions to take place." (Ex. CE-35 at 39:10-39:26)

| ECA Advances | Principal Owed | Interest Through December 31, 2012 | Totals |
|---|---|---|---|
| SDL Advances | $22,145,205 | $1,231,545.09 | $23,376,750.09 |
| BDL Advances | $43,980,382 | $2,113,645.32 | $46,094,027.32 |
| **Totals** | **$66,125,587** | **$3,345,190.41** | **$69,470,777.41** |

### Respondents' Position

44. Respondents emphasize that the two semi-submersible drilling vessels at issue here were commissioned for the purposes of long term charters to Petroleo Brasileiro S.A. – Petrobras ("Petrobras"), which had invited Schahin Engenharia S.A. to bid on the charter and operation of two semi-submersible oil drilling vessels for deep water drilling operations off the coast of Brazil. (RE-78 ¶ 8 [Witness Statement of Fernando Schahin])  Under the terms of the charters with Petrobras, Petrobras was entitled to significant penalties for delays in delivery of the Vessels, and if delivery was delayed past a specified period, Petrobras had the right to terminate the charters. (RE-78 ¶ 10.)

45. Because of the potential liability of BDL and SDL to Petrobras, each Shipbuilding Contract contained explicit provisions stating that "[t]ime is of the essence in the construction of the Vessel[s]." (Exs. CE-3, Article V Section 7(i), and CE-4, Article V Section7(i).)  The potential for Petrobras to terminate the charter agreements due to delay, and the loss of BDL's and SDL's forecasted revenue flows if that happened, was a driving factor in the negotiation of the Shipbuilding Contracts and the inclusion of the provision providing that time was of the essence. (RE-78 ¶ 10.)

46. The construction of both vessels was financed through long-term limited recourse financing. (RE-78 ¶ 12.)  A credit agreement was entered into on October 25, 2007, by, among others, Black Gold, as Borrower; BDL and SDL, as borrower subsidiaries and subsidiary guarantors; and certain lenders who became party to the agreements. (*Id.*)  Schahin Holding S.A. was not a party to this agreement, although it was designated as a Completion Guarantor. (*Id.*)

47. The vessels were originally scheduled for delivery on two dates in 2009. However, after construction of the Vessels had begun, BDL and SDL each paid US$6,000,000 for amendments to the Shipbuilding Contracts that accelerated the

delivery dates for each (RE-71 [BDL Third Amendment to the Shipbuilding Contract]; RE-75 [SDL Second Amendment to the Shipbuilding Contract]), in order to address concerns held by the banks financing the project that the delivery dates under the Shipbuilding Contracts and the deadlines under the Petrobras charters were too close in proximity. (RE-78 ¶ 11.)

48. Respondents contend that because of rampant and continuous delays on the part of Claimants, amendments were entered into with respect to each of the Shipbuilding Contracts in which Claimants admitted that they were in "Performance Default." (RE-74 [BDL Sixth Amendment to the Shipbuilding Contract]; RE-73 [SDL Tenth Amendment to the Shipbuilding Contract]) Following additional amendments, the final delivery date for each vessel, as agreed by the parties, was April 2, 2009 for SS Amazonia (bought by BDL) and December 7, 2009 for SS Pantanal (bought by SDL).[2] (RE-71; RE-75; RE-72 [SDL Third Amendment to the Shipbuilding Contract])

49. According to Respondents, during the negotiations of the Shipbuilding Contracts YRS made a number of representations regarding its shipyard and its capabilities. For instance, YRS represented that its shipyard facilities were complete, state of the art, and had all of the resources necessary to carry out the project. (RE-78 ¶ 17.) YRS also represented that it had a team of capable and experienced individuals who would complete the project in a professional and timely manner, and that YRS would utilize a high-performance software program, called Catia, which would expedite construction of the Vessels. (*Id.*) Respondents assert that these representations were false.

50. Claimants began construction of the Vessels in September 2006. From the beginning of construction, Respondents claim that Claimants failed to perform their obligations adequately, resulting in significant problems and delays in the completion and delivery of the Vessels. Claimants' shipyard, for example, initially used computer software designed for engineering planes, not oil-drilling vessels. Furthermore, the shipyard was understaffed and the personnel were inexperienced. Although Claimants promised to increase staffing, they never did, resulting in slow progress and delays in the construction of the Vessels.

---

[2]  As to the final agreed delivery dates, Respondents assert that Claimants are relying on unexecuted drafts of the Amendments in incorrectly contending that the Eighth Amendment to the BDL Shipbuilding Contract and the Twelfth Amendment to the SDL Shipbuilding Contract modified the then existing delivery dates. According to Respondents, those dates were never changed. Indeed, prior to signing these amendments Mr. Schahin expressly informed Claimants that Respondents could not change the dates of delivery. (Ex. CE-12). According to Respondents, the contractual date of delivery, from which damages owed by Claimants were to be calculated, was never changed. The Annex did not concern the contractual date of delivery, but rather laid out the obligation of Claimants to ensure that they marshaled sufficient resources to complete the Vessels by a certain date, even if that date was well beyond the agreed upon date of delivery. (See Exs.CE-10 at 3(c) and CE-11 at 3(c); Tr., pp. 216-23, 226-27)

51. This required BDL and SDL to provide assistance so that the projects would progress. At the start of the projects, it was anticipated that it would be necessary for BDL and SDL to send five people to monitor the projects, and in fact the Shipbuilding Contracts expressly provided that no more than five representatives from BDL and SDL should be at the shipyards. (RE-78 ¶ 19.) Ultimately, however, more than 200 people had to be sent by BDL and SDL to the shipyards in China to compensate for Claimants' shortcomings, which amounted to additional costs to BDL and SDL of US$36,863,212. (*Id.*)

52. Respondents assert that as a result of Claimants defaults it was necessary for them to enter into several amendments to the Shipbuilding Contracts in an effort to address those defaults. The amendments rescheduled certain milestones that Claimants were required to achieve under the Shipbuilding Contracts, without changing the delivery dates. Because of their exposure to penalties from Petrobras, BDL and SDL had no practical alternative to continuing with the projects and agreed to such amendments. (RE-78 ¶ 20.)

53. Further, the numerous delays at the shipyards and the resulting cost overruns also required BDL and SDL to transfer the Vessels from Claimants' shipyard in China to Brazil to complete the required work. It was necessary for BDL and SDL to engage ModuSpec USA, Inc. (a maritime inspection and risk management company) to commission the Vessels, resulting in additional cost to BDL of US$2,320,157.49 and to SDL of US$1,667,066.21. Both BDL and SDL were also required to retain Sinomaritime Shipping Agency, and SDL was required to retain an additional third party, Automatic & Controls Solutions, Inc., as a result of Claimants' breaches and defaults under the Shipbuilding Contracts. All told, Respondents assert that BDL and SDL paid US$6,039,099.99 in additional costs to these third parties to complete the Vessels. (RE-78 ¶ 21.)

54. In addition, Respondents contend that Claimants' defaults and failures during the construction process resulted in large cost increases for Respondents BDL and SDL and delayed income streams from the Vessels, causing significant financial hardship for the Respondents and exposing BDL and SDL to substantial penalties from Petrobras, totaling more than US$100,000,000. (RE-78 ¶ 18.) Claimants' failures also caused financial and reputational damage to BDL and SDL with suppliers, customers and banks, and had numerous negative consequences for other Schahin entities in connection with their ability to obtain financing for new projects. (RE-78 ¶ 23.)

55. In any event, Claimants delivered the SS Amazonia in April 2011, in Respondents' view more than two years late, and the SS Pantanal in November

2010, more than one year late. (Exs. CE-19; CE-20; CE-21; CE-22.) Claimants also delivered the Vessels incomplete. *Id.* The SS Amazonia was required to remain in Brazil for eight months for Respondents to complete work that Claimants were supposed to have performed. *Id.* The SS Pantanal was required to remain in Brazil for four months to be completed. *Id.* In spite of the fact that the Vessels were delivered incomplete, Respondents had no other alternative except to accept delivery, as they did not want to become embroiled in litigation in China, which would have threatened the projects. (*Id.*)[3]

56. According to Respondents, Claimants' consistent failures, and the attendant economic hardship they imposed upon Respondents, necessitated the entry into the Advance and Equity Conversion Agreements ("ECA Agreements") which are at issue here. In fact the ECA Agreements specifically provide that their purpose is to provide advances to Respondents "in the event there are delays in the delivery or acceptance" of the Vessels. (Ex. CE-1 at Recital (B); Ex. CE-2 at Recital (B).) In a December 7, 2009, email, Fernando Schahin made this purpose clear to Claimants by noting that the "equity agreement" was needed to compensate for "future delays" to, *inter alia*, "support future penalties." (Ex. CE-62.) Diane Chen, Deputy CFO of CIMC, acknowledged in an April 2011 email to Fernando Schahin that the delays caused by Claimants had caused problems and that the ECA Agreements were entered into "to solve some of the problems" and to "fund [Respondents'] additional costs and penalty." (Ex. CE-56.)

57. Further, in noting the amounts paid by Claimants, the 2010 Consolidated Financial Statements of Sea Biscuit state that the ECA Agreements were entered into "in order to minimize certain delay in the construction of the semi-submersible drilling platform." (CE-26 at SCHAHIN000036.) The 2010 Financial Statements for BDL and SDL each likewise note that the ECA Agreements are "related to certain delay in the construction of the semi-submersible drilling platform[s]." (RE-76 at SCHAHIN_000040 [BDL Financial Statements as of December 31, 2010 and 2009]; RE-77 at SCHAHIN_000043 [SDL Financial Statements as of December 31, 2010 and 2009].)

58. Respondents assert that the US$66,125,587 Claimants paid to Respondents under the ECA Agreements are part of the damages caused by Claimants' defaults under the Shipbuilding Contracts. Also, Respondents have on numerous

---

[3] *See,* Arthur Anyuan Yuan, *Enforcing and Collecting Money Judgments in China from a U.S. Judgment Creditor's Perspective,* 36 Geo. Wash. Int'l L. Rev. 757, 758 (2004) ("The enforcement of foreign judgments in China has been notoriously difficult in recent years. . . . [A] large percentage of judgments, both domestic and foreign, are never enforced.").

occasions informed Claimants that they were committed to working through the various issues surrounding the Shipbuilding Contracts, but also have emphasized that Claimants' actions and inactions had resulted in "significant costs and economic losses." (See, Exs. CE-40, CE-56, and CE-57.)

## Other Proceedings

59. On December 22, 2011, CIMC Raffles commenced two arbitrations in London before the London Maritime Arbitrators Association, one against Respondent BDL and the other against SDL (the "London Arbitrations") to obtain payment in the amount of about US$208 million for change orders, final milestone payments, and certain deferred payments under the Shipbuilding Contracts. (Tr., p. 26) On April 27, 2012, BDL and SDL each filed its Points of Defense and Counterclaims in the London Arbitrations, asserting counterclaims of approximately US$140,000,000, plus significant additional amounts to be proven, asserting counterclaims based on the losses and damages caused by Claimants. Those proceedings are currently pending. The merits hearings are scheduled to commence on March 5, 2014. (Letter from Linklaters dated November 15, 2012)

60. On December 23, 2011, CIMC Raffles brought an action before the High Court in London against Schahin Holding, which had guaranteed certain payments under the Shipbuilding Contracts pursuant to a Deed of Guarantee and Indemnity dated December 18, 2009. CIMC Raffles sought payment of some of the deferred milestone payments guaranteed under the agreement. On May 21, 2012, the High Court issued a summary judgment award in favor of CIMC Raffles, awarding it US$57.4 million. Schahin Holding has appealed this decision. (Tr., pp. 54-55, 163)

61. Claimants also filed an attachment petition with the Supreme Court of the State of New York to obtain provisional relief in aid of this contemplated arbitration pursuant to CPLR 7502(c) ("Attachment Petition"). On August 30, 2012, the Court dismissed the petition because it concluded that CIMC Raffles' potential arbitral award would not be "rendered ineffectual" because Respondents were not insolvent and they were likely to retain assets in New York. The Court reached no conclusions as to the merits of this dispute, including Respondents' obligations to repay the Advances under the ECAs. (Ex. CE-69) CIMC Raffles is appealing the Court's decision. (Cl. P-H Sub. ¶41)

**The Issues**

62. The issues before this Tribunal arise under the ECAs – nothing else.  We have no jurisdiction over, and offer no view as to the merits of, any claims or counterclaims that are the subject of the London Arbitrations or the London High Court proceeding.  Those claims and counterclaims arise under different contracts, are governed by different substantive law, and are to be resolved under different dispute resolution clauses.  We have no power, and no intention, to try to address any of those claims or their underlying factual issues.  Similarly, those London tribunals/courts have no jurisdiction over claims that arise under the ECAs.  Those are solely our responsibility.  (Tr., p. 52)

63. According to Claimants, the ECAs are clear and unambiguous.  Claimants are right in this regard.

64. Article 2 required CIMC Raffles, under certain conditions, to "make one or more unconditional and unsecured consecutive monthly advances to Sea Biscuit . . . up to an aggregate amount of US$50,000,000."

65. Article 4 provided Sea Biscuit the option either to repay CIMC Raffles its Advances plus interest or, if it was able to obtain consents from the Consenting Parties within the Consent Period, "convert the aggregate amount of all [BDL/SDL] Advances into newly issued equity in [BDL/SDL]."  Article 4 explicitly conditioned the conversion on the consent of the Consenting Parties, and it required Sea Biscuit to repay CIMC Raffles, with interest, if such consent was not granted.

66. Article 3 made CIMC Raffles a primary obligor, jointly and severally liable to Respondents for the "obligations of the Builders to provide the [SDL/BDL] Advances and (if applicable) pay interest for any late payment thereof . . . ."  It also made Schahin Holding and Schahin Engenharia primary obligors, jointly and severally liable to Claimants for the "punctual payment and performance by Sea Biscuit and Black Gold of their obligations to perform the Equity Conversion or repay the [BDL/SDL] Advances under this Agreement, including the prompt payment in full when due of such obligations."  CIMC Raffles executed its obligations under the ECAs by loaning the Schahin Entities a total of US$66,125,587 over the course of seven months.  It made these payments in full and on time, as reflected in CIMC Raffles' bank receipts and Respondents' accounting and auditing records.

67. On December 31, 2010 and April 25, 2011, Sea Biscuit notified CIMC Raffles of its intention to convert the SDL and BDL Advances into equity.  (Exs. C-28, C-

32) On January 4, 2011 and April 25, 2011, Respondents sent letters to Petrobras and the Administrative Agents of their credit agreements seeking their consent for the conversions. (Exs. C-29, C-30, C-31) Respondents acknowledge that the Bank lenders did not respond. (Ex. CE-35 at 18:14-20:2) Respondents further acknowledge that accordingly the loans had to be repaid. (Ex. CE-35 at 14:26 – 15:9)

68. None of the above is contested. Instead Respondents assert that the ECAs and the Shipbuilding Contracts are "inextricably connected" because the ECAs were compensation for defaults and damages arising from the Shipbuilding Contracts. Therefore, Respondents argue, their obligations to repay the Advances are subject to the defense of set-off against the damages for which they have counterclaimed in the London Arbitrations. In the alternative, Respondents ask this Tribunal to exercise its equitable power to simply stay this proceeding until judgments are rendered in the London Arbitrations, at which time a "full accounting of the monies between the parties can be achieved." (Resp. Sur-Reply ¶¶ 14-16.) We address each argument in turn.

## Set-Off

69. "The right to offset one's debts against corresponding debts owed a debtor was stated as early as 1675 in Anonymous, 86 Eng. Rep. 837, [K.B.]." In Re Prudential Lines, Inc. 148 B.R. 730 (Bankr. S.D.N.Y 1992). Today, New York law recognizes both statutory and equitable set-off. *Id.* (citing New York Debtor and Creditor Law 151 (McKinney's 1991 Supp.) In addition, New York courts will enforce a contractual right to set-off even if the requirements for statutory or equitable set-off have not been met. Bank of New York v. Meridien BIAO Bank Tanzania, Ltd., No. 95 Civ. 4856, 1997 WL 53172, at *4 (S.D.N.Y. Feb 10, 1997) (Sotomayor, J.)

70. Respondents do not rely on a contractual right to set-off presumably because they can point to no set-off provision in any of the pertinent written agreements. (Resp. Sur-Reply ¶40.) Indeed, one set of agreements – the side letters to the ECAs – explicitly obligates Respondents to repay the advances made by Claimants under the ECAs, together with interest, without any deduction "by way of set off, retention, counterclaim or otherwise howsoever." (Exs. C-17, p.5, ¶7; C-18, p.5, ¶7)

71. While one might conclude that the explicit terms of the side letters end the discussion, Respondents maintain that set-off is nevertheless appropriate under equitable principles. It is true that set-off is available in equity as a matter of the

exercise of the Tribunal's discretion. W. Seventy-Ninth St. Assocs. V. Levi, Inc., 141 Misc. 2d 830, 832, 535, N.Y. S. 2d 325, 327 (Civ. Ct. 1988). But that discretion is not unmoored from general principles of the law of set-off (whether equitable or statutory), that require (a) that claims, to be applied against each other, must be mutual, and (b) that, while a Respondent's claim may be unmatured, it may not be contingent. Beecher v. Vogt Mfg. Co. 227 N.Y. at 468, 473 (1920)(Cardozo, J.). Trojan Hardware Co. v. Bonacquisti Construction Corp., 141 A.D. 2d278 (3d Dept. 1988). Respondents' claims in the London Arbitrations fail on both counts.

72. To qualify as mutual, claims must be "due to and from the same persons in the same capacity." *Id.* In the present case, however, four of the six Respondents have no claims in the London Arbitrations. They act functionally as guarantors and have no legal or equitable grounds for seeking a set-off for themselves.

73. With respect to the two remaining Respondents – BDL and SDL – their claims are clearly mutual, but they are as clearly contingent. A contingent liability is one "marked by uncertainty as to whether any obligation will ever arise." In Re Prudential Lines, 148 B.R. at 752. While we express no view on the merits of Respondents' claims in London, we may comfortably state that it is "uncertain" whether any obligation will ever arise.

74. Respondents are correct that, as a matter of discretion, the Tribunal could in certain circumstances relax the requirements for application of the doctrine of set-off. But courts rarely do so and reported decisions appear to be limited to cases involving insolvency or, perhaps unsurprisingly, cases recognizing the priority of attorney's liens over set-off claims (*see,* e.g., Beecher v. Vogt, 227 N.Y. at 473-74.). That exceptions to the rule are rare reflects the fact that the twin requirements of mutuality and non-contingency themselves reflect equitable considerations. After all, in the absence of their application, almost any cross-border respondent could delay entry of judgment by the assertion elsewhere of a dubious set-off claim. Accordingly, after due consideration, we reject Respondents' set-off argument.

## Stay

75. Apparently sensitive to the weakness of their set-off position, Respondents focus on their request for a stay of this matter pending resolution of the London Arbitrations. (Tr. at 122-25) While the authorities are less precise as to what factors should guide the Tribunal's exercise of discretion on this issue, our examination indicates that the equitable considerations are more or less the same. If a set-off is denied or a stay not entered, Respondents are exposed to the risk

that they will prevail in London—at least on a relative basis—and then be unable either to recoup payments made in this proceeding or to collect on an affirmative award in London. This concern appears compelling if one goes no further than the authority relied upon by Respondents. *See* Arthur Anyuan Yuan, Enforcing and Collecting Money Judgment in China from a U.S. Judgment Creditor's Perspective, 36 Geo. Wash. Int'l L. Rev. 757. 758 (2004). However, this was a risk knowingly assumed by Respondents when they entered into the ECAs, which provide for a dispute resolution procedure and a governing law different from that provided in the Shipbuilding Contracts. And that risk was even more explicitly assumed by Respondents when they executed the side letter agreements, which expressly waive any right to set-off. While a Tribunal might stay its hand to forestall unforeseen consequences, it ought not act to alter a bargain intentionally struck. Nor are we persuaded that any possible inefficiencies are sufficient to justify a stay under these circumstances. Finally, while Respondents have identified the possibility of an inequitable result, they have hardly established that such an injury is likely. As noted, the Tribunal expresses no opinion on the merits of Respondents' claims in London, but the absence of such evidence weighs against Respondents in this proceeding, as they have the burden to establish the right to a set-off or, alternatively, the necessity or equity of a stay.

76. In sum, we conclude that the literal terms of the ECA Agreements, read with the side letters, are clear and unambiguous, and that Claimants have demonstrated their entitlement to the relief requested. Although there is something to be said in favor of the equitable considerations emphasized by Respondents, it would be unfair to delay Claimants' entitlements and to place them continuously at risk for the two plus years that the London Arbitrations will be pending. That is why we raised the subject of a bond or some other form of security at the close of the hearing:

> "THE CHAIR: What is your view about an award but a stay of the enforcement of the award of $65 million providing you bond it?
>
> JUDGE HOLWELL: You took the words out of my mouth.
>
> MR. HESSLER: My view is that's the second best result that you could reach but that it's far preferable to an award that, you know, requires a payment now where we think we have a very substantial payment coming back in the not distant future.
>
> JUDGE HOLWELL: The reality is that a stay is ultimately a matter of discretion and equity for the decision makers. One issue in equity is the

one that Mr. Rivkin raises about, well, if we don't get bonded on it then it's just going to put us back another year in chasing the money.

MR. HESSLER: Right

JUDGE HOLWELL: So to the extent that your client's prepared to offer security, that may not be outcome determinative, but certainly is a fact here that we should consider. You don't have to tell us now. You can write a letter.

MR. HESSLER: Fair enough.

JUDGE HOLWELL: Feel free to." (Tr., pp. 257-58)

77. By letter dated November 14, 2012, Respondents advised that they would look favorably upon providing security for any judgment amount the Tribunal might award if the Tribunal stayed enforcement of that judgment pending the completion of the London Arbitrations. However, Respondents' second letter of November 15, 2012 made clear that the period of stay could run through 2014 or even beyond. That is a bridge too far, even were the Tribunal minded to stay enforcement upon the posting of security.

78. Moreover, at this late date any security provided by Respondents should be subject to the reasonable approval of Claimants. In light of the contractually imposed deadline of January 3, 2013 for the completion of this arbitration and the issuance of our award, there simply is not time for negotiations between Respondents and Claimants over the terms of the security, and our resolution of the inevitable disagreements, to take place. Obviously, once the Award is in place, the parties can still negotiate whatever resolution they wish, involving the provision of security or otherwise. But in the meantime, Claimants are entitled to the relief sought.

**Costs and Attorneys Fees**

79. Article 22.2 of the ECAs provides that the Parties shall bear their own legal fees and that the costs, fees, and expenses of the arbitrators shall be shared equally. In their Statement of Defense, Respondents requested an award granting "Respondents their costs and expenses, including attorneys' fees . . . ." (Resp. St. of Defense, ¶ 25) Claimants then purported to accept what they characterized as an offer to renegotiate the terms of Article 22.2 and to allow attorneys' fees and other costs to be awarded to the prevailing party. (Cl. Reply to Statement of

Defense, ¶ 24; Cl. P-H Sub., ¶ 93) Respondents responded that their request was not a renegotiation of Article 22.2's terms. (Resp. Mem. ¶ 44)

80. Accordingly, the terms of Article 22.2 are to be applied, and the Parties are to bear their own legal fees and share arbitration costs equally.

## AWARD

81. Therefore, the Tribunal hereby AWARDS as follows:

    1. Claimants' total entitlement from all Respondents is US$43,980,382 for the repayment of Advances made under the BDL ECA plus interest through December 31, 2012 in the amount of US$2,113,645.32, US$22,145,205 for the repayment of Advances made under the SDL ECA plus interest through December 31, 2012 in the amount of US$1,231,545.09, for a total of US$66,125,587 for Advances plus US$3,345,190.41 in interest or US$69,470,777.41. Responsibility for this total amount is allocated among the Respondents as follows:

        a. BDL shall repay the Advances in the amount of US$43,980,382 and shall also pay interest in the amount of US$2,113,645.32 on the US$43,980,382 in Advances, calculated in accordance with the BDL ECA from the date each Advance was made through December 31, 3012, at a rate per annum equal to two percent above the 6-month LIBOR rate applicable to each advance;

        b. SDL shall repay the Advances in the amount of US$22,145,205 and shall also pay interest in the amount of US$1,231,545.09 on the US$22,145,205 in Advances, calculated in accordance with the SDL ECA from the date each Advance was made through December 31, 2012, at a rate per annum equal to two percent above the 6-month LIBOR rate applicable to each advance.

        c. Any amounts described in subparagraphs a and b above not paid within thirty (30) days from the date of transmittal of this Final Award to the Parties shall accrue interest at the rate of 9% per annum starting January 1, 2013.

    2. In the event, and to the extent, Respondents BDL and/or SDL do not make the payments directed in subparagraph 1 above, Respondents other than BDL and SDL shall make those payments or pay any shortfall in the payments in fact made by Respondents BCL and SDL.

    3. Claimants and Respondents are to bear their own attorneys' fees and expenses, and are to share all arbitration costs equally. In particular, the administrative fees of the International Centre for Dispute Resolution

(ICDR), totaling US$26,412.56, and the fees and expenses of the Tribunal totaling US$127,996.00 shall be borne equally by the Parties. Therefore, Respondents shall, jointly and severally, reimburse Claimant CIMC Raffles Offshore (Singapore) Limited the sum of US$13,206.28, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant CIMC Raffles Offshore (Singapore) Limited.

4. This Final Award is in full settlement of all claims submitted in this Arbitration.

We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, U.S.A.

Dated: December   , 2012

_____
Rayner M. Hamilton

_____
Paul Friedland

_____
Richard J. Holwell

22

State of Florida
　　　　　　　　　　　} SS:
County of Lee

On this ___24th___ day of  December 2012 before me personally came and appeared Rayner M. Hamilton, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

DATED:  December 24 2012

DANIELLE R. ROBBINS
NOTARY PUBLIC
STATE OF FLORIDA
Comm# EE010796
Expires 7/21/2014

_____
　　　　　　　　　　　　　Notary Public

_____
My Commission Expires

State of New York
　　　　　　　　　　　} SS:
County of New York

On this _____ day of December 2012 before me personally came and appeared Paul Friedland, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

DATED: December   , 2012

_____
　　　　　　　　　　　　　Notary Public

_____
My Commission Expires

23

State of New York

County of New York

}

On this _____ day of December 2012 before me personally came and appeared Richard J. Holwell, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

DATED: December   , 2012

_____

Notary Public

_____

My Commission Expires

State of New York        )
                         )        ss.:
County of New York       )


On this 21st day of December 2012 before me personally came and appeared Richard J. Holwell, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.


DATED:  December 21 2012


_____
        Richard J. Holwell


_____
        Notary Public


My Commission Expires

MARIA A CASALI
Notary Public, State of New York
No. 01CA4700559
Qualified in New York County
Commission Expires Sept. 30, 2013

(ICDR), totaling US$26,412.56, and the fees and expenses of the Tribunal totaling US$127,996.00 shall be borne equally by the Parties. Therefore, Respondents shall, jointly and severally, reimburse Claimant CIMC Raffles Offshore (Singapore) Limited the sum of US$13,206.28, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant CIMC Raffles Offshore (Singapore) Limited.

4. This Final Award is in full settlement of all claims submitted in this Arbitration.

We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, U.S.A.

Dated:  December 26, 2012

_____
Rayner M. Hamilton

_____
Paul Friedland

_____
Richard J. Holwell

 **International Centre for Dispute Resolution**

Thomas Ventrone
Vice President

1633 Broadway, 10th Floor, New York, NY 10019
telephone: 212-484-4181 facsimile: 212-246-7274
internet: http://www.adr.org/ICDR

December 28, 2012

**VIA ELECTRONIC MAIL AND FEDEX**

David W. Rivkin, Esq.
Nwamaka Ejebe, Esq.
Robert A. Holmes, Esq.
Debevoise & Plimpton, LLP
919 3rd Avenue
New York, NY  10022

Paul Hessler, Esq.
Michael Bassett, Esq.
Linklaters, LLP
1345 Avenue of the Americas
19th Floor
New York, NY  10105

Re: 50 148 T 00348 12
    CIMC Raffles Offshore (Singapore) Limited
    Yantai CIMC Raffles Offshore Limited
    vs
    Schahin Holdings S.A., Schahin Engenharia, S.A.
    Sea Biscuit International Inc.
    Black Gold Drilling LLC, Baerfield Drilling LLC
    Soratu Drilling LLC

Dear Parties:

By direction of the Panel we herewith transmit to you the duly executed Award in the above matter. This serves as a reminder that there is to be no direct communication with the Arbitrators. All communication shall be directed to the Association.

At this time we have verified with the arbitrators that they have submitted all requests for compensation and expenses in this matter. Accordingly, we have conducted a final reconciliation of the finances and are providing each party with a Financial History. If a party had any unused compensation deposits, we have issued a refund check that should arrive in the mail shortly.

Please be advised that, per ICDR Case File Document Retention and Destruction Policy, all files and related documents will be destroyed **twenty-four (24) months** from the date of this letter. The ICDR will retain a separate copy of the Award. In the normal course of our administration, the AAA may maintain

certain documents in our electronic records system.  Such electronic records are not routinely destroyed and do not constitute a complete case file.

Thank you for using the services of the International Centre for Dispute Resolution, a worldwide leader in dispute resolution.

Sincerely,

/s/

Carmen Preda
International Case Manager
212 484 4151
PredaC@adr.org

Miroslava Schierholz
ICDR Supervisor
212-484-3270
SchierholzM@adr.org

cc:    Paul Friedland, Esq.
        Hon. Richard J. Holwell
        Rayner M. Hamilton, Esq.