**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CIMC RAFFLES OFFSHORE (SINGAPORE) LTD. and YANTAI CIMC RAFFLES OFFSHORE LIMITED, | |
| Petitioners, | Case No. 13 Civ. 0052 (JSR) |
| v. | |
| SCHAHIN HOLDING S.A., SCHAHIN ENGENHARIA S.A., SEA BISCUIT INTERNATIONAL INC., BLACK GOLD DRILLING LLC, BAERFIELD DRILLING LLC AND SORATU DRILLING LLC, | |
| Respondents. | |

**DECLARATION OF JARED BRENNER IN SUPPORT OF PORTIGON AG'S MOTION FOR RELIEF FROM PETITIONERS' ENFORCEMENT ACTIONS AND IN PARTIAL OPPOSITION TO PETITIONERS' MOTION FOR POST-JUDGMENT ENFORCEMENT PURSUANT TO FED. R. CIV. P. 69.**

I, Jared Brenner, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

1.     I am the Executive Director for movant Portigon AG, New York Branch (f/k/a WestLB AG, New York Branch) ("Portigon"). I have been employed by Portigon and its predecessor entities since 1990. All facts set forth in this declaration are based on my personal knowledge and my understanding of relevant documents. If called upon to testify, I would testify competently to the facts set forth in this declaration.

2.     I submit this declaration in support of Portigon's Motion for Relief from Petitioners' Enforcement Actions and in Partial Opposition to Petitioners' Motion for Post-Judgment Enforcement Pursuant to Fed. R. Civ. P. 69.

3.     This dispute arises out of a transaction for the construction, chartering, and operation of two semi-submersible deep-water oil exploration vessels (the "Project"), the S.S. Amazonia and the S.S. Pantanal (the "Vessels").

**The Relevant Parties**

4.     The relevant parties involved in the Project are as follows:

a.  Administrative Agent:  Portigon acts as the Administrative Agent for the Senior Lenders.

b.  BDL:  Baerfield Drilling LLC owns the S.S. Amazonia, which is flagged, mortgaged, and registered in Panama and is currently operating under contract with Petrobras (defined below) off the coast of Brazil.

c.  Borrower:  Respondent Black Gold Drilling LLC is a special-purpose entity.  BDL and SDL (defined below) are its wholly-owned subsidiaries.

d.  Borrower Subsidiaries:  BDL and SDL (defined below).

e.  Collateral Agent:  Deutsche Bank Trust Company Americas is the Collateral Agent and Depositary pursuant to an agreement between the Borrower and Portigon on behalf of the Senior Lenders, defined below.  (*See* Ex. A, Collateral Agreement at 1 (Preamble).)

f.  Brazilian Collateral Agent:  Deutsche Bank S.A. – Banco Alemao is the Brazilian Collateral Agent pursuant to an agreement between the Borrower and Portigon on behalf of the Senior Lenders, defined below.  (*See* Ex. A, Collateral Agreement at 1 (Preamble).)

g.  <u>Senior Lenders</u>:  Nineteen senior secured creditors of the Borrower

and the Borrower Subsidiaries.[1]

h.  <u>Operator</u>:  Respondent Schahin Engenharia S.A., a corporation

organized under the laws of Brazil, operates the Vessels.

i.  <u>Petrobras</u>:  Petróleo Brasileiro S.A. is a multi-national petroleum

and energy company that is organized under the laws of Brazil.

Petrobras charters the Vessels and contracts for services provided

in respect thereof.

j.  <u>Petitioners</u>:  CIMC Raffles Offshore (Singapore) Limited and

Yantai CIMC Raffles Offshore Ltd. provided construction services

in connection with the Vessels.

k.  <u>SDL</u>:  Soratu Drilling LLC owns the S.S. Pantanal, which is

flagged, mortgaged, and registered in Panama and is currently

operating under contract with Petrobras off the coast of Brazil.

**Background on the Transaction**

5.      In July 2006, the Operator, Borrower, and their affiliated entities

contracted with Petitioners for the construction of the Vessels.  In order to finance the

---

[1] The following entities are the "Senior Lenders": (1) Banco Bilbao Vizcaya Argentaria S.A.; (2) Banco Itau BBA International S.A., London Branch; (3) Unicredit - Bayerische Hypo- und Vereinsbank A.G.; (4) Caterpillar Financial Services Corporation; (5) China Development Bank; (6) Credit Industriel et Commercial; (7) Dexia Credit Local, New York Branch; (8) HSH Nordbank A.G.; (9) International Finance Corporation; (10) Intesa San Paolo, S.p.A., NY Branch; (11) KfW; (12) Mitsubishi UFJ Lease & Finance (USA) Inc.; (13) Mizuho Corporate Bank, Ltd.; (14) Nordkap A.G.; (15) Shinhan Bank, New York Branch; (16) Standard Chartered Bank; (17) Portigon; (18) Bank of China; and (19) Nomura Corporate Funding Americas LLC.  The senior secured class also includes certain hedge providers (lenders that provided interest rate protection swaps) that are also entitled to senior secured treatment under the transactional documents.

construction of the Vessels, the Senior Lenders loaned the Borrower $800,000,000

(approximately $600,000,000 of which remains outstanding).

6.      Pursuant to the terms of the loan, it was agreed that Petrobras would

charter the Vessels from BDL and SDL, the Operator would run the daily operations of the

Vessels and provide services to Petrobras under services agreements, and that the Senior Lenders

would be paid on their loan from the payments made by Petrobras under the charter contracts and

services agreements.  The payments received from Petrobras are the only material source of

revenue for the Project.

7.      It was further agreed that the Senior Lenders would be repaid on their loan

pursuant to an agreed upon schedule of payments of principal and interest.  As is customary in

this type of financing, the Senior Lenders and Borrowers agreed to strict controls over the funds

received by the Borrowers, Borrower Subsidiaries, or the Operator, including the revenue

payments from Petrobras.

8.      Specifically, these funds are restricted and may only be allocated

according to two account "waterfalls" established under the Collateral Agreement (the

"Waterfalls").  The Waterfalls specify what particular payments can be made and in what

amounts.  (Amended and Restated Collateral Agency and Security Deposit Agreement among

the Borrower, BDL, SDL, Portigon, the Collateral Agent, Deutsche Bank S.A.—Banco Alemão,

and Schahin Engenharia S.A., dated as of December 18, 2009 (the "Collateral Agreement") Arts.

IV-V, annexed hereto as Exhibit A.)  The Collateral Agent was required to (and did) establish

certain separate segregated accounts in the name of the Borrower and in the name of each

Borrower Subsidiary, as applicable, and controlled by the Administrative Agent via the

Collateral Agent in New York (the "Offshore Project Accounts")[2] and the Brazilian Collateral

Agent was required to (and did) establish certain separate segregated accounts in the name of the

Operator in Brazil (the "Onshore Project Accounts") and, together with the Offshore Project

Accounts, the "Project Accounts").[3]  (Ex. A, Collateral Agreement §§ 2.02, 2.03.)

        9.     The Onshore Project Accounts are denominated in Brazilian Reais and the

Offshore Project Accounts are denominated in US Dollars.  Each of the Onshore and Offshore

Project Accounts is subject to a separate Waterfall establishing a priority of payments.

        10.    Every penny (and Brazilian centavo) of revenue related to the Project is

paid into the applicable Offshore BDL Revenue Account and Offshore SDL Revenue Account, if

denominated in US Dollars, and the applicable Onshore BDL Revenue Account and Onshore

SDL Revenue Account, if denominated in Brazilian Reais.  Those funds then flow through the

Waterfalls into the various Project Accounts each month, as mandated by the Collateral

---

[2] The Offshore Project Accounts are named as follows: (1) BDL Construction Account; (2) SDL Construction Account; (3) Offshore BDL Revenue Account; (4) Offshore SDL Revenue Account; (5) BDL Mobilization Fee Account; (6) SDL Mobilization Fee Account; (7) Offshore Revenue Account; (8) BDL Offshore Operating Account; (9) SDL Offshore Operating Account; (10) BDL Offshore Capital Expenses Account; (11) SDL Offshore Capital Expenses Account; (12) Interest Payment Account; (13) Principal Payment Account; (14) BDL Loss Proceeds Account; (15) SDL Loss Proceeds Account; (16) BDL Delay Insurance Proceeds Account; (17) SDL Delay Insurance Proceeds Account; (18) BDL Debt Service Reserve Account; (19) SDL Debt Service Reserve Account; (20) BDL Interest Expense Escrow Account; (21) SDL Interest Expense Escrow Account; (22) BDL Offshore Operating Reserve Account; (23) SDL Offshore Operating Reserve Account; (24) BDL Offshore Operating Escrow Account; (25) SDL Offshore Operating Escrow Account; (26) BDL Target Balance Account; (27) SDL Target Balance Account; (28) Offshore BDL Suspension Account and Offshore SDL Suspension Account; (29) Offshore Distribution Account; (30) BDL Penalties Escrow Account; and (31) SDL Penalties Escrow Account. )Ex. A, Collateral Agreement, Art. IV.)

[3] The Onshore Project Accounts are named as follows: (1) Onshore BDL Revenue Account; (2) Onshore SDL Revenue Account; (3) Onshore Revenue Account; (4) BDL Onshore Operating Account; (5) SDL Onshore Operating Account; (6) BDL Onshore Capital Expenses Account; (7) SDL Onshore Capital Expenses Account; (8) BDL Onshore Operating Reserve Account; (9) SDL Onshore Operating Reserve Account; (10) BDL Onshore Operating Escrow Account; (11) SDL Onshore Operating Escrow Account; (12) Onshore BDL Suspension Account and Onshore SDL Suspension Account; and (13) Onshore Distribution Account.  (Ex. A, Collateral Agreement, Art. V.)

Agreement.  Approximately 90% of BDL Revenue and 60% of SDL Revenue (revenue associated with the charter contracts) pass through Offshore Project Accounts' waterfall and approximately 10% and 40%, respectively, (revenue associated with the service agreements) pass through the Onshore Project Accounts' Waterfall.

11.     The majority of the Project operating expenses are paid from the Brazilian Onshore Project Accounts.  In a normal month, only roughly $1-2 million in operating expense reimbursements are paid through the Offshore Project Accounts in New York.

12.     The Waterfalls are designed to protect the Senior Lenders by ensuring that, before the Borrower is entitled to utilize any funds to pay certain subordinate obligations, all revenue generated from the Project is used for principal and interest payments to the Senior Lenders, to fund the continued operation of the Vessels, and to reserve required amounts of funds in respect of future principal and interest and operating expenses.  The funds paid in consideration for the operation of the Vessels are critical in protecting the continued operation of the Project and the continued receipt of charter payments and other revenue used to pay principal and interest on the Senior Loan.

13.     Importantly, to date, the only Waterfall payments released to the Borrower or Operator or any of its affiliates have been for operating expenses and capital expenses for the Vessels, and no money has been released as dividends to the Borrower.

14.     As further assurance that their loan would be repaid, the Senior Lenders also received certain collateral from the Borrower, Borrower Subsidiaries, and Operator. Relevant to this dispute, the Senior Lenders received collateral in all of the income generated by the charter contracts and services contracts with Petrobras related to the Vessels as well as all of

the assets and equipment of the Borrowers and the Borrower Subsidiaries, and the proceeds thereof.[4]

15.     In order to execute the loan, and establish the Waterfall payments and the Senior Lenders' collateral interests, the Senior Lenders, Borrowers, and Borrower Subsidiaries entered into a series of agreements.  For purposes of this motion, the relevant agreements are: (i) the Collateral Agreement; (ii) the Amended and Restated Credit Agreement, dated as of December 18, 2009, among the Borrower, BDL, SDL, Bayerische Hypo-Und Vereinsbank A.G., Mizuho Corporate Bank Ltd., Standard Chartered Bank, Portigon, the Collateral Agent, Deutsche Bank S.A.—Banco Alemão and the Senior Lenders (the "Credit Agreement"), which is annexed hereto as Exhibit B; (iii) the Amended and Restated Pledge and Security Agreement, dated as of December 18, 2009, between the Borrower and the Collateral Agent, which is annexed hereto as Exhibit C (the "Pledge Agreement"); (iv) the Amended and Restated Security Agreement between BDL and the Collateral Agent, dated as of December 18, 2009 (the "BDL Pledge Agreement"), annexed hereto as Exhibit D; and (v) the Amended and Restated Security Agreement between SDL and the Collateral Agent, dated as of December 18, 2009 (the "SDL Pledge Agreement"), annexed hereto as Exhibit E.

**The Offshore Project Accounts and Waterfall**

16.     The funds entering the Offshore Project Accounts in New York are allocated in the following order to accounts earmarked for the purposes described below:

> a.  **First step**:  Interest payments to the Senior Lenders (Ex. A, Collateral Agreement § 4.12.);

---

[4] Schahin Engenharia also gave a security interest in respect of its interest in the Project, the Petrobras agreements, and the Onshore Accounts.

b. **Second step**:  Principal payments to the Senior Lenders (Ex. A, Collateral Agreement § 4.13.);

c. **Third step**:  Offshore operating expenses and capital expenses (such as payments to U.S. companies that provide services to the Vessels and are paid in U.S. dollars) (Ex. A, Collateral Agreement §§ 4.08-4.09 (operating expenses), 4.10-4.11 (capital expenses).); and

d. **Fourth step**:  Onshore operating expenses (i.e. Project funds are converted to Brazilian Reais to pay Brazilian service providers) (Ex. A, Collateral Agreement §§ 5.04-5.07.).

(Ex. A, Collateral Agreement 4.07(c).)

17.     There are a total of eleven steps in the Waterfall; however, as of the date hereof, no revenue has been allocated beyond the fourth step identified above.  That is to say, the Project payments from Petrobras have not generated sufficient revenue for the Borrower or Borrower Subsidiaries to have become entitled to receive any funds (other than those funds necessary to pay Project operating expenses and capital expenses) or to supplement the Senior Lenders' reserve accounts under the terms of the financing agreements.

18.     To be clear, no payments are permitted to the Borrower or the Borrower's owner on account of their equity interest in the form of dividends or otherwise in the Project until all the transfers and distributions in the Waterfall are paid in full and various conditions required for such a disbursement pursuant to the Credit Agreement are satisfied, including but not limited to no events of default, satisfaction of certain financial covenants and payment of all

reserve accounts at the required level for debt service and operating expenses.  (Ex. B, Credit Agreement §§ 8.12.)

19.     All payments of operating expenses and capital expenses made from the Waterfalls must be in accordance with an operating budget approved by Portigon.  (Ex. B, Credit Agreement § 8.21.)  The Operator is not entitled to receive more than 20% above the costs and expenses associated with operating the Vessels under the then-applicable operating budget as compensation for operating the Vessels. (Ex. B, Credit Agreement § 8.21.)

**The Borrower and Borrower Subsidiaries Cannot Assign or Transfer Funds From the Offshore Project Accounts**

20.     While the Offshore Project Accounts are established in the Borrower's or Borrower Subsidiaries' name, none of those parties are able to assign or transfer funds from those accounts.  The Collateral Agreement requires that "[a]ll amounts from time to time held in each [Offshore Project] Account shall be disbursed in accordance with the terms hereof shall constitute the property of the Borrower and shall be (A) subject to the Lien of the Collateral Agent (for the benefit of the Secured Parties), and (B) held in the sole custody and control of the Collateral Agent for the purposes and on the terms set forth in this Agreement and all such amounts shall constitute a part of the Collateral and ***shall not constitute payment of  . . . any other obligation of the Borrower***, unless and until applied thereto as contemplated hereby."  (Ex. A, Collateral Agreement § 2.02(a) (emphasis added).)

21.     Similarly, while the Onshore Project Accounts are established in the Operator's name, it is unable to assign or transfer funds from those accounts.  The Collateral Agreement requires that "[a]ll amounts from time to time held in each Onshore [Project] Account shall be disbursed in accordance with the terms hereof, shall constitute the property of the Operator, and shall be (A) subject to the Lien of the Brazilian Collateral Agent (for the

benefit of the Collateral Agent on behalf of the Secured Parties), and (B) held in the sole custody and control of the Brazilian Collateral Agent for the purposes and on the terms set forth in this Agreement and the Fiduciary Assignment Agreement and all such amounts shall constitute a part of the Collateral and ***shall not constitute payment of . . . any other obligation of the Borrower***, unless and until applied thereto as contemplated hereby."  (Ex. A, Collateral Agreement § 2.03(d) (emphasis added).)

        22.     Pursuant to the terms of the Collateral Agreement governing the Waterfalls, neither the Borrower, Operator, nor the Borrower Subsidiaries has authority to stop the operation of the Waterfalls or to transfer or assign assets in a manner inconsistent with the Waterfalls.  Section 3.02(b) of the Collateral Agreement provides that "neither the Borrower nor any applicable Borrower Subsidiary nor the Operator shall be entitled to request withdrawals or transfers of monies from any Account without having provided a Withdrawal/Transfer Certificate authorizing such withdrawal and/or transfer."  (Ex. A, Collateral Agreement § 3.02(b).)  If the Borrower's requested withdrawal "is inconsistent with, or otherwise fails to satisfy the requirements of, the provisions of [the Collateral] Agreement and the other Financing Documents," Portigon is required to either return the Withdrawal/Transfer Certificate or correct the Withdrawal/Transfer Certificate to conform to the agreed upon Waterfall distributions.  (*See* Ex. A, Collateral Agreement § 3.02(d)(i).)  Thus, any withdrawal or transfer is governed by the contractual agreements between the parties and subject to Portigon's control as agent for the Senior Lenders.

        23.     In addition, the Collateral Agreement expressly states that the Borrower, Borrower Subsidiaries, and the Operator have no right of withdrawal from the Project Accounts except as provided by agreement between the parties.  (Ex. A., Collateral Agreement § 3.10

("Except as specifically set forth in the Financing Documents, none of the . . . Operator, the Borrower, or any Borrower Subsidiary shall have any rights of withdrawal in respect of any [Project] Accounts.").)

24.     In sum, the Collateral Agent holds the Offshore Project Accounts and the Brazilian Collateral Agent holds the Onshore Project Accounts in order to ensure that all payments to the Senior Lenders and Operator are made as required by the Collateral Agreement. This control is a critical component of the protections negotiated by the Senior Lenders as part of their $800 million secured loan.  To be clear, neither the Borrower, nor the Operator, nor BDL, nor SDL has the authority or ability to assign, transfer, or withdraw funds from the Project Accounts without the express authorization of Portigon.

**The Pledged Collateral**

25.     The Collateral Agent holds collateral tendered by the Borrower and Borrower Subsidiaries in its possession, custody, and control for the benefit of the Senior Lenders and to secure the Borrower and Borrower Subsidiaries' obligations to the Senior Lenders.  The Collateral Agent acts as agent for the Senior Lenders and other secured parties. (*See* Ex. A, Collateral Agreement § 2.12 (The "rights and powers granted to the Collateral Agent . . . by the Secured Parties have been granted in order to, among other things, perfect their Lien in the Accounts and the other Account Collateral and to otherwise act as their agent with respect to the matters contemplated hereby.").)

26.     In this transaction, the Senior Lenders received a blanket lien over all assets of the Borrower and the Borrower Subsidiaries.  Among other things, the collateral includes contracts, government approvals, collateral accounts, all deposit accounts, all securities accounts, "all moneys due and to become due to the [Borrower] in respect of any . . . Equipment

. . . leased," instruments and chattel paper, inventory, equipment, "all other tangible and intangible personal property whatsoever of the" Borrower, all rights, claims and benefits of the Borrower, and "all other cash, products, offspring, rents, revenues, issues, profits, payment intangibles, royalties, income, benefits, [and] accessions" of the Borrower. (Ex. C, Pledge Agreement § 3.01(a)-(q); Ex. D, BDL Pledge Agreement § 3.01(a)-(p); and Ex. E, SDL Pledge Agreement § 3.01(a)-(p).)

27.    Significantly, the collateral held for the benefit of the Senior Lenders includes all of the shares of BDL and SDL (Ex. C, Pledge Agreement § 3.01(j) (including "Pledged Shares" in the meaning of "Pledged Collateral"), § 1.01 (defining "Pledged Shares"), Annex 8) and all funds in the Project Accounts. (Ex. C, Pledge Agreement § 3.01(c).)

### The Project Accounts

28.    Consistent with the Collateral Agreement, the Collateral Agent has, for the benefit of the Senior Lenders, filed Uniform Commercial Code ("U.C.C.") financing statements on the Borrower and Borrower Subsidiaries, which are annexed hereto as Exhibit F (the "Borrower U.C.C. Filing"), Exhibit G (the "BDL U.C.C. Filing"), and Exhibit H (the "SDL U.C.C. Filing"). Each such financing statement states that it covers "[a]ll assets of the Debtor whether now owned or hereafter acquired, and all proceeds thereof." (Ex. F, Borrower U.C.C. Filing at 1; Ex. G, BDL U.C.C. Filing at 1; and Ex. H, SDL U.C.C. Filing at 1.) Therefore, the U.C.C. filings are in respect of all assets of the Borrower, including the Project Accounts and Stock Certificates.

29.    In order to perfect the Senior Lenders' security interests, the Collateral Agent also has "control" over the Project Accounts for purposes of the U.C.C. (Ex. A, Collateral Agreement § 2.05.) Specifically, the Collateral Agreement states:

> [T]he Collateral Agent shall have "control" (within the meaning of Section 8-106(d)(2) or Section 9-104(a) (as applicable) of the UCC) of the [Project] Accounts and the Operator's, Borrower's, BDL's and SDL's "security entitlements" (within the meaning of Section 8-102(a)(17) of the UCC) with respect to the Financial Assets credited to the Accounts. All property delivered to the Depositary pursuant to this Agreement will be promptly credited to the applicable Account. Each of the Operator, Borrower, BDL and SDL hereby irrevocably directs, and the Depositary (in its capacity as securities intermediary) hereby agrees, that the Depositary will comply with all instructions and orders (including entitlement orders within the meaning of Section 8-102(a)(8) of the UCC) regarding each [Project] Account and any Financial Asset therein originated by the Collateral Agent without the further consent of the Operator, the Borrower, BDL, SDL or any other Person.

(Ex. A, Collateral Agreement § 2.05.)

30.     Accordingly, the Collateral Agent controls the Offshore Project Accounts and the Brazilian Collateral Agent controls the Onshore Project Accounts solely in their capacity as agents to the Senior Lenders (and other Secured Parties).   (Ex. A, Collateral Agreement § 2.12 ("The rights and powers granted to the Collateral Agent and Brazilian Collateral Agent by the Secured Parties have been granted in order to, among other things, perfect their Lien in the [Project] Accounts and the other Account Collateral and to otherwise act as their agent with respect to the matters contemplated hereby.").)

31.     In fact, each of the Borrower and Borrower Subsidiaries pledged and transferred "to the Collateral Agent (for the benefit of the [Senior Lenders]) . . . a Lien on all of [its] rights, titles and interests in, to and under" the Project Accounts and "all cash, instruments, investment property, securities, 'security entitlements' . . . and other Financial Assets at any time on deposit. . . ."  (Ex. A, Collateral Agreement § 2.04(a)-(c).)  In short, the Senior Lenders have a security interest in the Project Accounts (and the cash in those accounts) that takes priority over unsecured obligations of the Borrower and Borrower Subsidiaries.

*Stock Certificates*

32.     All of BDL and SDL's membership certificates (the "Stock Certificates")

are in the custody of the Collateral Agent, for the benefit of the Senior Lenders.  Annexed hereto

as Exhibit I is a letter, dated October 29, 2007, that was countersigned on behalf of the Collateral

Agent to confirm that the Collateral Agent took possession of "the original membership

certificates for the equity interests" in the Borrower and the Borrower Subsidiaries.

33.     The Pledge Agreement states:

> As collateral security for the prompt and complete payment and
> performance when due (whether at stated maturity, by acceleration or
> otherwise) of all of the Secured Obligations, whether now existing or
> hereafter arising and howsoever evidenced, the [Borrower] hereby
> pledges, grants, assigns, hypothecates, transfers and delivers to the
> Collateral Agent (for the ratable benefit of the Secured Parties) a security
> interest in all of the [Borrower's] right, title and interest in, to and under
> the property identified below, in each case whether tangible or
> intangible, wherever located and whether now owned or hereafter
> acquired by the [Borrower] or in which the [Borrower] now has or at any
> time in the future may acquire any right, title or interest (collectively, the
> "Pledged Collateral"). . . .

(Ex. C, Pledge Agreement § 3.01.)

34.     Neither the Borrower nor the Borrower Subsidiaries are permitted to

assign or transfer the Stock Certificates.  (Ex. B, Credit Agreement § 8.13 ("Each Obligor shall

preserve and maintain good and valid title to, or rights in, the Collateral and its Property and

shall not create, incur, assume or suffer to exist any Lien on any of the Collateral or any of its

other Property, whether now owned or hereafter acquired. . . .").)

35.     If the court were nevertheless to order the turnover of the Stock

Certificates to Petitioners, it would constitute a change in control, triggering an event of default

that would permit the Senior Lenders to take any and all remedies available under the loan

documents and permitted by law, including foreclosure on the Pledged Collateral (including the

Stock Certificates).  (Ex. B, Credit Agreement §§ 1.01 (defining "Change in Control"), 9.01(r) (providing that a Change in Control constitutes an Event of Default).)

**The Restraining Notice**

36.     On or about April 4, 2013, the Collateral Agent received a restraining notice executed by David W. Rivkin (the "Restraining Notice"), which is annexed hereto as Exhibit J.  The Restraining Notice instructs the Collateral Agent that it is "forbidden to make or suffer any sale, assignment, transfer of, or any interference with any property in which [the Borrower], BDL or SDL have an interest" and that this restraint "also covers all property in which [the Borrower], BDL or SDL has an interest hereafter coming into your possession or custody, and all debts hereafter coming from you to the judgment debtors."  (Ex. J, Restraining Notice at 2.)

37.     Notably, the funds that have been restrained as a result of the Restraining Notice are funds that are to be paid by the Borrower and Borrower Subsidiaries to the Senior Lenders to cover certain debt service obligations.  As of April 4, 2013, the Offshore Project Accounts held the following amounts in the accounts referenced below:

        a.   BDL Debt Service Reserve Account: $18,413,453.31.

        b.   SDL Debt Service Reserve Account: $160,782.87.

        c.   Black Gold Offshore Revenue Account: $17,075.05.

**The Writs of Execution**

38.     On or about April 11, 2013, a U.S. Marshal served the Collateral Agent with three writs of execution (the "Writs") submitted by the Petitioner.  The Writs commanded that the Collateral Agent turn over to the U.S. Marshal goods and chattels from certain entities.

39.     Attached hereto as Exhibit K is the writ for the goods and chattels of Black Gold Drilling LLC and Soratu Drilling LLC in the amount of $23,774,475.07.

40.     Attached hereto as Exhibit L is the writ for the goods and chattels Black Gold Drilling LLC and Baerfield Drilling LLC in the amount of $46,878,257.21

41.     Attached hereto as Exhibit M is the writ for the goods and chattels of Black Gold Drilling LLC, Soratu Drilling LLC, and Baerfield Drilling LLC in the amount of $83,138.96.

**Events of Default**

42.     In the event of a default, the Project Accounts and the amounts therein, regardless of whether the Waterfall has run, are subject to Portigon's right (acting on the behalf of the Senior Lenders) to freeze the Project Accounts.  After freezing the Project Accounts, the Senior Lenders are further entitled to take the funds in any or all Project Accounts and apply the funds therein as instructed by the Senior Lenders (including for payment of the debt owed to the Senior Lenders), as a remedy for the default. (Ex. A, Collateral Agreement § 3.04.)

43.     There are currently outstanding default events—including, but not limited to, events of default arising from the Restraining Notice and the entry of Petitioners' judgments against the Borrower and its affiliated entities—with respect to the Project.  This subjects any funds maintained in the Project Accounts, including funds designated for operating expenses, to the Senior Lenders' ability to, at their discretion, freeze those funds and apply the funds to the Borrower and Borrower Subsidiaries' outstanding debt.

44.     Further, the Borrower or Borrower Subsidiaries have acknowledged and agreed pursuant to the Credit Agreement that they "shall preserve and maintain good and valid title to, or rights in, the Collateral and its Property and shall not create, incur, assume or suffer to

exist any Lien on any of the Collateral or any of its other Property, whether now owned or hereafter acquired, except [for such limited liens permitted pursuant to the Credit Agreement]." (Ex. B, Credit Agreement §§ 8.13.)  If any such a lien or encumbrance is attached to the collateral, the Borrower or Borrower Subsidiaries have the obligation to remove it, or else it is subject to the Senior Lenders' ability to declare default and resort to the remedies described in paragraph 42.  (Ex. B, Credit Agreement §§ 9.01(d) and (h).)

**The Continued Restraint of the Project Accounts Would Severely Prejudice the Senior Lenders**

45.      As with any large scale project financed by loans from a syndicate of international lenders, the uninterrupted movement of monies through the Project Accounts established as part of the transaction is critical to the successful and continued operation of the project and maintenance of the loan facilities.

46.      The restraint of the Project Accounts is currently preventing the operation of the Waterfall, which, among other things, means that the Senior Lenders cannot receive the payments to which they are entitled in connection with the approximately $600,000,000 loan that is currently outstanding.

47.      In addition, because of the restraint, Project operating and capital expenses cannot be paid as they become due.  The failure to pay these expenses will jeopardize the continued operation of the Vessels.  If operation ceases on the Vessels, Petrobras is entitled to suspend charter payments.  Furthermore, failure to operate for more than 60 days would grant Petrobras the right to terminate the charter contracts with BDL and SDL, thereby diminishing dramatically the value of the Senior Lenders' collateral security package.

48.      Any such disruption has the potential to disrupt the entire Project, which would make it impossible for the Project to generate the revenue necessary to pay the

$600,000,000 in outstanding principal and interest.  Moreover, any uncontrolled default and suspension of operation of the Vessels would threaten the Vessels themselves, which secure the Senior Lenders' ability to recover the $600,000,000 owed to them by the Borrower.  In that respect, I note that the Vessels are currently operating oil drilling rigs in Brazilian territorial waters by a Brazilian company for the benefit of another Brazilian company.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 14, 2013.

Jared Brenner