UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

CIMC RAFFLES OFFSHORE (SINGAPORE)
LTD. and YANTAI CIMC RAFFLES OFFSHORE
LIMITED,

                            Petitioners,

              v.                                              13 Civ. 0052 (JSR)

SCHAHIN HOLDING S.A., SCHAHIN                                 **ECF CASE**
ENGENHARIA S.A., SEA BISCUIT                                  **Electronically Filed**
INTERNATIONAL INC., BLACK GOLD
DRILLING LLC, BAERFIELD DRILLING LLC
and SORATU DRILLING LLC,

                            Respondents.

------------------------------------------------------------x

**OPPOSITION OF BLACK GOLD, BDL, AND SDL TO PETITIONERS'
MOTION FOR POST-JUDGMENT ENFORCEMENT PURSUANT TO
FED. R. CIV. P. 69 AND STATEMENT IN SUPPORT OF PORTIGON
AG'S MOTION FOR RELIEF FROM PETITIONERS'
<u>ENFORCEMENT ACTIONS</u>**

Respondents Black Gold Drilling LLC ("Black Gold"), Baerfield Drilling LLC ("BDL"), and Soratu Drilling LLC ("SDL") (collectively, "Respondents") respectfully submit this Memorandum in Opposition to Petitioners' Motion for Post-Judgment Enforcement Pursuant to Fed. R. Civ. P. 69 and Statement in Support of Portigon AG's[1] Motion for Relief from Petitioners' Enforcement Actions.

For the sake of efficiency and to avoid needless repetition, Respondents hereby incorporate by reference the relevant factual background and legal arguments advanced in Portigon's Motion.

## PRELIMINARY STATEMENT

Petitioners have attempted to restrain, levy and force the turnover of assets that Respondents do not control and cannot assign or transfer. Black letter law prohibits these attempts at post-judgment enforcement. If permitted, these actions would irreparably harm the senior, perfected interests of the Senior Lenders[2] and, ironically, most likely harm the Petitioners' collection interests by threatening the viability of the very Project from which income will be generated to satisfy their judgment.

The Senior Lenders provided $800,000,000 to finance the construction of two semi-submersible drilling rigs (the "Vessels"), and secured that investment by obtaining a senior security interest over the entire project financing structure, including the Project Accounts utilized by the Waterfalls and Black Gold's membership interests in BDL and SDL (the "Stock

---

[1]    Portigon AG, New York branch ("Portigon" or the "Administrative Agent"), brought its motion in its capacity as Administrative Agent for a group of lenders (together with Portigon, the "Senior Lenders"). The Senior Lenders are identified in footnote 1 of Portigon AG's Memorandum of Law in Support of Its Motion for Relief From Petitioners' Enforcement Actions and Limited Opposition to Petitioners' Motion for Post-Judgment Enforcement Pursuant to Fed. R. Civ. P. 69 ("Portigon's Motion").

[2]    Capitalized terms not otherwise defined herein have the meaning given them in Portigon's Motion.

Certificates"). Respondents are not able to assign or transfer either the Project Accounts (or proceeds), or the Stock Certificates.

As described in Portigon's Motion, the Project Accounts are funded by the revenue generated from operation of the Vessels, specifically from payments made by Petrobras, a petroleum and energy company that charters the Vessels. The payments made by Petrobras are the only source of revenue for the Vessels. The money received from Petrobras does not pass through the hands of the Respondents; rather, it is deposited directly into accounts in which the Senior Lenders have prior perfected security interests and that are held and controlled by the Collateral Agent. The funds flow through payment Waterfalls that distribute the funds according to specific contractual conditions and priorities. In the Offshore Project Accounts Waterfall, the priority of payments begins with interest and principal on the Senior Lenders' loan, after which the operating expenses of the Vessels are paid. Following other payments, such as to debt reserve accounts, a second, subordinate waterfall (the "Subordinated Waterfall") is run to service the subordinated debt facility established with an affiliate of Mitsubishi Corporation, MS Drillship I S.A. (the "Junior Lender"). Only after both waterfalls have run, so that the Senior Lenders, operating expenses, and the Junior Lender (together with the Senior Lenders, the "Lenders") have been paid, in that order, can any equity dividends be paid. To date, because of the harm inflicted on the Project due to Petitioners' defaults and the late delivery of the Vessels, no equity dividends have been paid.

Similarly, the Senior Lenders have possession and a prior perfected security interest in the Stock Certificates, which renders Black Gold unable to assign or transfer the Stock Certificates. Furthermore, even if the Stock Certificates were property against which a judgment could be enforced (and they are not), the Stock Certificates have an estimated value of $1.27

2

billion, which far exceeds the value of Petitioners' claims and makes their request for turnover facially unreasonable, and contrary to N.Y. C.P.L.R. ("CPLR") 5225's explicit limitation to limit turnover orders to assets of "sufficient value to satisfy the judgment."

By seeking to restrain the Project Accounts or to obtain turnover of the Stock Certificates, Petitioners have effectively asked this Court to shut down the normal operation of the Vessels. That would have dire consequences for all parties involved. As detailed in Portigon's Motion, the relief sought by Petitioners would effectively destroy the only avenue by which the Project generates revenue to repay the Lenders, and indeed, Petitioners themselves. Should the Project Accounts be restrained, the Stock Certificates turned over, or the Respondents themselves be restrained, the likely consequence is that the Vessels will cease operation, causing a default under the Petrobas charter agreements and a halt to the payments which go to repay the Lenders and (ultimately) the judgment owed to Petitioners. The more prudent course of action, which will result in both the Lenders and Petitioners receiving what they are owed, is to vacate the restraints sought by Petitioners so that the Waterfall payments may continue unimpeded, thus allowing for the continued and uninterrupted operation of the Vessels. The Respondents are willing to work with Petitioners and the Lenders to provide Petitioners, until the judgment is satisfied, with a lien on any profits that would be paid out from the Waterfalls (which is to say, money available over and above what is required to pay principal and interest to the Senior Lenders, operating expenses of the Vessels, and debt service to the Junior Lender).

## ARGUMENT

I. **NEITHER THE PROJECT ACCOUNTS NOR THE STOCK CERTIFICATES CONSTITUTE PROPERTY SUBJECT TO ENFORCEMENT AND THE LENDERS HAVE A PERFECTED SENIOR INTEREST IN BOTH**

As an initial matter, and as stated in Portigon's Motion, this Court is entitled under CPLR 5240 to "make an order denying, limiting, conditioning, regulating, extending or

3

modifying the use of any enforcement procedure," including the Petitioners' restraining notices and turnover requests. Consequently, this Court has the authority to vacate the restraining notices served on the Offshore Project Accounts held by Deutsche Bank Trust Company Americas, and to deny turnover of the Stock Certificates.

Contrary to Petitioners' Motion for Post-Judgment Enforcement, the Stock Certificates as well as the funds contained in the Offshore Project Accounts are not property subject to enforcement under CPLR 5201(b), and thus are not susceptible to restraint or levy. CPLR 5201(b) states that a money judgment may be enforced only against property "which could be assigned or transferred" by the judgment debtor. As set forth below, neither Black Gold, BDL, nor SDL have the right to assign or transfer the Project Accounts or any of the Stock Certificates.

A.     **Black Gold, BDL, and SDL Cannot Assign or Transfer Any Of The Project Accounts**

The Offshore Project Accounts held as collateral are not property against which a judgment may be enforced, due to the judgment debtors' inability to "secure, much less assign or transfer," the Project Accounts, or the funds therein. *Capital Ventures Int'l v. Argentina*, 280 F. App'x 14 (2d Cir. 2008) (collateral in security and pledge agreements was not property against which a judgment may be enforced, due to the judgment debtors' inability to "secure, much less assign or transfer," the funds therein).

In addition, parties other than the Senior Lenders have an interest in the Project Accounts. On February 21, 2008, Black Gold, with BDL and SDL as borrower subsidiaries and subsidiary guarantors, entered into a subordinated financing agreement with MS Drillship I S.A., known as the Subordinated Debt Facility Agreement (the "Subordinated Credit Agreement"). The Junior Lender was designated the administrative agent and Deutsche Bank Trust Company

4

Americas and Deutsche Bank S.A. the collateral agent and the Brazilian collateral agent, respectively. Declaration of Paul S. Hessler in Support of Opposition of Black Gold, BDL, and SDL to Petitioners' Motion for Post-Judgment Enforcement Pursuant to Fed. R. Civ. P. 69 and Statement in Support of Portigon AG's Motion for Relief from Petitioners' Enforcement Actions ("Hessler Decl.") Ex. A at Preamble.

Analogous to the Collateral Agency Agreement, the parties entered into a Collateral Agency and Security Deposit Agreement (the "Subordinate Agency Agreement") whereby the Collateral Agent is authorized to open subordinated offshore accounts on behalf of Black Gold, BDL, and SDL (collectively, the "Combined Offshore Project Accounts"). Hessler Decl. Ex. B at § 2.02. Due to the Junior Lender's subordinate interest, project revenues from Petrobras are run through the subordinated offshore accounts only after all of the Senior Lenders' accounts and the Operating Expense account have been funded in accordance with the provisions of the Collateral Agency Agreement. Hessler Decl. Ex. B at Article 4. Pursuant to the Subordinate Agency Agreement, the Junior Lender holds a lien in the Senior Lenders' account, as well as a first-priority lien in all of the Sub-Debt Borrower Accounts and any funds or proceeds therein. Hessler Decl. Ex. B at § 2.04(a)-(c) and (e). Consequently, both the Senior Lenders and the Junior Lender have a prior perfected security interest in the Combined Offshore Project Accounts and, therefore, CIMC cannot enforce a money judgment against the Combined Offshore Project Accounts. *Capital Ventures*, 280 F. App'x at 14.

Even if the Court were to find that the Offshore Project Accounts are property against which a money judgment may be enforced under CPLR 5201, CIMC would not be entitled to enforce its judgment against the accounts because of the Lenders' senior security interest in them. Although the Junior Lender has an interest junior to that of the Senior Lenders,

the prior perfected interest of the Junior Lender is still superior to any potential interest CIMC

may acquire as a judgment creditor. *See* U.C.C. § 9-322 (stating that a perfected security interest

takes priority over all unperfected security interests and subsequently perfected security

interests). New York courts have consistently held that a prior perfected security interest

remains superior to a judgment obtained against the debtor. *See* Portigon's Motion at n.21.

Thus, the Junior Lender's junior security interest in the Senior Lenders' accounts and its senior

security interest in the subordinated offshore accounts has priority over any judgment creditor

interest CIMC may obtain. *See Walmart Stores, Inc. v. First Am. Corp.*, No. 11 CIV. 7185

(PAE), 2012 WL 3957184 (S.D.N.Y. Aug. 30, 2012) (holding that a prior perfected security

interest that pre-dated a writ of garnishment was superior); *Travelers Cas. & Sur. Co. of Am. v.

Target Mech. Sys.*, 800 N.Y.S.2d 358 (Table), 2004 WL 3050798 (Sup. Ct. 2004) (stating that

financing statement perfected eighteen months prior to execution of judgment had superior

interest to settlement funds); *Indus. Comm'r of N.Y. v. Five Corners Tavern Inc. (In re Indus.

Comm'r of N.Y.)*, 393 N.E.2d 1005, 1009 (1979) (holding that where the debtor had borrowed

money with the accounts held as collateral, the bank's set-off rights as a perfected first in time

secured creditor took priority over the state's creditor interest, even though the bank's debt had

not yet matured).

**B.    The Stock Certificates Do Not Constitute Property Against Which CIMC
May Enforce Its Judgment**

Similar to the Project Accounts, the Stock Certificates cannot be assigned or

transferred by the judgment debtor, since they are currently in the possession of the Collateral

Agent and as such are not subject to enforcement under CPLR 5201(b).

Under the Amended and Restated Pledge and Security Agreement and the Pledge

and Security Agreement (For Subordinated Debt Facility), Black Gold "pledges, grants, assigns,

hypothecates, transfers and delivers to the Collateral Agent . . . a security interest in all of the [Borrower's] right, title and interest in, to and under the property identified below" including all "Pledged Shares", among other collateral.  Declaration of Jared Brenner in Support of Portigon AG's Motion for Relief from Petitioners' Enforcement Actions and in Partial Opposition to Petitioners' Motion for Post-Judgment Enforcement Pursuant to Fed. R. Civ. P. 69 ("Brenner Decl.") Ex. C at § 3.01; Brenner Decl., Ex. C at § 4.04(c)(i) (stating that the "Pledged Shares [shall] constitute at all times 100% of the total number of Shares of each Issuer [BDL and SDL] then outstanding owned by [Black Gold]"); Hessler Decl. Ex. C § 3.01; Hessler Decl. Ex. C § 4.04(c)(i).  Consequently, the Collateral Agent has, for the benefit of both the Senior Lenders and the Junior Lender, filed UCC financing statements for the Stock Certificates as well as established a perfected security interest through possession and control. *See* UCC §§ 9-310, 9-312(b), 9-314; Brenner Decl. Exs. F, G, and H.[3]  Put simply, the legal and beneficial interests in the Stock Certificates cannot be granted to Petitioners, as those interests have already been pledged to secure the Lenders.

Because Black Gold has transferred the Stock Certificates, as well as its interest in them, to the Collateral Agent, Black Gold no longer has the ability to assign or transfer the Stock Certificates—a requirement for property subject to enforcement under CPLR 5201(b). Consequently, similar to the Combined Offshore Accounts, since Black Gold is unable to assign or transfer interest in the Stock Certificates, the Court must prohibit their turnover to Petitioners.

Moreover, even if the Court should find that the Stock Certificates are assignable property under CPLR 5201(b), as discussed in Portigon's Motion and Section II(A), *supra*, the Senior and Junior Lenders have a first-in-time perfected security interest in the Stock Certificates

---

[3]     The Junior Lender's later-in-time perfection of its security interest in the Stock Certificates provides a junior perfected security interest below the Senior Lenders.

superior to any potential interest acquired by a judgment creditor like Petitioners.[4]  See Portigon Motion, fn. 21; *supra* Section II(A).  Accordingly, Petitioners should not be granted turnover of the Stock Certificates, because such a turnover would nullify the Lenders' superior security interest.

Lastly, Petitioners' request for the turnover of "all membership interests and ownership interest [Black Gold] holds in BDL and SDL" is grossly disproportional to the $70.8 million judgment Petitioners possess.  CPLR 5225 explicitly limits the turnover remedy to an amount of property  that "is of sufficient value to satisfy the judgment."  Petitioners do not attempt to limit their turnover request to that portion of Black Gold's membership interests in the Stock Certificates—valued at an estimated $1.27 billion—that would satisfy the judgment. *Contrast Gryphon Domestic VI, LLC v. APP Int'l Fin. Co., B.V.*, 836 N.Y.S.2d 4 (1st Dep't 2007) (Plaintiffs sought the turnover of "$68,179,703.97 money to satisfy the judgment, or alternatively, stock certificates of equivalent value.")  Petitioners' overbroad turnover request supports Portigon's statement that Petitioners' efforts only aim to place "maximum pressure on the judgment debtors by threatening their ability to do business and make good on their obligations to the Senior Lenders," and is not reasonably calibrated to achieve the relief that it seeks.  Portigon Motion at 21.  Indeed, Petitioners have previously been offered a bond to secure payment of the entire arbitration award, but that offer was summarily rejected, again demonstrating that Petitioners' true aim is not to secure payment of its judgment, but rather to disrupt the business of the Respondents.

---

[4]     The Portigon Motion also cites Article 8 of the U.C.C. and the Senior Lenders' interest as protected purchasers, Portigon Motion at pg. 23:  this applies in a like manner to the Junior Lender, which also gave value by lending money to Black Gold, BDL, and SDL.

**C.    Operating Expenses Must Continue to Run to Schahin Engenharia to Protect the Lenders' Security Interests**

The Court should deny Petitioners' attempt to halt payment of operating expenses from the Project Accounts to Schahin Engenharia. These payments represent non-capital expenses incurred as a result of the projects' normal operations, to pay necessary operating expenses such as salaries and wages, insurance costs, and electricity. If the Court does not modify the restraining notice on these accounts, such that operating expenses flow out of the waterfall to Schahin Engenharia, Petrobras is entitled to suspend charter payments, resulting in the cessation of operation of the Vessels. Brenner Decl. ¶ 47. Failure to operate for more than 60 days would grant Petrobras the right to terminate the charter contracts with BDL and SDL, jeopardizing the sole source of income for these drilling rigs and putting at risk the nearly $1.27 billion in value represented by the Vessels. Accordingly, Petitioners' proposed restraint is entirely disproportionate, not to mention inconsistent with the Lenders' Security Interest.

The disproportionate burden and potential for irreparable harm warrant the Court's exercise of its "broad discretionary power" under CPLR 5240 to issue a protective order to modify the restraint. Courts should employ CPLR 5240 "to prevent 'unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or the courts.'" *Guardian Loan Co. v. Early*, 392 N.E.2d 1240, 1242-43 (1979).[5] Courts have applied CPLR 5240 where, as here, the asset sought to be limited was the main source of income which could be used to satisfy the judgment. *See Moskin w. Midland Bank & Trust Co.*, 409 N.Y.S.2d 327 (Sup. Ct. 1978) (CPLR 5240 used to stay turnover of a seat on the New York Stock Exchange

---

[5]    Indeed, CIMC's own counsel has previously argued, citing to *Guardian*, that this Court should not enforce restraining notices which impose a far greater hardship on the party restrained than the potential benefit gained by the beneficiary of the restraint. *See* Memorandum of Law in Support of Motion to Enjoin LNC Investments, Inc. from Restraining the Airlines' Compliance with Foreign Law, *LNC Indus., Inc. v. Republic of Nicaragua*, No. 96 Civ. 6360, 2000 WL 34528534, ECF No. 58 (S.D.N.Y. Apr. 26, 2000).

where the seat was the sole source of income to pay off any judgments); *Tokio Marine & Fire Ins. Co. v. Rosner*, No. 02-CV-5065 (RJD), 2007 WL 437240, at *4 (E.D.N.Y. Dec. 10, 2007) (In balancing the equities, court invoked its protective powers, recognizing that enforcement would otherwise have caused substantial harm by effectively shutting down defendant's practice). The payment of the operating expenses to the Operator, Schahin Engenharia, is what drives the entire Waterfall by ensuring the continued operation and revenue generating potential of the two Vessels.

The essential nature of these operating expenses is evident by the fact that they are subordinated only to the Senior Lenders within the Waterfall; indeed, the operating expenses are senior to other *debt* interests within the project financing structure, in particular the Junior Lender, as well as other debt service accounts. This unique priority of payments highlights the importance of maintaining the operating expenses, particularly in light of the less intrusive means of enforcement available to Petitioners.

## CONCLUSION

For the reasons set forth above, Black Gold, BDL, and SDL respectfully request that the Court vacate the Restraining Notices and Writs of Execution imposed on the Respondents and the Combined Offshore Project Accounts, as well as deny Petitioners' request for the turnover of the Stock Certificates.

10

Dated:      New York, New York
            April 16, 2013

                                    Respectfully submitted,

                                    Linklaters LLP

                                    By:    /s/ Paul S. Hessler
                                    Paul S. Hessler
                                    Patrick C. Ashby
                                    Thomas G. Haskins, Jr.
                                    1345 Avenue of the Americas,
                                    New York, NY 10105
                                    Telephone:  (212) 903-9000
                                    Facsimile:  (212) 903-9100

                                    *Attorney for Respondents Black Gold Drilling
                                    LLC, Baerfield Drilling LLC, and Soratu
                                    Drilling LLC*