**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CIMC RAFFLES OFFSHORE (SINGAPORE) LIMITED, and YANTAI CIMC RAFFLES OFFSHORE LIMITED, | Civil Action No.:  1:13-cv-00052-JSR |
| Petitioners, | ECF Case |
| - against - | Hon. Jed S. Rakoff |
| SCHAHIN HOLDING S.A., SCHAHIN ENGENHARIA S.A., SEA BISCUIT INTERNATIONAL INC., BLACK GOLD DRILLING LLC, BAERFIELD DRILLING LLC, and SORATU DRILLING LLC, dfd | |
| Respondents. | |

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF CIMC RAFFLES' MOTION**
**FOR RULE 69 POST-JUDGMENT ENFORCEMENT, AND IN OPPOSITION TO**
**PORTIGON'S MOTION SEEKING TO LIFT RESTRAINING ORDERS AND**
**VACATE WRITS OF EXECUTION, AND TO ALLOW PAYMENTS TO SCHAHIN**

**SCHULMAN BLACKWELL LLP**
Dan J. Schulman
Christopher A. Blackwell
11 Broadway, Suite 615
New York, New York 10004
Tel:  (646) 688-5214
Fax:  (646) 304-1117
Email:  dschulman@schulmanblackwell.com
*Co-counsel for Petitioners*
*CIMC Raffles Offshore (Singapore) Limited and*
*Yantai CIMC Raffles Offshore Limited*

## <u>TABLE OF CONTENTS</u>

THE UNCONTESTED RELIEF SHOULD BE GRANTED…….…………………………2

PROCEDURAL BACKGROUND….……………………………………………….………2

FACTS…………..……….……….…….………..……………………………………….……4

ARGUMENT ..…………….…………………………………….………….….………7

   I.   The Court Should Allow Enforcement of Judgments
        Against Funds Released to Schahin Entities From the
        Project Accounts, and Against All Other Assets in Which
        Schahin Entities Have an Interest, Consistent with Controlling N.Y. Law...…….……..…7

           A.  CIMC Raffles Is Entitled to Seize Schahin's
                Contingent and Non-Vested Interests, as Well
                as Its Non-Contingent and Vested Interests.….……….….……….……7

           B.  Portigon's Motion Pursuant to CPLR 5240
                Seeking to Protect Schahin Entities, and to
                Bar Enforcement of CIMC Raffles' Judgment
                Is Legally and Factually Baseless …...…..……..….….…..……………10

           C.  All Facts Strongly Support Enforcement of Judgments.….…………..…….16

   CONCLUSION…………………………………………………………………......21

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## CASES

1.  <u>In re Adirondack Timber Enterprise, Inc.</u>,
    71 UCC Rep. Serv. 2d 722 (Bankr., N.D.N.Y. 2010)…....…..…….……....…….…......…….….7

2.  <u>Berkowitz v. Chavo Int'l Inc.</u>,
    144 A.D.2d 263, 533 N.Y.S.2d 86 (1st Dep't 1988) .............................................................7

3.  <u>Capital Ventures Int'l v. Republic of Argentina</u>,
    443 F.3d 214 (2d Cir. 2006)...................................................................................................10

4.  <u>Hotel 71 Mezz Lender LLC v. Falor</u>,
    14 N.Y.3d 303, 900 N.Y.S.2d 698 (2010) ........................................................................9, 10

5.  <u>Koehler v. Bank of Bermuda, Ltd.</u>,
    577 F.3d 497 (2d Cir. 2009).................................................................................................12

6.  <u>Koehler v. Bank of Bermuda, Ltd.</u>,
    12 N.Y.3d 533, 883 NY.S.2d 763, 911 N.E.2d 825 (N.Y. 2009) ..........................................12

7.  <u>Kolotron Systems, Inc. v. Casey</u>,
    118 A.D.2d 687, 500 N.Y.S.2d 36, <u>appeal dism'd</u>
    68 N.Y.2d 807, 506 N.Y.S.2d 1037, 498 N.E.2d 437 (1986)...............................................14

8.  <u>Midlantic National Bank/North v. Reif</u>,
    732 F. Supp. 354 (E.D.N.Y. 1990) .......................................................................................14

9.  <u>N. Mariana Islands v. Millard</u>,
    845 F. Supp.2d 579 (S.D.N.Y. 2012) (Rakoff, J.) ...............................................................12

## STATUTES

10.  Fed. R. Evid. 408 (2012)………….……….…......…….…......…………………….……………7

11.  N.Y. CPLR § 103……….……….…......…….…......……….…......……………….…….…..……12

12.  N.Y. CPLR § 105……….……….…......…….…......……….…......……………….…….…..……12

13.  N.Y. CPLR § 5239……….……….…......…….…......……….…......…………….…….…..……12

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

14.  N.Y. CPLR § 5240……………………………………………………...…10, 12, 13, 14

15.  N.Y.  Limit. Liab. Co. § 603 (2012)……………………………………….……..8

16.  N.Y.  U.C.C. § 8-102 (2012)………………………………………..…………7

17.  N.Y.  U.C.C. § 8-103 (2012)…………………………………………..…………8

18.  N.Y.  U.C.C. § 8-106 (2012)…………………………………..……………7

19.  N.Y.  U.C.C. § 9-104 (2012)…………………………………………..…………7

20.  N.Y.  U.C.C. § 9-401 (2012)…...…………………………………………8

21.  N.Y.  U.C.C. § 9-514 (2012)…...……………………………………………..…7

## <u>SECONDARY SOURCES</u>

22.  David Siegel, New York Practice § 486……..……..................…..........……....…..........…10

Petitioners CIMC Raffles Offshore (Singapore) Limited and Yantai CIMC Raffles Offshore Ltd. ("Petitioners" or "CIMC Raffles") respectfully submit this memorandum of law in further support of their motion to enforce the judgment (the "Enforcement Motion") rendered by this Court and entered by the Clerk on or about March 19, 2013 as against respondents Black Gold Drilling LLC ("Black Gold"), Baerfield Drilling LLC ("BDL") and Soratu Drilling LLC ("SDL") (collectively, "Judgment Debtors"), and in opposition to Portigon's motion—which has just been parroted in a filing by BDL, SDL, and Black Gold by their long-time counsel, Linklaters LLP.  Those papers solely address release of funds to Schahin Engenharia, and turnover of certain membership interests in two Delaware LLCs, BDL and SDL.

## The Uncontested Relief Should Be Granted

This Memorandum addresses the claims asserted in Portigon's papers, and the substantially similar papers filed by Schahin's counsel.  As a first order of business, however, the Court should enter Orders granting key relief sought by CIMC Raffles, which is wholly unopposed:

 (i)  the Court should enter an Order, as requested in the Enforcement Motion, directing BDL, SDL, and Black Gold to bring in assets into New York to fully pay and discharge the outstanding judgments;

 (ii)  the Court should also enter the judgments sought as against Schahin Holding S.A. ("Schahin Holding"), Schahin Engenharia S.A. ("Schahin Engenharia"), and Sea Biscuit International, Inc.

## Procedural Background

Petitioners, CIMC Raffles, are judgment creditors, with judgments totaling approximately $70.8 million, plus post-judgment interest, as against Black Gold Drilling LLC

("Black Gold"), Baerfield Drilling LLC ("Baerfield" or "BDL"), and Soratu Drilling LLC ("SDL" or "Soratu").

On April 9, 2013, CIMC Raffles filed two motions.

The first motion seeks entry of a judgment based on the New York Arbitration Award in the amount of $71,232,634.88, plus post-judgment interest,[1] jointly and severally, as against the other respondents, Schahin Holding S.A. ("Schahin Holding"), Schahin Engenharia S.A. ("Schahin Engenharia"), and Sea Biscuit International Inc. ("Sea Biscuit") (Respondents are collectively referred to as "Schahin" or "Schahin Entities").  Longtime counsel for all of the Schahin Entities, Linklaters LLP, has now appeared, albeit solely for BDL, SDL, and Black Gold, and has not opposed this relief.  Nor has Portigon opposed the relief.  And Schahin Holding, Schahin Engenharia, and Sea Biscuit remain in default.  The motion seeking entry of three new judgments is unopposed, and the Court should enter an Order granting this relief forthwith.

The second motion, for Rule 69 Post-Judgment Enforcement, seeks an Order that, in the first instance, directs Black Gold, BDL, and SDL to bring in funds into New York to pay the existing judgments.  Linklaters has appeared for Black Gold, BDL, and SDL, and has not opposed entry of an Order granting this relief.  Judgment debtors solely object to turnover of membership certificates, and to enforcement by CIMC Raffles as against funds that are payable to Schahin Engenharia—which Linklaters is not representing.  Black Gold, BDL, and SDL also claim that BDL and SDL have an estimated value of $1.27 billion.  (Schahin Memo. at 2-3.) Certainly, if they have this value, they should be more than able to pay the judgments which were entered against them in this Court.

---

[1] The difference between the amount of the existing judgments and the new judgments is attributable to accrued interest.

For the reasons set forth in CIMC Raffles' Enforcement Motion, including all case law cited therein, and given the express and implicit admissions in judgment debtors' papers, the Court should enter an Order forthwith granting that tranche of the Enforcement Motion, and directing BDL, SDL, and Black Gold to bring in funds and pay the judgments. When and if Black Gold, BDL, and SDL fail to comply with that Order, CIMC Raffles can bring follow-on motions for contempt, for appointment of a receiver, for an auction of Schahin assets (including membership interests and vessels), and for other relief.

On April 4, 2013, CIMC Raffles served a restraining notice on Deutsche Bank Trust Company Americas ("Deutsche Bank") (which possesses various bank accounts in the name of one or more Respondent) restraining the sale, assignment, or transfer of property in which judgment debtors hold an interest.  (Brenner Decl. ¶ 36 & Ex. J.)  On or about April 11, 2013, the US Marshal's Service served Deutsche Bank with three writs of execution.  (Brenner Decl. ¶¶ 38-41 & Exs. K, L, & M.)  While Deutsche Bank has not appeared in this proceeding, Portigon A.G. ("Portigon") nevertheless has filed papers opposing certain relief sought by CIMC Raffles.

### Facts

Portigon asserts that it is the Administrative Agent for a group of senior lenders[2] that collectively are owed $600 million[3] under certain loan and project finance agreements attached to the Declaration of Jared Brenner ("Brenner Aff.").  Those inter-related documents relate to loans that were issued in New York to three Delaware limited liability companies

---

[2] The senior lenders are listed at Portigon Memo. at n.1.  Deutsche Bank is <u>not</u> listed as a senior lender.

[3] The $600 million apparently excludes (does not net out) some $18.6 million being held in three debt service reserve funds at Deutsche Bank.  (Brenner Decl. ¶ 37).

(judgment debtors Black Gold, BDL, and SDL).  Those project finance documents all specify that New York law governs.

Portigon asserts that Deutsche Bank acts as Collateral Agent on behalf of the Senior Lenders and other secured parties under the project finance documents.  (Brenner Decl. ¶¶ 4(e), 25.)  Portigon further asserts that Deutsche Bank filed UCC financing statements in Delaware, and annexes three UCC-1 financing statements by way of proof.  All of these UCC-1 financing statements are dated October 25, 2007; and all list the secured party as "Deutsche Bank Trust Company Americas, as Collateral Agent".  (Brenner Decl. ¶ 28 & Exs. F-H.)

Neither Portigon nor its predecessor, WestLB, is listed as a secured creditor in any of these UCC filings. (See Brenner Decl. Exs. F-H.)  Nor is Portigon or WestLB listed as a secured creditor in any other UCC filings made as against judgment debtors in New York or Delaware.  (See Schulman Reply Aff. ¶ 3.)

Portigon does not argue that it is a perfected secured creditor, and Mr. Brenner's Declaration details the rights Deutsche Bank has as Collateral Agent under the project finance documents.  (Brenner Decl. ¶ 4.)[4]  Indeed, however, Portigon effectively concedes that Deutsche Bank is acting independently.  In particular, Portigon states that service of a restraining notice on Deutsche Bank barring "sale, assignment, transfer of, or any interference with any property in which [judgment debtors] have an interest" (Brenner Decl. ¶ 36) has caused Deutsche Bank to restrain "funds that are to be paid by the Borrower [Black Gold] and Borrower Subsidiaries [BDL and SDL] to the Senior Lenders to cover certain debt service obligations."  (Brenner Decl. ¶ 37.)

---

[4] The principal right Mr. Brenner attributes to Portion is the right to freeze accounts in the event of default – an action Portigon has not exercised despite the existence of defaults for months.

Nevertheless, while Deutsche Bank has not filed any opposition, Portigon seeks:

(1) "the lifting of the current restraint on all bank accounts in which they [Senior Lenders] have a perfected security interest."  (Portigon Memo. at 1.)

(2) to protect the right of <u>Schahin Entities</u> to continue to receive monthly payments of approximately $8 million from Deutsche Bank or its foreign affiliates pursuant to the terms of the Project Finance agreements, and

(3) to protect Black Gold's ownership interest in SDL and BDL, and opposing turnover of such rights or interests as Black Gold has in SDL and BDL, presuming that Black Gold does not comply with the Court's order directing Black Gold to bring funds into New York to pay the judgments.

BDL, SDL, and Black Gold have filed papers that are substantially similar to the papers filed by Portigon, objecting to turnover of assets in which Portigon purportedly has a perfected security interest.  Indeed, BDL, SDL, and Black Gold also seek to have funds continue to be paid to Schahin Engenharia – even though counsel for the Schahin Entities, Linklaters, has solely entered an appearance on behalf of BDL, SDL, and Black Gold in this action.  (Linklaters did appear for ALL of the Schahin Entities in all other matters, including the NY Attachment Proceeding, the NY Arbitration, the London Arbitration, and the London High Court Action.) Nowhere in the Schahin papers is there any argument that Schahin Entities lack a reversionary right to all assets in which Deutsche Bank has a perfected security interest, or even a claim that Black Gold does not have a current ownership interest in BDL and SDL.

Precisely because it is uncontested, the balance of this Memorandum will not address the uncontested relief (judgments against Schahin Holding, Schahin Engenharia and Sea

Biscuit, and an Order directing BDL, SDL, and Black Gold to bring money into New York to

pay the judgments against BDL, SDL, and Black Gold).

**Argument**

I.     **THE COURT SHOULD ALLOW ENFORCEMENT OF JUDGMENTS AGAINST FUNDS RELEASED TO SCHAHIN ENTITIES FROM THE PROJECT ACCOUNTS, AND AGAINST ALL OTHER ASSETS IN WHICH SCHAHIN ENTITIES HAVE AN INTEREST, CONSISTENT WITH CONTROLLING NY LAW**

    **A.  CIMC Raffles Is Entitled to Seize Schahin's Contingent and <u>Non-Vested Interests, as Well as Its Non-Contingent and Vested Interests</u>**

Much of Portigon's[5] (and Schahin's)[6] memorandum sets up a "straw man"

argument, arguing that CIMC Raffles cannot seize funds that are payable to lenders – and then

mischaracterizing certain assets as belonging to lenders. For the avoidance of doubt, CIMC

---

[5] Portigon appears to be the wrong party to seek relief. Portigon does not hold a perfected security interest because the UCC filings were all filed in the name of Deutsche Bank, the Collateral Agent, and creditor of record pursuant to UCC 9-514. (Brenner Aff. ¶ 28 & Exs. F-H.) Nor can Portigon claim perfection through control, because the Collateral Agreement provides that "the Collateral Agent shall have 'control' (within the meaning of Section 8-106(d)(2) or Section 9-104(a) (as applicable) of the Accounts and the Operator's, Borrower's, BDL's and SDL's 'security entitlements' (within the meaning of Section 8-102(a)(17) of the UCC) with respect to the Financial Assets credited to the Accounts." (Brenner Decl. Ex. A § 2.05.) Finally, Deutsche Bank also has "the **exclusive** right to enforce rights, exercise remedies … and make determinations regarding the release, disposition, or restrictions with respect to the Collateral…." (See id. at § 7.03(a)(emph. added.)) See Berkowitz v. Chavo Int'l Inc., 144 A.D.2d 263, 533 N.Y.S.2d 86 (1st Dep't 1988) (rejecting secured party's motion to vacate restraining notice and execution served by judgment creditor, where secured party did not hold perfected security interest); In re Adirondack Timber Enterprise, Inc., 71 UCC Rep. Serv. 2d 722 (Bankr., N.D.N.Y. 2010) (holding that plaintiff, Farm Plan, an affiliate of John Deere, was not entitled to enforce security interest filed in the name of John Deere, even though security agreement stated that Farm Plan's interests were also to be protected by the security interest, because the security agreement provided that only John Deere could enforce the agreement).

[6] These papers have been slightly modified to reference Schahin's papers. References to Portigon's motion should generally be viewed as references to Schahin's substantially similar papers. We also note Schahin's papers refer to a confidential settlement offer. We decline to address such comment, which is improper and inadmissible under Fed. R. Evid. 408(a), other than to state that the reference was incomplete and accordingly totally misleading. We also note that Schahin's papers adopt factual arguments (e.g., waterfall priorities) that are wholly inconsistent with the testimony of Mr. Schahin. (See Schulman Reply Aff. Ex. 1.)

Raffles is not now seeking to seize funds that are payable, in the ordinary course, to Senior Lenders for repayment of principal and interest. And Portigon and Deutsche Bank were each advised as much.[7] (See Schulman Reply Aff. ¶ 4; Portigon Memo. at 18.)

In essence, Portigon (and Schahin) misstates and overstates the "stands in the shoes" doctrine to argue incorrectly that, because there are security interests in assets owned by Schahin Entities, CIMC Raffles is not entitled to seize Schahin Entities' remaining interests in those assets. (See Portigon Memo. at 15, *et al*.) This argument leads to the absurd result that CIMC Raffles purportedly cannot seize millions of dollars of funds being released on a monthly basis from project accounts to Schahin Engenharia, (Brenner Decl. ¶¶ 11, 19) or whatever interest (presumably, the ownership interest) that Black Gold currently holds in BDL and SDL, because Portigon (or Deutsche Bank) allegedly has a perfected security interest in the Accounts and the membership interests.[8]

In short, Portigon and Schahin want to allow Schahin to continue operating without paying its debts, and without Schahin Entities' giving up their assets. The law does not work that way. In fact, the UCC specifically provides that "[a]n agreement between the debtor and secured party which prohibits a transfer of the debtor's rights in collateral or makes the transfer a default does not prevent the transfer from taking effect." See NY UCC 9-401(b).

Contrary to Portigon's and Schahin's arguments, and consistent with current controlling law in New York State, CIMC Raffles IS entitled to seize whatever remaining or contingent non-vested interests judgment debtors may have in BDL and SDL, and in all of judgment debtors' interests in project accounts, tangibles, and intangibles, regardless of whether

---

[7] While CIMC Raffles is not seeking such relief now, it does not currently concede that such relief might not be authorized under applicable law if later sought.

[8] An interest in a limited liability company is a personal property interest. See NY Limited Liability Company Act § 603(b), unless it qualifies as a security under UCC § 8-103(c).

this results in further defaults under the project finance agreements.  And CIMC Raffles IS entitled to seize funds being released to Schahin Engenharia – as Portigon implicitly recognizes, by arguing that the Court has the "discretion" not to allow seizure of those funds.  Incidentally, as set forth below, Schahin has been in default under the project finance agreements since 2009 and Schahin will be in default, in any event, merely because of entry of CIMC Raffles' judgments, let alone the enforcement of those judgments.

Portigon simply does not address the controlling cases cited to and relied on in CIMC Raffles' moving memorandum, which demonstrate that CIMC Raffles has precisely that right. Nor does Portigon cite to or rely on any case on this point that was issued after the controlling Court of Appeals decision in Hotel 71 Mezz. Lender v. Falor, 14 N.Y.3d 303, 900 N.Y.S.2d 698, 926 N.E.2d 1202 (2010) (allowing seizure of interests in LLCs).

As the Court of Appeals recently held, in unequivocal language, a judgment creditor is entitled to seize all interests, vested or non-vested, contingent or non-contingent, that a judgment debtor holds in all tangible and intangible assets.  See generally CIMC Raffles Moving Memo. at 13, citing Hotel 71 Mezz. Lender v. Falor, 14 N.Y.3d 303, 312-313, 900 N.Y.S.2d 698, 704, 926 N.E.2d 1202, 1208 (2010).  The Court of Appeals was not at all unclear in its decision:  even if Black Gold, BDL, or SDL cannot currently execute on any such interests, CIMC Raffles is entitled to seize whatever interests, even if contingent and non-vested, that judgment creditors possess.

No one denies that Schahin has valuable assets.  To the contrary, Schahin argues that BDL and SDL are worth $1.27 billion.  (Schahin Memo. at 2-3.)  On a monthly basis, Lenders release from their lien and pay Schahin Entities $4 million ($48 million annually), from both US and Brazilian accounts. Portigon has control over all of the accounts. (Brenner Decl. ¶¶

- 9 -

7, 19, 22, 29; Portigon Memo. at 5.)   Once Schahin repays its loans, Schahin also will be entitled

to be repaid the sums contained in the multiple reserve accounts, escrow accounts, etc.,

maintained by lenders.  CIMC Raffles is entitled to execute on those contingent non-vested

interests.  Black Gold also has ownership interests in BDL and SDL subject to execution by

CIMC Raffles.

There is simply no question that CIMC Raffles is entitled as a matter of law to

execute on each of those present or future vested, unvested, contingent, or non-contingent

interests.  See Hotel 71 Mezz. Lender, supra; see also Capital Ventures Int'l v. Republic of

Argentina, 443 F.3d 214 (2d Cir. 2006) (allowing attachment of proceeds of bonds that

potentially could revert to defendant, despite "exceedingly small" likelihood that proceeds would

actually revert, especially where plaintiff's lien would be subordinate to other bondholders).[9]

### B.  Portigon's Motion Pursuant to CPLR 5240 Seeking to Protect Schahin Entities, and  to Bar Enforcement of CIMC Raffles' Judgments, Is Legally and Factually Baseless

The balance of Portigon's and Schahin's memoranda are nothing more, and

nothing less, than an attempt to shield the defaulting Schahin Entities from CIMC Raffles'

Enforcement Motion.

Portigon inconsistently argues that:

(i)     judgment debtors have "substantial unencumbered assets in Brazil," and CIMC

Raffles should go to Brazil to seek to collect its NY judgments; (see Portigon

Memo. at 3); but that

---

[9]  Case law relating to property subject to pre-judgment attachments is equally applicable in the context of post-judgment execution.  Cf. David Siegel, New York Practice (5th ed.) § 486 at 848 ("Recognizing that under the CPLR the same property interests lend themselves to pre-judgment attachment and post-judgment enforcement indifferently, cases involving either are cited interchangeably throughout….")

(ii)     Portigon has a senior perfected security interest in <u>all</u> assets belonging to

judgment debtors, Black Gold, BDL, and SDL, whether those assets are in

Onshore or Offshore Accounts.  (<u>See</u> Portigon Memo. at 7-9; <u>see also</u> Brenner

Decl. ¶ 26) ("Senior Lenders received a blanket lien over all assets of [Black

Gold, BDL, and SDL]); cf. Brenner Decl. ¶ 28 & Exs. F-H (financing statements

apply to "all assets of the Debtor, whether now owned or hereafter acquired, and

all proceeds thereof.").

Yet these contradictory positions can be reconciled:  **Portigon implicitly is**
**conceding that, once Lenders release funds from project accounts to Schahin Entities, for**
**operating expenses and the like, Lenders have released their liens, and judgment creditors**
**can enforce as against those funds**.  (<u>See also</u> Portigon Memo. at 18.)   This is why Portigon's
argument is premised not on a legal defense, but on a plea for the Court to exercise its
"discretion".

Portigon's suggestion that CIMC Raffles should go to Brazil to collect those
funds that Portigon, in New York, authorizes Deutsche Bank and Deutsche Bank's affiliate in
Brazil to release to Schahin Entities, rather than allowing CIMC Raffles simply to seize funds in
New York, is perverse and cynical.  Portigon's suggestion is also wholly inconsistent with how
judgments are typically enforced: by seizing monies garnishees owe to judgment debtors where
the garnishees are found.[10]  Certainly, New York courts have an interest in seeing New York

---

[10]  Notably, Portigon has not moved to change venue or argued *forum non conveniens*.  It
has not precisely because it cannot:  Lenders' loans were issued from New York.  Lenders'
project accounts are largely based in New York.  The funds are sent to New York by Petrobras—
as Lenders required.  Lenders are in New York.  Lenders' documents specify that New York law
controls. Judgment debtors are US (Delaware) entities—as Lenders required.  CIMC Raffles'
judgments issued in New York.  And CIMC Raffles judgments are all based on an arbitration

judgments enforced.  Similarly, Schahin's arguments that funds should not be seized from accounts in Brazil is inconsistent with the fact that Portigon admittedly has authority to direct the release of funds from those accounts, pursuant to the New York project finance agreements, and the Court has jurisdiction over Portigon (and Deutsche Bank) here in New York.  See generally Koehler v. Bank of Bermuda, Ltd., 577 F.3d 497 (2d Cir. 2009), and Koehler v. Bank of Bermuda Ltd., 12 N.Y.3d 533, 883 NY.S.2d 763, 911 N.E.2d 825 (N.Y. 2009).[11]  Portigon cynically offers to have CIMC Raffles collect only on the equity distributions that Respondents would receive in the eleventh step of the payment waterfall – while unabashedly noting that no payment has ever been made beyond the fourth step.  (Brenner Decl. ¶17.)   Portigon's not-so-hidden agenda is evident: the Project Accounts that fund the Senior Lenders' principal and interest are all located in New York.

       Portigon relies on supposed equitable factors to argue that the Court should exercise its discretion pursuant to CPLR 5240[12] to vacate any restraints on judgment debtors, to

---

award issued in New York, pursuant to two Equity Conversion Agreements governed by New York law.

[11]  Precisely because Portigon has the ability to direct release of funds located in New York or Brazil, the Court need not address whether the "single entity" rule was overruled by the N.Y. Court of Appeals in Koehler as regards post-judgment enforcement, or the merits of the multiple conflicting cases that have addressed this issue since Koehler.

[12]  Portigon also references and relies on CPLR 5239, which permits an interested party to commence a special proceeding to determine rights in property.  Inconsistently, at Portigon Memo. n.26, Portigon argues that CIMC Raffles should have commenced a separate proceeding to seize assets.  Portigon is wrong.  See N. Mariana Islands v. Millard, 845 F. Supp.2d 579, 581 (S.D.N.Y. 2012) (Rakoff, J.) (turnover application was properly brought as a motion rather than a special proceeding).  See CPLR 105(b) (the word "action" includes a special proceeding); CPLR 103(c) (if a court has obtained jurisdiction, "a civil proceeding shall not be dismissed solely because it is not brought in the proper form, but the court shall make whatever order is required for its proper prosecution," and "[i]f the court finds it appropriate in the interests of justice, it may convert a motion into a special proceeding, or vice-versa, upon such terms as may be just").  Of course, Portigon's argument here is also entirely irrelevant as to the impact of the restraining notices served on Deutsche Bank.

vacate restraining notices and writs of execution served on Deutsche Bank, and to deny enforcement of any judgments against Black Gold, BDL, or SDL, by directing turnover of their membership interests and interests in the Accounts.  (Portigon Memo. at 13.)

Portigon (joined by Schahin) supports this argument by speculating that "Any levy of the reimbursements for operating expenses incurred in connection with the operation of the Vessels would threaten the ability of the Vessels to continue to operate and generate the revenue necessary to pay principal and interest to the Senior Lenders."  (Portigon Memo. at 1.) Portigon further speculates that if funds are not released by Portigon to the operator of the vessels, that this would result in Schahin "ceasing operations of the Vessels."  (Portigon Memo. at 3; id. at 11.)   And Portigon continues speculating, that if Schahin should cease operations, Petrobras might suspend or even terminate its charter contracts with BDL and SDL, "thereby diminishing dramatically the value of the Senior Lenders' collateral security package." (Portigon Memo. at 11-12.)

Portigon's offer is to have CIMC Raffles collect only on the equity distributions that Respondents would receive in the eleventh step of the payment waterfall – while unabashedly noting that no payment has ever been made beyond the fourth step of the waterfall. (Brenner Decl. ¶ 17.)

As a matter of law, CPLR 5240 does permit a court to issue an order to limit, condition, regulate, extend, or modify the use of any enforcement procedure.  However, as explained by then-District Judge Joseph M. McLaughlin[13] just a few months before he was elevated to the Second Circuit, "**only the gravest circumstances warrant CPLR 5240**

---

[13]  Judge McLaughlin, a professor and former Dean of Fordham Law School, is an acknowledged expert on New York practice, having authored numerous works on evidence and civil procedure, including Practice Commentaries for McKinney's New York CPLR.

**equitable modification in the face of a valid judgment.**"  Midlantic National Bank/North v.

Reif, 732 F. Supp. 354, 356 (E.D.N.Y. 1990) (emph. added).

Judge McLaughlin further explains that:

"CPLR 5240 is plainly designed to prevent the brutal use of legal procedures against a judgment debtor. In Kolotron Systems, Inc. v. Casey, 118 A.D.2d 687, 500 N.Y.S.2d 36, appeal dism'd  68 N.Y.2d 807, 506 N.Y.S.2d 1037, 498 N.E.2d 437 (1986), the Court emphasized the precise purpose of CPLR 5240 relief, explaining "[i]ts use is strictly to aid a party inequitably burdened by the use of enforcement procedures by his adversary and to allow him an opportunity to either meet his legal obligation or postpone the enforcement of a judgment until such time that its enforcement is more properly sought."

Id. (citations omitted).

Judge McLaughlin elaborates that, "even in the face of harsh consequences to a

minor grandchild residing with the debtor, the forced sale of a home was found appropriate

where the underlying judgment was for the substantial sum of $117,531.45 and was incurred

personally by the debtor."  Id. (citations omitted).

Portigon does not, and cannot, point to any "brutal" use of legal procedures here,

or any inequitable burdens being placed on Schahin entities.  Certainly, Schahin, let alone

Portigon, does not and cannot demonstrate the "grave[] circumstances" required to impose CPLR

5240 equitable modification in the face of a valid judgment, given Schahin Entities' assiduous

efforts to avoid their obligations as judgment debtors – let alone their misrepresentations to the

NY court that they would promptly pay any final judgment or final arbitration award when

rendered, so as to lift an attachment of their assets.  And a judgment for more than $70 million

certainly qualifies as "substantial."

If the courts are willing to enforce a judgment that places a small child on the

street, one would expect that the courts would have even less willingness to consider the harm

that might be done to Portigon or Schahin Entities, sophisticated institutions with substantial assets and income.

Certainly, Portigon and Schahin cannot argue that they are being treated inequitably.  To the contrary, Schahin owes the money.  And Portigon has been directly advantaged by virtue of the improper conduct of its borrowers, BDL and SDL.  BDL and SDL accepted delivery of two vessels (on which Lenders have since placed ship mortgages), and then BDL and SDL simply ceased paying the $208 million still due, despite signing acceptance documents and the final invoices.  Portigon's lack of equity is demonstrated in the fact that Lenders' ship mortgages are senior precisely because of Schahin's improper conduct, and Lenders' loans are being repaid through charter contracts with Petrobras for the vessels that CIMC Raffles built—and for which CIMC Raffles still has not been paid.

All evidence is that Schahin entities have ample assets to pay the judgment; Schahin Entities have known for years that they would be forced to pay the judgment; but Schahin Entities simply continue to delay and resist enforcement, even after defaulting, at present by using their cat's paw, Portigon.  If Schahin continues to resist bringing in assets to satisfy the judgments, there simply is no equitable reason to deny CIMC Raffles its legal right to reach all other available assets belonging to Schahin Entities.

Portigon's conduct here in seeking to protect Schahin best can be understood by quoting J. Paul Getty, who famously noted, "If you owe the bank $100 that's your problem.  If you owe the bank $100 million, that's the bank's problem."  <u>Cf.</u> John Maynard Keynes ("If you owe your bank manager a thousand pounds, you are at his mercy.  If you owe him a million pounds, he is at your mercy.")  Here, Schahin owes Lender banks $600 million – 400 million

pounds.  Rather than excusing and aiding Schahin's judgment avoidance, Portigon should be using its contractual rights to cause Respondents to remedy their defaults.

### C.  All Facts Strongly Support Enforcement of the Judgments

All facts strongly support enforcement of the judgments.  Portigon counters with two speculations, neither of which is supported by evidence or by logic.

First, Portigon speculates that, if operating expenses are not paid, Schahin entities might not continue to operate the vessels, resulting in suspension or cancellation of the Petrobras charter for the vessels, and impairment of Portigon's collateral.[14]  Second, Portigon speculates that Senior Lenders might accelerate the debts owed by Schahin Entities, on account of defaults, and might impose all sorts of other arduous penalties on Schahin Entities.

The facts and the equities contradict Portigon's speculations.  In summary:

(i)     All evidence establishes, and Portigon expressly concedes, that Schahin Entities have ample assets to operate the vessels, whether or not operating expenses are paid from the Accounts;

(ii)     Past history proves that Schahin Entities continued to operate the vessels even when they were not being paid operating expenses from the Accounts;

(iii)    All evidence provides that lenders are vastly over-secured on their loans, which they claim only has a $600 million balance outstanding (less $18.6 million in onshore debt service reserve accounts, and an unknown amount in multiple other accounts); and

(iv)    Portigon elides over the fact that the parade of horribles that Portigon could impose by virtue of Schahin Entities' defaults has never materialized, and that

---

[14]  Mr. Schahin testified that operating expenses are reimbursed retrospectively on a monthly basis.  (See Schulman Aff. Ex. C., June 9, 2012 Tr. 94.)

enforcement of CIMC Raffles' judgments does not affect Portigon's claimed rights: Schahin Entities have been in technical default under the project agreements since at least 2009, and are also in default simply because of the existence of CIMC Raffles' judgments.  Portigon neglects to advise the Court that it (on behalf of Senior Lenders) made use of those existing defaults in 2009 to increase the interest rates, commitment fees, and other fees payable by Schahin borrowers, rather than triggering the phantom Armageddon by freezing accounts or accelerating loans.

The moving papers set forth Schahin's assets, and Schahin's memorandum confirms the substantial value of Schahin's assets.  Fernando Schahin testified, and his counsel at Linklaters argued in the NY Attachment Proceeding, that the Schahin Entities had ample assets to pay the full $208 million that CIMC Raffles was seeking.

Portigon concedes as much, stating that "sworn testimony and evidence suggest[s] that the judgment debtors and their affiliates have substantial *unencumbered* assets…." (Portigon Memo. at 3  -- emphasis in original.)  Portigon's concession is significant, given the financial disclosure that borrowers provide to their lenders.

Other evidence is contained in financial statements of Schahin Engenharia (the entity which operates the vessels), and the owners of the vessels, BDL and SDL.  (See Schulman Reply Aff. Exs. 4, 6 & 7, respectively.)  Schahin Engenharia's audited financials for 2011, for example, state that it had net profits of 26,669,000 Brazilian reales, or approximately $13.6 million (applying an exchange rate of 1.0 real = US$0.51), and share capital of 651,094,000 reales ($332 million).  Schahin Engenharia also had cash and cash equivalents at the beginning of the year of 208,145,000 reales ($106.1 million) and cash or cash equivalents at the end of the

year of 39,876,000 ($20.3 million), fixed assets of 23,851,000 reales ($12.1 million), and
intangible assets of 4,466,000 reales ($2.27 million).  (See Schulman Reply Aff. Ex. 4 at 31, 33.)

With regard to judgment debtors, BDL and SDL, which are wholly owned by
Black Gold, Mr. Fernando Schahin specifically testified that the ultimate parent company of
BDL and SDL (via Sea Biscuit and Black Gold), Schahin Oil and Gas Limited (see Schulman
Moving Aff. Ex. D) has $800 million in annual revenues.  In his successful efforts to persuade
the NY Court to vacate the attachment, Mr. Schahin represented to the NY Court that, if BDL or
SDL needed capital injections, the parent could "easily" provide those capital injections.
(Schulman Reply Aff. Ex. 5, May 7, 2012 Hearing Tr. at 163.)

Portigon's and judgment creditors' speculation that Schahin Engenharia would
cease operating the vessels if CIMC Raffles were permitted to enforce its judgment and to seize
the funds that Lenders release for reimbursement of operating expenses is wholly unfounded. It
is also directly contradicted by past history.  Mr. Fernando Schahin expressly testified that, until
February 2012, operating expenses were not paid to Schahin Entities.  Schahin Engenharia
nonetheless continued to operate the vessels without receiving those payments, simply waiting
until the cash flow was sufficiently "robust" before taking operating expenses, at which point
Schahin also began to receive "catch up" payments for earlier operating expenses that had been
accrued but had not been paid.  (Schulman Moving Aff. Ex. C, June 19, 2012 Hearing Tr. 93:20
– Tr. 94:14.)  Given its substantial cash flow and resources, there is no doubt that Schahin can
and will again "front" the operating expenses.

Of course, even if Petrobras should choose, for whatever reason, to suspend or
cancel its charter of the two vessels, Portigon would still be vastly over-secured.  Deutsche Bank
has a ship mortgage on each of the two vessels, SS Amazonia and SS Pantanal.  Fernando

Schahin testified that these vessels are "worth a billion dollars each." (Schulman Reply Aff. Ex. 5, May 7, 2012 at Hearing Tr. 144.)[15]  And Schahin's motion papers allege that just the membership interests in BDL and SDL are worth $1.27 billion (Schahin Memo. at 2-3), and that does not even include the assets of Black Gold, let alone the assets of Schahin Holding, Schahin Engenharia, and Sea Biscuit, all of which will shortly be subject to judgments of this Court.

In addition, Portigon lists 43 project accounts (Brenner Decl. ¶ 8 n.2), including multiple escrow, suspense, and reserve accounts.  Solely in the three Offshore debt service reserve accounts, Portigon reports that Deutsche Bank holds $18,591,311.23 in additional security.  (Brenner Decl. ¶ 37.)  Presumably, Deutsche Bank also holds additional security in the other reserve accounts, escrow accounts, and suspense accounts listed in Mr. Brenner's declaration to fund any payment shortfalls.

Finally, Portigon also recites a parade of horribles that could occur if CIMC Raffles were permitted to enforce its judgment, starting with acceleration of the debt, on account of contractual defaults.  (Portigon Memo. at 11-12, 17; Brenner Decl. ¶¶ 42-43; 47-48.)

Portigon testifies, very carefully, that "There are currently outstanding default events—including, but not limited to, events of default arising from the Restraining Notice and the entry of Petitioners' judgments against [Black Gold] and its affiliated entities—with respect to the Project."  (Brenner Decl. ¶ 43.)

The existence of outstanding defaults defeats Portigon's equitable argument.  And what Portigon neglects to advise the Court is just how long these defaults have been outstanding.

---

[15]  The BDL and SDL 2010 audited financial statements prepared by PricewaterhouseCoopers value the SS Amazonia, and the SS Pantanal, on a cost basis as of December 31, 2010 at $499.7 million and $517 million, respectively, and show total assets for BDL and SDL of $578.4 million and $575 million, respectively.  (Schulman Reply Aff. Exs. 6 & 7, both at p.4 of each exhibit.)

In fact, since 2009, Black Gold, SDL, and BDL have been in technical default under the project finance agreements, having failed to meet required project timetables.  (Schulman Reply Aff. Exs. 6 & 7 [BDL and SDL financial statements] each at note 6.)  The result of these defaults: lenders increased the interest rates charged to BDL and SDL, increased the commitment fees, and charged other fees—further enriching Lenders at CIMC Raffles' ultimate expense.  (Id.)

In essence, Portigon is asking the court to "save it from itself", since it could only be Portigon (or Deutsche Bank) that would be instituting the parade of horribles by calling an Event of Default.  But the Lenders have no intent of doing that.  In 2013, the lenders no doubt will make use of these additional defaults to increase the rate of interest payable by Black Gold, BDL, and SDL, precisely as lenders did in 2009.

In any event, Portigon's argument that enforcement will cause Schahin Entities to be in default is wholly irrelevant, because it really does not matter whether CIMC Raffles acts to enforce its judgment.  According to Portigon, it can take action against judgment debtors regardless of whether CIMC Raffles acts to enforce its judgments, precisely because the mere entry and existence of CIMC Raffles' current judgments (and the new judgments about to be entered) constitute defaults under the project finance agreements.  (Brenner Decl. ¶ 43.)  If Portigon were to do equity, it would use its rights under the project finance agreements to cause Respondents to cure those defaults by paying the judgment, and the other debts Schahin owes to CIMC Raffles.

## Conclusion

For all of the foregoing reasons, CIMC Raffles respectfully requests that (1) the Court enter judgments as against Schahin Holding, Schahin Engenharia, and Sea Biscuit; (2) the Court enter an Order of Post-Judgment Enforcement; and (3) deny Portigon's motion, and Schahin's arguments, in their entirety.

Dated: New York, New York
        April 16, 2013

SCHULMAN BLACKWELL LLP

By: _____
        Dan J. Schulman
        Christopher A. Blackwell
*Co-counsel for Petitioners*
*CIMC Raffles Offshore (Singapore) Limited*
*and Yantai CIMC Raffles Offshore Limited*
11 Broadway, Suite 615
New York, New York 10004
Tel:  (646) 688-5214
Fax:  (646) 304-1117
Email:  dschulman@schulmanblackwell.com

.