UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
CIMC RAFFLES OFFSHORE (SINGAPORE)    :
LIMITED, and YANTAI CIMC RAFFLES     :
OFFSHORE LIMITED,                    :
                                     :
               Petitioners,          :
                                     :
        -v-                          :
                                     :
SCHAHIN HOLDING S.A., SCHAHIN        :
ENGENHARIA S.A., SEA BISCUIT         :
INTERNATIONAL INC., BLACK GOLD       :
DRILLING LLC, BAERFIELD DRILLING LLC, :
and SORATU DRILLING LLC,             :
                                     :
               Respondents.          :
------------------------------------- x

```
┌──────────────────────────────┐
│ USDC SDNY                     │
│ DOCUMENT                      │
│ ELECTRONICALLY FILED          │
│ DOC #:                        │
│ DATE FILED: 5/1/13            │
└──────────────────────────────┘
```

13 Civ. 52 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

        Petitioners CIMC Raffles Offshore (Singapore) Ltd. and Yantai
CIMC Raffles Offshore Ltd. (collectively, "CIMC"), two offshore oil
rig construction yards, constructed two semi-submersible drilling
vessels for respondents Baerfield Drilling LLC ("BDL") and Soratu
Drilling LLC ("SDL"). See Supp. Decl. of Nwamaka G. Ejebe filed Feb.
15, 2013, Ex. 1 (Final Award of Arbitrators). During the course of
construction and pursuant to two "Advance and Equity Conversion
Agreements," CIMC loaned $66,125,587 to all six respondents, which
failed to repay the loans. Id. The terms of the Agreements provide for
mandatory arbitration of disputes under the Agreements in New York
City, and on December 26, 2012, an arbitral tribunal awarded
$69,470,777.41 to CIMC for repayment of the loans and pre-award
interest, as well as $13,206.28 in arbitration costs. Id. at 21-22.

        On January 2, 2013, CIMC filed a petition seeking confirmation of
the arbitration award, interest, costs and fees.  On March 13, 2013,

the Court granted judgment against three of the respondents, BDL, SDL, and Black Gold Drilling LLC ("Black Gold"), their owner, see Order, 13 Civ. 52, ECF No. 21 (filed Mar. 13, 2013), and on April 21, 2013, the Court granted judgment against the remaining three respondents, Schahin Holding S.A., Schahin Engenharia S.A., and Sea Biscuit International Inc., see Order, 13 Civ. 52, ECF No. 53 (S.D.N.Y. filed Apr. 22, 2013).

Meanwhile, on April 10, 2013, CIMC filed a motion seeking an Order that would (1) require Black Gold, BDL, and SDL to immediately turn over to CIMC funds sufficient to pay the judgment; (2) require Black Gold, should sufficient funds not be turned over, to transfer to CIMC its membership interests in BDL and SDL; and (3) restrain Schahin Holding, Schahin Engenharia, and Sea Biscuit from transferring or selling any property or assets until they pay sums sufficient to satisfy the judgment in full. The Court heard oral argument on these motions on April 18, 2013.

CIMC's first and third motions are unopposed. As to the first, under N.Y. C.P.L.R. § 5225(a), incorporated through Rule 69(a)(1) of the Federal Rules of Civil Procedure, it is well established that "a New York court with personal jurisdiction over a defendant may order him to turn over out-of-state property." Koehler v. Bank of Bermuda, Ltd., 12 N.Y.3d 533, 541 (2009). Here, this Court has personal jurisdiction over respondents because they contractually agreed to arbitrate in New York, thereby agreeing to submit themselves to the jurisdiction of New York courts. See 9 U.S.C. § 9 ("Notice of the

2

application [for confirmation of an arbitration award] shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding."). Thus, this Court may properly direct, and hereby so orders, Black Gold, SDL and BDL to bring into New York and turn over to CIMC funds sufficient to satisfy the judgment issued against them on March 13, 2013.

As to the third of CIMC's requests, the Clerk of the Court expeditiously entered judgment against Schahin Holding, Schahin Engenharia, and Sea Biscuit International on April 24, 2013, mooting in some respects CIMC's request for a pre-judgment restraining order under Rule 69 and C.P.L.R. § 5229. However, the Court notes that, since CIMC has now also obtained judgments against Schahin Holding, Schahin Engenharia, and Sea Biscuit International, CIMC may serve restraining notices premised on these judgments pursuant to N.Y. C.P.L.R. § 5222, without further action from the Court.

As to the middle prong of CIMC's three-prong motion, interested non-parties, as well as Black Gold, BDL and SDL raised objections in response to CIMC's request for a turnover of Black Gold's membership interest in BDL and SDL and also objected to restraining notices CIMC issued to third parties believed to be in possession of the Black Gold's, BDL's and SDL's property. The primary objector was non-party Portigon AG, New York Branch ("Portigon"), which filed a motion for relief from CIMC's enforcement actions. Portigon serves as the administrative agent for a group of nineteen lenders (the "senior

3

lenders") to whom Black Gold, BDL and SDL currently owe approximately $600 million on loans used to finance BDL's and SDL's purchase of the drilling vessels from CIMC. Decl. of Jared Brenner filed Apr. 14, 2013 ("Brenner Decl.") ¶ 5.

As relevant to Portigon's objections, BDL and SDL, although the owners of the drilling vessels built by CIMC, do not operate the vessels; rather, Petróleo Brasileiro S.A. ("Petrobras"), a Brazilian petroleum company, charters the vessels, and Schahin Engenharia runs their operations. Id. ¶ 6. Under the terms of the relevant agreements, Deutsche Bank Trust Company Americas, the collateral agent for the senior lenders, has established a network of segregated bank accounts (the "offshore project accounts") held in the names of the respondents, although these accounts are controlled solely by Portigon and Deutsche Bank in New York, and respondents have no authority to vary payments from those laid out in the underlying contractual agreements. Id. ¶¶ 7-8. Payments by Petrobras are the sole source of revenue flowing into the offshore project accounts, and the funds in these accounts are distributed according to the contractual "waterfall," through which all revenue is disbursed into various sub-accounts for distribution or reservation as set forth in the underlying agreements. Id. ¶ 10. In effect, the contractual waterfall ensures that payments of interest and principal are first made to the senior lenders, following which payments of operating expenses and capital expenses may be made. Id. ¶ 12. The waterfall provides for a total of eleven steps, although no revenue has thus far been allocated

4

beyond operating and capital expenses because the vessels have not produced sufficient revenue to support such payments. Id. ¶¶ 16-17.

As security for the loans, BDL, SDL and Black Gold made broad pledges of collateral to the senior lenders, including "a Lien on all of [the respondents'] rights, titles and interests in, to and under" the offshore project accounts and "all cash, instruments, investment property, securities, security entitlements . . . and other Financial Assets at any time on deposit." Brenner Decl. Ex. A. § 2.04(a)-(c). The senior lenders have perfected their security interest in the offshore project accounts. In particular, Deutsche Bank, as collateral agent, has filed U.C.C. financial statements for the offshore accounts for the benefit of the senior lenders, see Brenner Decl. Exs. F-H, and has established "control" over the accounts for purposes of the U.C.C., see Brenner Decl. Ex. A § 2.05.

Additionally, Black Gold's membership certificates in SDL and BDL provide further collateral to the senior lenders. See Brenner Decl. Ex. C § 3.01. The membership certificates are currently in the possession of Deutsche Bank, the collateral agent, for the benefit of the senior lenders, and Deutsche Bank has also filed U.C.C. financing statements with respect to the stock certificates. See Brenner Decl. Ex. I. Under the terms of the relevant agreements, Black Gold may not assign or transfer the membership certificates. See Brenner Decl. Ex. B § 8.13.

On April 4, 2013, Deutsche Bank, the collateral agent, received a restraining notice issued by CIMC's counsel instructing it that it is

5

"forbidden to make or suffer any sale, assignment, transfer of, or any interference with any property in which" Black Gold, BDL or SDL "have an interest." See Brenner Decl. Ex. J at 2. In response to the restraining notice, Deutsche Bank froze all funds in the offshore project accounts, including funds to be paid to the senior lenders. The next payment on the waterfall will occur in early May, at which point, if the restraint continues, the senior lenders will not receive their interest and principal payments, and operating and capital expenses will not be paid as they come due, which Portigon claims would jeopardize the continued operation and safety of the vessels. Brenner Decl. ¶¶ 46-47.

Based on these facts, Portigon seeks the following relief: (1) the lifting of the current restraint on all bank accounts in which the senior lenders have a perfected security interest, including any restraint on funds paid to Schahin Engenharia as operating expenses; and (2) the denial of CIMC's request for a turnover of Black Gold's ownership interest in BDL and SDL, in which the senior lenders have a perfected security interest.[1]

---

[1] Non-party MS Drillship I S.A., a wholly-owned subsidiary of Mitsubishi Corporation ("Mitsubishi"), joins in Portigon's opposition. See Joinder of Interested Party MS Drillship I S.A. in Motion of Portigon AG ("Mitsubishi Joinder"), 13 Civ. 52, ECF No. 50 (S.D.N.Y. filed Apr. 17, 2013). Mitsubishi is a secured lender to Black Gold on a $146 million loan. As security for the loan, Mitsubishi has a second-priority security interest in the project accounts and in all other collateral in which the senior lenders have a security interest, as well as a first-priority security interest in other project accounts subject to the petitioners' restraining notice. Payment to Mitsubishi occurs at the last level of the contractual payment waterfall discussed above and the first five levels of a separate, subordinated debt waterfall. Respondents Black Gold, BDL, and SDL also

Turning to the first objection, it is clear that CIMC cannot restrain the entirety of the funds in the offshore project accounts; that is, CIMC may not restrain or levy on the payments of principal and interest owed to the senior lenders under the terms of the contractual waterfall. Under N.Y. C.P.L.R. § 5201(b), a money judgment may only be enforced against property "which could be assigned or transferred" by the judgment debtor. See also Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70, 83 (2d Cir. 2002) ("A determination of [the debtor's] property interest in the disputed funds — i.e., whether [the debtor] can 'assign or transfer' any of these funds — is therefore dispositive . . . ."). Here, even though the offshore project accounts are established in BDL's, SDL's and/or Black Gold's names, only Portigon and Deutsche Bank, as agents for the senior lenders, can exercise control the withdrawal and transfer of funds under the terms of the contractual waterfalls. See Brenner Decl. Ex. A § 3.02(b). Moreover, the senior lenders have perfected liens on all of Black Gold's, BDL's, and SDL's "rights, titles, and interest in, to and under" the offshore project accounts, as the senior lenders have filed UCC statements recording their liens, and Deutsche Bank, as collateral agent for the lenders, has taken control of the offshore project accounts. See N.Y. U.C.C. Law §§ 9-310, 9-314; cf. In re Lehman Bros. Holdings Inc., 469 B.R.

---

submitted a limited opposition to CIMC's motion and in support of Portigon's motion. As their arguments largely echo Portigon's, the Court only discusses these other objectors where relevant.

415, 440 (Bankr. S.D.N.Y. 2012) (stating, in the context of a fraudulent transfer action, that "courts uniformly have treated a pledge or the attachment and perfection of a security interest as a 'transfer' of an interest in property").[2] Because the respondents cannot "assign or transfer" the funds in the offshore project accounts under either of these theories, CIMC has no claim over amounts owing to the senior lenders under the contractual waterfalls.

However, whether CIMC may restrain and execute upon payments under the contractual waterfall that would otherwise be made to reimburse Schahin Engenharia for the costs of operating the SDL and BDL vessels is a different situation. Once the funds are paid to Schahin Engenharia, the senior lenders' lien is released, and the funds are no longer subject to the superior claims of the senior lenders. See Brenner Decl. Ex. A § 3.07 (providing for continuity of liens until transfer of funds "to a Person other than an Obligor"). Portigon does not contest that the Court may allow CIMC to restrain these funds. Rather, Portigon requests that the Court exercise its discretionary authority under N.Y. C.P.L.R. § 5240 to "make an order denying, limiting, . . . or modifying the use of any enforcement procedure." This provision "grants the courts broad discretionary power to control and regulate the enforcement of a money judgment under article 52 to prevent unreasonable annoyance, expense,

---

[2] Mitsubishi also has a prior perfected security interest in the offshore project accounts pursuant to its subordinated agreement with the respondents, which, while subordinated to the senior lenders, would remain superior to any interest CIMC acquires as a judgment creditor. See Mitsubishi Joinder at 2.

embarrassment, disadvantage, or other prejudice to any person or the courts." Guardian Loan Co., Inc. v. Early, 47 N.Y.2d 515, 519 (1979). Here, Portigon claims that the reimbursement of operating expenses to Schahin Engenharia is critical to protecting the senior lenders' interests because it is only by allowing the vessels to continue to operate that Black Gold, BDL and SDL are able to generate the revenues necessary to make monthly debt service payments to the senior lenders.

Portigon trots out a parade of horribles in support of its argument that restraining these payments would create an inequitable hardship for the third-party lenders: if Schahin Engenharia is not reimbursed for its operating expenses, it may be unable to continue operating the vessels; if operations cease on the vessels, Petrobras is entitled to suspend charter payments, and failure to operate for more than 60 days would grant Petrobras the right to terminate the charter contracts with BDL and SDL, which would stop payments to the offshore project accounts entirely. Brenner Decl. ¶¶ 47-48.

However, the Court is unpersuaded that such an outcome would inevitably flow from a freeze on reimbursements to Schahin Engenharia. As an initial matter, the operating expense reimbursements paid through the offshore project accounts amount to approximately $1-2 million per month. See Brenner Decl. ¶ 11. While the Court is sympathetic to the senior lenders' desire to avoid any greater risk on their sizable investments, it is nonetheless skeptical that a failure to obtain $1-2 million in payments will shut down a likely highly lucrative operation. Furthermore, CIMC points out that Schahin

9

Engenharia has been in default under the project finance agreements
since 2009 for failure to meet its project targets, and Schahin will
remain in default in any case because the entry of judgment against it
alone constitutes a default, regardless of any enforcement of the
judgments, suggesting that another reason for default likely would not
cause Schahin Engenharia to stop operating the vessels. See Brenner
Decl. ¶ 43. Additionally, CIMC notes that, prior to February 2012,
Schahin Engenharia was not being reimbursed for operating expenses
under the payment waterfalls (as the projects were not producing
sufficient revenues), further suggesting that restraining payment of
its operating expenses would not shut down the entire enterprise. See
Affirmation of Dan J. Schulman filed Apr. 9, 2013 Ex. C, Tr. 93:20-
94:14. Because "only the gravest circumstances warrant CPLR 5240
equitable modification in the face of a valid judgment," the Court
declines to restrict CIMC's ability to restrain payments made to
Schahin Engenharia under the contractual waterfalls on the
circumstances presented here. See Midlantic Nat. Bank/N. v. Reif, 732
F. Supp. 354, 357 (E.D.N.Y. 1990).[3] It is too unlikely that the parade
of horribles put forth by Portigon will occur to justify preventing

---

[3] The Court also notes that respondents have represented in New York
State Supreme Court that "[i]f final judgments or awards are rendered
against the Defendants, the Defendants of course will satisfy them,"
and that they "have substantial net worth and assets that are more
than sufficient to pay any judgments that might be rendered against
them." Schumlan Aff. Ex. A ¶ 14; see also CIMC Raffles v. Schahin
Holding, No. 650850/2012 (N.Y. Sup. Ct.). To the extent that
respondents induced that court's reliance on their representations, it
would be inequitable to allow them to avoid a restraint on their
assets now under the theory that they will not have enough funds to
continue to operate.

10

CIMC from obtaining satisfaction on a judgment that it has rightfully obtained.

At oral argument, Mitsubishi argued that allowing CIMC to restrain the payments to Schahin Engenharia would, in effect, "jump the line" of secured creditors, allowing CIMC, an unsecured judgment creditor, to recover before Mitsubishi, a secured creditor, receives payments under the contractual waterfall. However, this argument misunderstands the nature of CIMC's relief.  Once the operating expense reimbursements are calculated and paid by Portigon and Deutsche Bank under the terms of the contractual waterfall, it is of no consequence to those at other levels of the waterfall who gets the money.  Schahin Engenharia's reimbursements are calculated according to criteria set out in the transaction documents, and it is entitled to no greater or lesser payments should those payments be restrained by CIMC.  Since the Court discounts the "doomsday" scenario put forth by the senior lenders, whether funds continue to flow down the waterfall to subordinated lenders is unaffected by whether CIMC may restrain and execute upon the payments otherwise due to Schahin Engenharia.

Finally, to the extent that Portigon argues that CIMC should pursue the "less intrusive" path of seeking to collect on its judgment in Brazil against the respondents' unencumbered assets available there, the Court notes only that such a suggestion is contrary to usual practice under the C.P.L.R., which allows a judgment creditor to seize monies garnishees owe to judgment debtors wherever those

11

garnishees are found, and would only engender more delay in collecting on a judgment from what are, by all appearances, recalcitrant debtors.

The Court finds greater merit to Portigon's second objection – that CIMC's request for a turnover of Black Gold's ownership interest in BDL and SDL should be denied because the senior lenders have a perfected security interest in the membership certificates. As with the offshore project accounts, because the senior lenders' security interests have been perfected by filing a U.C.C. financing statement with respect to the membership certificates, Black Gold is not permitted to assign or transfer the certificates, and so its membership interest in SDL and BDL cannot be subject to a turnover order. See Brenner Decl. Ex. B § 8.13; N.Y. U.C.C. Law §§ 9-310.

Moreover, the Court notes that Black Gold, BDL and SDL represented in their papers that the membership certificates have an estimated value of $1.27 billion, which far exceeds the value of petitioners' $70.8 million claim, and CIMC failed to contradict that representation. Although CIMC argues that the Court should order the turnover of Black Gold's contingent, residual interest in the membership certificates (which would arise upon successful repayment of the senior lenders' loans), CIMC was unable to make any representation as to how that interest should be valued. Because N.Y. C.P.L.R. § 5225 provides for turnover of assets only of "sufficient value to satisfy the judgment," the Court declines to order turnover of the membership certificates for the independent reason that CIMC has failed to show that the certificates' value is commensurate with

12

their judgment.

In sum, the Court grants in part and denies in part the various motions at issue here. The Court orders the immediate turnover to CIMC by Black Gold, BDL, and SDL of funds sufficient to pay the judgment entered against them, but it declines to order the alternative remedy of a turnover of Black Gold's membership interest in BDL and SDL. The Court vacates the restraining notices served on the offshore project accounts to the extent that they would restrain payments to the senior lenders under the contractual waterfalls, but CIMC may restrain and execute on any payments made to Schahin Engenharia under the waterfalls as reimbursement for operating expenses. The Clerk of the Court is ordered to close documents number 32 and 36 on the docket of this case.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        April 30, 2013

13