UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

CIMC RAFFLES OFFSHORE (SINGAPORE)
LIMITED and YANTAI CIMC RAFFLES
OFFSHORE LIMITED,

                          Petitioners,

              v.

SCHAHIN HOLDING S.A.,
SCHAHIN ENGENHARIA S.A.,
SEA BISCUIT INTERNATIONAL INC.,
BLACK GOLD DRILLING LLC,
BAERFIELD DRILLING LLC and
SORATU DRILLING LLC,

                          Respondents.

------------------------------------------------------------x

13 Civ. 52 (JSR)

**ECF CASE**
**Electronically Filed**

**MEMORANDUM IN OPPOSITION TO PETITIONERS' SECOND
MOTION FOR POST-JUDGMENT ENFORCEMENT AGAINST
<u>SCHAHIN HOLDING AND SCHAHIN ENGENHARIA</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................................1

FACTS ...........................................................................................................................................3

ARGUMENT .................................................................................................................................6

I.     TURNOVER OF OPERATING EXPENSES FROM THE ONSHORE BLACK GOLD WATERFALL WOULD RESULT IN A SIGNIFICANTLY GREATER BURDEN ON THE PROJECT AND FURTHER THREATEN THE LENDERS' PERFECTED SECURITY INTEREST ..........................................................6

II.    THIS COURT SHOULD DENY CIMC'S REQUEST FOR TURNOVER OF OPERATING EXPENSES FOR THE LANCER AND VITORIA BECAUSE IT WOULD INTERFERE WITH LENDERS' PERFECTED SECURITY INTEREST AND OTHERWISE WARRANTS AN EXERCISE OF DISCRETIONARY RELIEF UNDER CPLR 5240 ..........................................................10

        A.    Vitoria and Lancer Financing Structures Are Different Than The Black Gold Structure ........................................................................................................10

                1.  The Vitoria ..............................................................................................10

                2.  The Lancer ..............................................................................................11

        B.    The Court Should Deny CIMC's Request for Turnover of Operating Expenses for Turasoria and Vitoria Because The Owners and Lenders Have a Contractual and Perfected Security Interest in the Continued Running of the Vessels ...........................................................................................11

        C.    The Court Should Deny CIMC's Request for Turnover of Operating Expenses for Turasoria and Vitoria Because of Circumstances Warranting the Exercise of Discretionary Relief under CPLR 5240 ........................................13

        D.    This Is Not The Proper Forum For CIMC To Seek A Turnover Order That Threatens To Shut Down The Operation of Foreign Drilling Vessels Operating In Foreign Waters Under Foreign Law ...................................................14

# TABLE OF AUTHORITIES

## CASES

*Guardian Loan Co., Inc. v. Early*,
392 N.E.2d 1240 (N.Y. 1979)..................................................................................................9

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara
("Pertamina")*, 313 F.3d 70 (2d Cir. 2002).........................................................................9, 12

*N. Mariana Islands v. Canadian Imperial Bank of Commerce*,
__ N.E.2d __, 2013 WL 1798585 (N.Y. Apr. 30, 2013) ............................................................8

*Shaheen Sports, Inc. v. Asia Ins. Co.*,
Nos. 98 Civ. 5951, 11 Civ. 920, 2012 WL 919664 (S.D.N.Y. Mar. 14, 2012) ...............................7

*Tokio Marine & Fire Ins. Co. v. Rosner*,
No. 02 CV 5065(RJD), 2007 WL 4373240 (E.D.N.Y. Dec. 10, 2007) ..........................................9

## RULES

CPLR 320(c)(1) .....................................................................................................................1

CPLR 5240...................................................................................................................... 3, 14

CPLR 5226............................................................................................................................7

Respondents Black Gold Drilling LLC ("Black Gold"), Baerfield Drilling LLC ("BDL") and Soratu Drilling LLC ("SDL") (collectively, "Respondents"), joined by Turasoria S.A. LLC ("Turasoria") and Deep Black LLP ("Deep Black," and together with Turasoria, the "Third-Party Objectors"),[1] respectfully submit this Memorandum in Opposition to Petitioners' Second Motion for Post-Judgment Enforcement Against Schahin Holding and Schahin Engenharia. Petitioners' request for turnover of operating expenses paid to Schahin Engenharia S.A. ("Schahin Engenharia") under the onshore waterfall for the Black Gold Project and in connection with unrelated drillships the S.C. Lancer ("Lancer") and Vitoria 10,000 ("Vitoria"), is unjustified and would cause serious harm to the Third-Party Objectors and to the lenders to all of these projects, who have senior perfected security interests in them. The relief that Petitioners seek is unnecessary because it is duplicative of the general turnover order they also seek, but unlike that general turnover order would inflict serious harm on the operation of multiple vessels, the parties who provide goods and services necessary to their operation, and the lenders to those projects, who have prior perfected security interests in all of their assets. Moreover, this form of relief and the harm it would cause to the projects is out of all proportion to the Petitioners' $70 million judgment. If the Petitioners wish to stop the operation of foreign drilling vessels operating in foreign waters, to the detriment of foreign suppliers and secured lenders under contracts entered into under foreign law, the appropriate forum in which to seek such relief is one where the vessels are located.

## PRELIMINARY STATEMENT

Petitioners' latest turnover motions are a further example of post-judgment brinkmanship, as the Petitioners seek to hinder projects wholly unrelated to the underlying

---

[1] Turasoria and Deep Black are non-parties that have no connection to the underlying dispute between CIMC and certain Schahin-related entities. They specially appear, pursuant to CPLR 320(c)(1), to defend their property and to contest Petitioners' proposed overbroad turnover order.

arbitration award and the resulting judgment. Since this Court's decision on April 30, 2012, Petitioners have served more than a dozen additional restraining notices on various non-parties, many of whom do not have possession or custody of Petitioners' assets. Now, despite being cognizant of the harm that their actions will cause to the project financing structures, Petitioners move for the turnover of operating expenses from two unrelated ships: the Lancer and the Vitoria. As previously articulated by Respondents and Portigon in response to CIMC Raffles' first motion for post-judgment enforcement, this diversion of essential operating expenses will jeopardize the operation of the Lancer and the Vitoria, harming the respective lenders to those projects to the advantage of CIMC. Turasoria, which leases the Lancer, and Deep Black, which leases the Vitoria, are separate and distinct entities from the judgment debtors, and Petitioners' motion for turnover of operating expenses from the Lancer and Vitoria is a post-judgment enforcement overreach that should be denied.

Similarly, Petitioners' request for turnover of onshore operating expenses from the Black Gold project waterfall would significantly jeopardize that project and the lenders' superior security interest in the project, because a much larger portion of the operating expenses for the S.S. Amazonia and the S.S. Pantanal are funded through the onshore waterfall than through the offshore. The cumulative effect would be to make much more likely the potential consequences previously described by Respondents and Portigon, including termination of the Petrobras contracts, which would irreparably injure the project and its lenders. The lenders for all four of these projects deliberately entered into financing structures that mandate the payment of operating expenses precisely because the continued operation of the vessels is essential to protect their investment. These operating expenses do not represent profit or distributions of any kind to the operator, but rather represent the actual expenses incurred to operate the rigs. Indeed,

the operator does not have an interest in the operating expense payments that it receives, but merely acts as a conduit for funds to be paid to employees and other service providers. By seeking the turnover of operating expenses, CIMC is seeking to interfere with the prior perfected security interests of senior lenders, even for projects that have no connection to the underlying dispute between the parties. To be clear, Respondents and the Third Party Objectors do not challenge that CIMC may be entitled to seek a general turnover order against Schahin Engenharia and/or Schahin Holding, but a specific turnover order targeting operating expenses is inappropriate, because it would (and indeed is intended to) directly interfere with the operation of rigs operating in foreign waters to the detriment of, among others, parties with prior perfected security interests.

Furthermore, as the documents appended to CIMC's own motion attest, Respondents are willing to work with Petitioners to satisfy the judgment in a timely fashion and in fact have put forth settlement offers to such effect. A turnover of the operating expenses for any or all of the Black Gold project, the Lancer or Vitoria, especially on top of the restraint of the Black Gold Offshore operating expenses that has already been ordered, would severely inhibit Schahin Engenharia's ability to meets its obligations and to continue running the vessels. New York law prohibits post-judgment enforcement mechanisms that obstruct the judgment debtors' ability to satisfy a judgment. Because the potential harm to third parties outweighs any interest the Petitioners might have in the operating expenses they seek to execute on, Petitioners' request for turnover of the Black Gold Onshore operating expenses and the Lancer and Vitoria operating expenses should be denied pursuant to CPLR 5240.

## FACTS

As the Court is aware, in connection with the Black Gold project, the Senior Lenders provided $800,000,000 to finance the construction of two semi-submersible drilling rigs,

3

the SS Amazonia and SS Pantanal (the "Black Gold Vessels"), and secured that investment by obtaining a senior security interest over the entire project financing structure, including the Project Accounts used by the Waterfalls.[2] Respondents are not able to assign or transfer the Project Accounts or their proceeds. April 30, 2013 Memorandum Order ("Order") at 7.

As described previously by the parties, the Project Accounts are funded by the revenue generated from operation of the Black Gold Vessels, specifically from payments made by Petrobras, a petroleum and energy company that charters the Black Gold Vessels. Portigon's April 14, 2013 Motion at 5. The payments made by Petrobras are the only source of revenue for the Black Gold Vessels. The money received from Petrobras does not pass through the hands of the Respondents; rather, it is deposited directly into accounts in which the Senior Lenders have prior perfected security interests and that are held and controlled by the Collateral Agent. *Id*. The funds flow through payment waterfalls that distribute the funds according to specific contractual conditions and priorities. In the Black Gold Offshore project accounts waterfall, the priority of payments begins with interest and principal on the Senior Lenders' loan, after which the operating expenses of the Black Gold Vessels are paid. *Id*. at 6. Following other payments, such as to debt reserve accounts, a second, subordinate waterfall (the "Subordinated Waterfall") is run to service the subordinated debt facility established with an affiliate of Mitsubishi Corporation, MS Drillship I S.A. (the "Junior Lender"). Only after both waterfalls have run, so that the Senior Lenders, operating expenses for the ships, and the Junior Lender (together with the Senior Lenders, the "Lenders") have been paid, in that order, can any equity dividends be paid. To date, because of the harm inflicted on the Project due to Petitioners' defaults and the

---

[2] Capitalized terms used but not defined herein have the meaning ascribed to them in the Opposition of Black Gold, BDL, and SDL to Petitioners' Motion for Post-Judgment Enforcement Pursuant to Fed. R. Civ. P. 69 and Statement in Support of Portigon AG's Motion for Relief from Petitioners' Enforcement Actions.

4

late delivery of the Black Gold Vessels, no equity dividends have been paid. Respondents' April 16, 2013 Motion at 2.

Petitioners already are restraining payments made to Schahin Engeharia for operating expenses under the Black Gold Offshore Waterfall. They now seek the turnover of operating expenses under the Black Gold Onshore Waterfall, despite the fact that this would threaten the viability of the Black Gold project and threaten the Lenders' perfected security interest. In an even more flagrant overreach, Petitioners also seek the turnover of operating expenses that pass through Schahin Engenharia in connection with the drillship Lancer and the drillship Vitoria, projects entirely separate from the Black Gold Project, which is the subject of the worldwide disputes between the parties. Turasoria leases the drillship Lancer from Turasoria S.A., a Panamanian company that owns the Lancer, and Deep Black leases the Vitoria pursuant to a capital lease with Petrobras. Schahin Engenharia is the operator of both. The Lancer is financed through a bond, which repays its lenders through a waterfall similar to the Black Gold project. The operating expenses for the Lancer are paid through an onshore waterfall. (Declaration in Support of Memorandum in Opposition to Petitioners' Second Motion for Post Judgment Enforcement Against Schahin Holding and Schahin Engenharia ("Decl.") ¶ 5).

Financing for the Vitoria is governed by a Credit Agreement, which provides for the repayment of certain tranche A loans and which protects the lenders' security interests by ensuring that operating expenses flow so that the operation of the vessel will not be disrupted.

ARGUMENT

I.  **TURNOVER OF OPERATING EXPENSES FROM THE ONSHORE BLACK GOLD WATERFALL WOULD RESULT IN A SIGNIFICANTLY GREATER BURDEN ON THE PROJECT AND FURTHER THREATEN THE LENDERS' PERFECTED SECURITY INTEREST**

In its decision on April 30, 2013, the Court granted Petitioners' motion to "restrain and execute on any payments made to Schahin Engeharia" for operating expenses under the Black Gold Offshore Waterfall.[3] Order at 13. As noted by the accompanying declaration, operating expenses paid from the Offshore Waterfall are approximately $1-2 million each month. Partially based on this fact, this Court stated that it was "skeptical that a failure to obtain $1-2 million in payments will shut down a likely highly lucrative operation." Order at 9. Due to the limited nature of the relief sought by the Petitioners at that time, Respondents and the interested third-parties did not previously brief this Court on the importance of the Black Gold Onshore waterfall, and the operating expenses that it funds. But, at approximately R$9 million per month (and potentially more in the future based on rig performance), the Onshore Waterfall accounts for a much larger portion of the total operating costs incurred each month to run both vessels, such that appropriating this money to CIMC would substantially jeopardize the Black Gold Project and the Lenders' interest in the project. (Decl. ¶ 8-9).

In the Order, the Court observed that Mitsubishi's "jump the line" argument was unpersuasive because once the operating expenses are calculated and paid, "it is of no consequence to those at other levels of the waterfall who gets the money." Order at 11. The Lenders, however, do have an interest in who gets the operating expenses: without payment of

---

[3]  Although the full scope of CIMC's request for a turnover of offshore operating expenses is unclear from the face of its motion, it should be noted that this Court's opinion properly limited CIMC's ability to restrain and execute only as to those operating expenses actually paid to Schahin Engenharia. Up until the funds leave the Offshore Waterfall, the funds are subject to the Lenders' senior perfected security interest, and CIMC has no right to invade any accounts held at Deutsche Bank Trust Company America.

6

those operating expenses, the operation of the Vessels is endangered. The salient point is not that the operating expenses are paid to Schahin Engenharia, but rather that those operating expenses are earmarked for payment of the actual and necessary costs of operating the Vessels. (Decl. ¶ 9). In effect, Schahin Engenharia (or relevant borrower) acts as a mere conduit through which the operating expenses flow to those who provide the insurance, goods and services necessary to operate the Vessels. That is precisely why the payment of operating expenses is a unique instance in which funds are permitted to flow from the waterfall to the borrower or operator. By allowing CIMC to collect funds from the project before Mitsubishi, CIMC is literally jumping the line, transferring CIMC's risk as an unsecured creditor to Mitsubishi. Mitsubishi Brief at 2. Instead of being assured that operating expenses will be paid, as provided for by the agreements that Mitsubishi entered into (which are themselves part of the Lenders' collateral package), Mitsubishi now must assume the risk that Schahin Engenharia will find alternative funding for the day-to-day operating expenses of the Vessels.

While the Court "discount[ed] the 'doomsday' scenario" for the $1-2 million monthly operating expenses that flow through the Black Gold Offshore Waterfall, the Black Gold *Onshore* Waterfall is of a different magnitude: an additional R$9 million, or approximately $4.5 million per month, which is paid in reais through accounts held in Brazil at Deutsche Bank S.A. – Banco Alemão.[4] (Decl. ¶ 8). The deprivation of an additional $4.5 million each month for

---

[4] Petitioners' carefully crafted request directing Schahin Engenharia to turn over operating expenses paid to it is a tacit acknowledgement that the party required in these proceedings, Deutsche Bank S.A. – Banco Alemão, has not been appropriately served or noticed. Under the Collateral Agency and Credit Agreement, only the Brazilian Collateral Agent, Banco Alemao, has possession and custody of the Onshore Waterfall accounts. As this Court stated in its previous opinion, only the "agents for the senior lenders, can exercise control . . . under the terms of the contractual waterfalls." Order at 7. Banco Alemao is a separate entity from Deutsche Bank Trust Company Americas, and New York law does not permit service on the former by service on the latter. *See Shaheen Sports, Inc. v. Asia Ins. Co.*, Nos. 98 Civ. 5951, 11 Civ. 920, 2012 WL 919664, at *3–8 (S.D.N.Y. Mar. 14, 2012) (holding that under the separate entity rule plaintiff would be unable to secure a turnover of assets held by the bank in Pakistan merely by serving the New York branch, let alone an entirely separate entity). New York law requires a judgment creditor to show that the party

7

the protracted period necessary to pay the judgment threatens to effectively shut down these projects. *Id.* These projects were structured such that the operating expenses are funded by the proceeds of the project, in some instances even before debt is serviced, because it is central to protecting the Lenders' security interests. The Lenders deliberately did not leave to chance the question of whether operating expenses would be available to ensure the operation of the Vessels. Although Fernando Schahin has testified that Schahin Engenharia has previously operated for a short period without operating expenses for a single ship, the S.S. Amazonia, the withholding of operating expenses for both Vessels, for a protracted period of time, is unsustainable. April 10, 2013 Affirmation of Dan J. Schulman, Exhibit C at 94:7-14. If the Vessels stop operating, Petrobras could terminate its charter contracts with BDL and SDL, and the payments necessary to run the Onshore and Offshore Waterfalls will cease. Respondents' April 16, 2013 Motion at 9. Preventing the payment of those expenses would certainly jeopardize the projects, and it is inappropriate to place that risk on senior secured lenders for CIMC's benefit as a judgment creditor.

Moreover, Schahin Engenharia (or the relevant borrower) does not have an interest in the operating expenses because it receives them as a conduit and immediately disburses the funds to pay salaries, wages, insurance costs, electricity, and equipment suppliers. (Decl. ¶ 9). Thus, even after the funds are delivered to Schahin Engenharia, they are not property

---

against which the creditor has chosen to proceed has actual possession or custody of the asset. *N. Mariana Islands v. Canadian Imperial Bank of Commerce*, __ N.E.2d __, 2013 WL 1798585 (N.Y. Apr. 30, 2013). Since only the Brazilian Collateral Agent has possession or custody of the Onshore accounts, including the operating expense accounts, CIMC is required to either serve its proposed turnover order on Banco Alemao, or otherwise execute its judgment in Brazil in order to levy funds held in Brazilian accounts. In addition, Petitioners' proposed order five is an inappropriate attempt to circumvent the requirement of CPLR 5225(b), requiring a turnover order to be brought against the party in possession of the judgment debtors' assets. CPLR 5226 is tailored to provide a judgment creditor relief only as to funds in the judgment debtors' possession. Since funds held by Schahin Engenharia's banks, including by Banco Alemao, are not in Engenharia's possession, Petitioners' proposed fifth order must be denied until they serve turnover orders upon the appropriate third-parties.

8

subject to enforcement under CPLR 5201(b), because Schahin Engenharia cannot freely "assign or transfer" them but rather must transmit them to employees and services for whom they are intended. *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 83 (2d Cir. 2002).

Under CPLR 5240, the Court has broad discretion "to control and regulate the enforcement of a money judgment under article 52 to prevent 'unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or the courts.'" *Guardian Loan Co., Inc. v. Early*, 392 N.E.2d 1240, 1242-43 (N.Y. 1979). As previously briefed, this discretion has been exercised where enforcement of the judgment would divest a judgment debtor of a sole source of income and means of repaying the judgment. *See e.g., Tokio Marine & Fire Ins. Co. v. Rosner*, No. 02 CV 5065(RJD), 2007 WL 4373240, at *4–5 (E.D.N.Y. Dec. 10, 2007) (staying turnover of a law practice partnership where turnover would not have satisfied the judgment and would have deprived the judgment debtor of her sole source of income). Turnover of the Onshore Operating Expenses would cut off all funds that the Lenders directly allocate to pay employee salaries and the suppliers of the Black Gold Vessels, which would compromise the continued operation of the Vessels and therefore the ability of the projects to generate income with which to repay the Lenders (and, indeed, CIMC). Accordingly, the Respondents respectfully request that the Court deny turnover of the Black Gold Onshore Operating Expenses.

In the alternative, and to preserve the continued operation of the project and therefore protect the secured interest of the Lenders, Respondents request that this Court allow the Administrative Agent to pay the Onshore and Offshore operating expenses directly to suppliers and labor, bypassing Schahin Engenharia altogether. As Respondents have previously stated, and as established during the hearing on April 18, 2013, the funds disbursed to Schahin

Engenharia do not include any profits and are purely for the actual expenses incurred from operating the vessels. Transcript of April 18, 2013 S.D.N.Y. Hearing at 35:10 – 36:3. By having the Administrative Agent directly pay the suppliers and employees aboard the vessels, the Lenders can protect their security interest, and the value of the ships, which is necessary to protect CIMC as well.

II. **THIS COURT SHOULD DENY CIMC'S REQUEST FOR TURNOVER OF OPERATING EXPENSES FOR THE LANCER AND VITORIA BECAUSE IT WOULD INTERFERE WITH LENDERS' PERFECTED SECURITY INTEREST AND OTHERWISE WARRANTS AN EXERCISE OF DISCRETIONARY RELIEF UNDER CPLR 5240**

A. **Vitoria and Lancer Financing Structures Are Different Than The Black Gold Structure**

Although CIMC asserts – without evidence – that the Vitoria and Lancer "are all operated and financed through substantially similar project finance arrangements" as the Black Gold Project, there are important differences in the financing structures that directly impact CIMC's requested relief. CIMC Br. at 11.

1. **The Vitoria**

Unlike the other drillships at issue, the Vitoria itself is not owned by a Schahin-related entity, but instead is owned by Petrobras and leased to Deep Black pursuant to a 20-year capital lease. (Decl. ¶ 7). In December 2009, Deep Black entered into a Master Credit Agreement, not a project financing arrangement similar to the Black Gold structure, in order to secure financing for the Vitoria. While there is in fact a waterfall (an ordering of payment priorities) under the credit facility, operating expenses are not paid to Schahin Engenharia from the project accounts in this waterfall. *Id.*

10

2. **The Lancer**

The Lancer is owned by Turasoria S.A., a Panamanian company, and leased to Turasoria S.A. LLC. To raise funding, in October 2010 Turasoria S.A. LLC entered into a securitization program through the special purpose entity Lancer Finance Company (SPV) Limited,[5] and issued notes under Rule 144A/Regulation S. (Decl. ¶ 5). This financing is distinct from the financing of the Black Gold project, but the bondholders here, like the Black Gold lenders, have perfected and fully secured interests in all aspects of the project, including a pledge of Lancer Finance Company (SPV) Limited's rights under a loan made to Turasoria S.A. of the proceeds of the notes, and the underlying collateral for such loan, including the project accounts, and the right to receive payments under the charter contract between Turasoria S.A. LLC and Petrobras and the services contract between Schahin Engenharia S.A. and Petrobras, a mortgage on Lancer, an assignment of the proceeds of insurance policies, and certain spare parts. While the Indenture Agreement does contain a waterfall delineating the order of payments, no operating expenses are paid to Schahin Engenharia from this waterfall. (Decl. ¶ 5).

**B. The Court Should Deny CIMC's Request for Turnover of Operating Expenses for Turasoria and Vitoria Because The Owners and Lenders Have a Contractual and Perfected Security Interest in the Continued Running of the Vessels**

The lenders for the Lancer and Vitoria have security interests over the entire projects. A critical part of that security is a covenant in the Operator Agreement, entered into by Schahin Engenharia, as the operator, and the Indenture Trustee (on behalf of the noteholders), among other parties, which governs Schahin Engenharia's operation of the vessels and the

---

[5] As is common in international finance transactions, Lancer Finance Company (SPC) Limited is a bankruptcy-remote entity that has no corporate relationship to any other Schahin-related entities, much less to the judgment debtors. This feature was critical to the credit rating agencies when they assessed the bond offering, and it makes it particularly inequitable for CIMC to attempt to interfere with operating costs of this project, which are collateral the noteholders justifiably expect to be protected.

11

payment of operating expenses and which ensures that the sums allocated to pay operating expenses are in fact used for that purpose. In that agreement, in the context of a project where the operating expenses are funded by the project, Schahin Engenharia explicitly covenants to timely pay the salaries and benefits of the officers and crew members of the Vessels and to timely pay all of the Operator Expenses of the Vessel. (Decl. ¶ 4). The Operator Agreement is one such example of an agreement entered into between the project entities and with third parties and which are required for the service of the Lancer or its parts, which was specifically included in the security interests provided to the noteholders in the Indenture Agreement, and which was perfected via the Fiduciary Assignment Agreement and the Operator Security Agreement. Such covenants between Schahin Engenharia and the noteholders are necessary to provide security for the continued running of the vessels and, consequently, funds specifically allocated for operating expenses cannot be diverted to CIMC without hurting the noteholders or the vessel owners.

      A money judgment may only be enforced against property "which could be assigned or transferred" by the judgment debtor. Order at 7 citing *Karahah*, 313 F.3d at 93. Schahin Engenharia acts as a conduit to ensure that operating expenses reach the correct parties and that the ships continue their operations. Schahin Engenharia's use of the funds is limited – for example, by the Lancer Operator Agreement covenants – to paying expenses such as labor and fuel. As such, Schahin Engenharia may not divert these funds for any other purposes, including the payment of judgments. As the Second Circuit stated in *Karaha*, "a [judgment creditor] stands in the shoes of the judgment debtor in relation to any debt owed him or a property interest he may own." *Karaha*, 313 F.3d at 80. If CIMC is allowed to divert operating expenses from the Vitoria and Lancer to pay its judgment, CIMC would gain a right that Schahin Engenharia itself does not possess. Importantly, this would serve to undermine the noteholders'

and lenders' prior security interest in the projects, as well as both Turasoria and Deep Black, who control the vessels. The potential consequences of such a diversion have previously been articulated by both the Respondents and Portigon, and ultimately could include halting operation of the vessels and the revocation of the Petrobras charters that fund the projects. Respondents' April 16, 2013 Motion at 10. The more operating expenses that are diverted from the projects, which were each designed to ensure operating expenses are funded, the more likely this result will transpire.

### C. The Court Should Deny CIMC's Request for Turnover of Operating Expenses for Turasoria and Vitoria Because of Circumstances Warranting the Exercise of Discretionary Relief under CPLR 5240

By requesting turnover of operating expenses for two additional vessels, each of which is entirely unrelated to the disputes between the parties, CIMC seeks to ensure that Schahin Engenharia will be unable to continue operating the ships, inevitably resulting in harm to the lenders to these two projects.

The Court has stated that it doubts that the $1-2 million of offshore operating expenses that it permitted to be restrained would affect Schahin Engenharia's ability to operate the Black Gold Vessels. Order at 9. But CIMC now seeks the turnover not only of $4 million more in Onshore Operating Expenses from the Black Gold project, but also operating expenses from the Lancer and Vitoria. That is not a sustainable burden. (Decl. ¶ 9). No company can operate without payment of operating expenses, and the cumulative effect of such a diversion of operating expenses would undermine Schahin Engenharia's ability to pay the workers and suppliers who operate the vessels, causing it to stop operations, violating its Services Agreements with Petrobras, directly violating the noteholders' perfected security interest in various contractual agreements which are required for the service of the vessel (such as the Lancer Operator Agreement covenants), and exposing the lenders of each ship to further risk to

13

their general security interests in the forms of penalties by Petrobras, and cross-defaults under charter contracts and for services contracts for other vessels. The unrelated third-party owners, Turasoria and Deep Black, would also face harm as their value in the ships decrease. The Court should exercise its authority under CPLR 5240 "to control and regulate the enforcement of a money judgment under article 52" to prevent such "unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or the courts." CPLR 5240.

### D. This Is Not The Proper Forum For CIMC To Seek A Turnover Order That Threatens To Shut Down The Operation of Foreign Drilling Vessels Operating In Foreign Waters Under Foreign Law

CIMC's request for turnover of the operating expenses of drilling vessels operating in foreign waters affects rights and obligations of numerous parties who are not before the Court, including lenders to those projects, the workers and suppliers who enable their operation, and the governments who license and regulate operation of the vessels. CIMC's turnover request threatens the shut down of those vessels. That should not be permitted for at least two reasons. First, it is out of all proportion to CIMC's $70 million judgment. There is no reasonable argument that a judgment creditor should be entitled even potentially to inflict damages that could dwarf the amount of its judgment, much less on parties who are not judgment debtors.

Second, if CIMC wishes to threaten the operation of foreign drilling vessels operating in foreign waters, to the detriment of foreign suppliers and secured lenders under contracts entered into under foreign law, the appropriate forum in which to seek such relief is one where the vessels are located. CIMC has not attempted to bring before the court the numerous parties whose rights in the operation of the vessels would be affected by turnover of the operating expenses of the vessels. And it is not at all clear that it could, as those entities may

or may not be subject to personal jurisdiction here. Even if they were, this forum would not be a convenient one in which to adjudicate all of the interested parties' rights.

Dated:  New York, NY
        May 15, 2013

                                    Respectfully submitted,

                                    Linklaters LLP

                                    By:   /s/ Paul S. Hessler
                                    Paul S. Hessler
                                    Patrick C. Ashby
                                    1345 Avenue of the Americas,
                                    New York, NY 10105
                                    (212) 903-9000
                                    (212) 903-9100 (fax)

                                    *Attorneys for Black Gold Drilling LLC,
                                    Baerfield Drilling LLC, Soratu Drilling LLC,
                                    Turasoria S.A. LLC and Deep Black LLP*

15