UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

CIMC RAFFLES OFFSHORE (SINGAPORE) PTE.
LTD. AND YANTAI CIMC RAFFLES
OFFSHORE LIMITED,

                              Petitioners,

               v.                                          13 Civ. 0052 (JSR)

SCHAHIN HOLDING S.A., SCHAHIN
ENGENHARIA S.A., SEA BISCUIT
INTERNATIONAL INC., BLACK GOLD
DRILLING LLC, BAERFIELD DRILLING LLC
and SORATU DRILLING LLC,

                              Respondents.

------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF JUDGMENT DEBTORS'
## MOTION TO STAY ENFORCEMENT

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................................................ ii

STATEMENT OF FACTS .............................................................................................. 2

    A.    Despite Their Strong Financial Health, the Judgment Debtors Cannot Presently
Satisfy the Judgment Due to a Temporary Liquidity Shortage ................................. 3

    B.    ████████████████████████████████
████████████████ ................................................... 9

    C.    The Petitioners' Aggressive Enforcement Actions Have Impaired the
Respondents' Ability to Obtain Traditional Financing to Pay the Judgment ............ 10

    D.    Respondents Are In The Process Of Obtaining Financing That Will Permit Full
Payment of the Judgment ......................................................................................... 10

ARGUMENT ................................................................................................................ 12

I.    THIS COURT SHOULD EXERCISE ITS EQUITABLE POWER TO STAY
ENFORCEMENT TO ALLOW RESPONDENTS TO FINALIZE THE
FINANCING NECESSARY TO SATISFY THE JUDGMENT THIS YEAR ................. 12

CONCLUSION ............................................................................................................ 15

## TABLE OF AUTHORITIES

Page

### CASES

*2301 Jerome Ave. Realty Corp. v. Di Paolo,*
737 N.Y.S.2d 816 (Sup. Ct. 2002)............................................................................14

*B.D. Int'l Discount Corp. v. Chase Manhattan Bank (In re B.D. Int'l Discount Corp.),*
701 F.2d 1071 (2d Cir. 1983)..................................................................................9

*Guardian Loan Co. v. Early,*
392 N.E.2d 1240 (N.Y. 1979)...........................................................................12, 14

*PRL USA Holdings, Inc. v. U.S. Polo Ass'n,*
520 F.3d 109 (2d Cir. 2008)....................................................................................9

*Pine St. Assocs., L.P  v. Southridge Partners, L.P.,*
No. 652109/2010, 2011 WL 10646532 (N.Y. Sup. Sept. 7, 2011)...............................14

### STATUTES

CPLR 5240..........................................................................................1, 12, 14

Fed. R. Evid. 408 ..................................................................................................9

### OTHER AUTHORITIES

Steven C. Alberty, *1 Advising Small Businesses* § 12:31 (2013)..............................5, 6

*Financial Handbook For Bankruptcy Professionals* § 1.7 (2d ed. 2013)......................6

Bob Kulpa, *Being Liquid Doesn't Mean Being All Wet: Measuring Liquidity,* ALA News
(Dec. 1993/Jan. 1994)...........................................................................................6

Third Preliminary Report of the Advisory Comm. on Practice and Procedure, 1959 ...................12

Respondents Baerfield Drilling LLC ("BDL"), Soratu Drilling LLC ("SDL"), Black Gold Drilling LLC ("Black Gold") and Schahin Engenharia S.A. respectfully move, pursuant to CPLR 5240, for a stay of enforcement to permit them to finalize the financing necessary to pay, and to satisfy, the judgment entered against them in this case (the "Judgment").

The Respondents have attempted for many months to reach agreement with the Petitioners on a plan by which the Respondents will satisfy the Judgment. It has become apparent, however, that the Petitioners are less interested in collecting on their judgment than in inflicting harm on the Respondents and using their judgment as leverage to seek advantages in other proceedings. The Petitioners' aggressive enforcement actions, which have seen them issue no fewer than 60 restraining notices and writs of execution, mostly on US and Brazilian banking institutions, including many that do not do any business with the Respondents, have severely hampered the Respondents' ability to obtain financing to pay the Judgment. The Respondents have been forced to turn to a non-traditional source of financing, which will take approximately 60 days to finalize. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

█████████████

The Respondents would rather have entered into a settlement agreement with the Petitioners to effectuate this payment plan. But every time the Respondents improved their payment plan to meet the Petitioners' demands, the Petitioners increased their demands. It is apparent that the Petitioners have no interest in reaching a settlement. In light of the financing that the Respondents are arranging and the schedule for repayment which will see the Judgment satisfied within the next approximately 90 days, further enforcement measures can have no purpose <u>but</u> to harass and injure the Respondents. Moreover, they can only be counterproductive to the Petitioners' stated goal of obtaining satisfaction of the Judgment. The Respondents therefore respectfully request that the Court stay further enforcement activities so that the Respondents can finalize the financing and pay the judgment without the further execution risk, harassment and prejudice created by Petitioners' enforcement actions.

**STATEMENT OF FACTS**

On December 28, 2012, an arbitral tribunal issued a final award against BDL, SDL, Black Gold, Sea Biscuit International Inc. ("Sea Biscuit"), Schahin Holding S.A., and Schahin Engenharia S.A. in the amount of $69.4 million. This Court confirmed the arbitral award and entered judgment on March 13, 2013, against BDL, SDL, and Black Gold, and on April 22, 2013, against Schahin Engenharia, Schahin Holding, and Sea Biscuit. Docket Nos. 22 and 53. As set forth in more detail below and in the accompanying affidavits and declarations, the Respondents do not have the liquidity, and therefore have both sought financing and attempted to reach agreement with Petitioners, to permit them to satisfy the Judgment.

2

**A.      Despite Their Strong Financial Health, the Judgment Debtors Cannot Presently Satisfy the Judgment Due to a Temporary Liquidity Shortage**

The judgment debtors are profitable, solvent, appropriately leveraged and fully intent on satisfying the Judgment.

As an initial matter, as the Court is aware, judgment debtors Sea Biscuit, Black Gold, BDL and SDL are all special purpose vehicles which were created specifically for the Black Gold project.  Despite these entities' high net worth, as is typical in project finance, all of these companies' assets are subject to a security interest.  Therefore, as this Court has repeatedly recognized, their assets are not property subject to enforcement.  *See* April 30, 2013 Memorandum Order ("April 30 Order") at 8; August 6, 2013 Memorandum Order ("August 6 Order") at 9. The only funds generated by these companies which are available for distribution other than to secured parties are those that are paid out of the relevant waterfall; only once the funds leave the project accounts does the lenders' security interest fall away.  (*Id.*)  Because the projects do not currently generate enough revenue to cover principal, interest and operating expenses, the only funds that could flow out of the waterfall are the operating expense reimbursements payable to Schahin Engenharia.[1] A withdrawal transfer certificate was submitted

███████████████████████████████████████████

███████████████████████████████  (Affidavit of Paul S. Hessler ("Hessler Aff.") at Ex. 1 (Declaration of Fernando Schahin ("Schahin Decl.") ¶ 23)).

---

[1]      While offshore operating expenses for the S.S. Amazonia and S.S. Pantanal are paid directly to Black Gold, a judgment debtor, and Respondents have requested that these funds be turned over to CIMC, offshore operating expenses for the remaining vessels are not paid to any judgment debtor. For example, offshore operating expenses for the Vitoria are paid to Deep Black Drilling and offshore operating expenses for the S.C. Lancer are paid to Turasoria S.A.  (Schahin Decl. ¶ 10).

3

The remaining judgment debtors, Schahin Holding and Schahin Engenharia, are profitable and solvent, but do not have the liquidity to satisfy the Judgment at this time. Over the last year, these two entities ███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████;

(*See* Hessler Aff. at Ex. 2 (Declaration of José Isaias Hoffmann ("Hoffman Decl.") at Exs. A, B, D, E and ¶¶ 14, 16)). During this same period, however, Schahin Holding's ███████

█████████████████████████████████████████████

██████████████████████████████ (*Id.*)

These judgment debtors' long-term viability is also strong, with sufficient assets available to satisfy the Judgment, and their day-to-day business expenses. (Hoffmann Decl. ¶ 22). Generally, the higher the general solvency ratio, the more favorable. Both Schahin Holding and Schahin Engenharia have high general solvency ratios, which is calculated by dividing total assets by total liabilities. (*Id.*) This metric measures the ability of a corporation to satisfy its long-term debt and expenses, and its ability to expand and grow over the long-term. (*Id.*) In 2011, Schahin Holding's general solvency ratio was 2.846 and in 2012, its general solvency ratio was 2.320. (*Id.* ¶ 23). ██████████████████████████

████████████████████ (*Id.* ¶ 24). ████████████████████

---

[2]  The gross profit margin is a strong indicator of a company's profitability. It evaluates a company's earnings as a result of operations and whether this is enough to pay future expenses. (Hoffmann Decl. ¶ 15). Though Schahin Holding's ████████████████ ████████████████████████ these still remained positive and in line with the gross profit margin of comparable companies in the industry. (Hoffmann Decl. ¶¶ 15, 17).

[3]  Gross profits decreased for both of these entities as a result of cost increases for their contracts, delays in project clearances and work fronts, and increased fixed costs. (Hoffmann Decl. ¶ 14).

████████████████████████████████ (*Id.*)  Though the general

solvency ratio for both companies has decreased slightly from 2011, they still remained high, and

are greater than similar companies in the industry, who have a general solvency ratio ranging

from 1.819 to 2.095.  (*Id.*)

      Both Schahin Holding and Schahin Engenharia have healthy leverage ratios as

well.[4]  (*Id.* ¶¶ 19, 20).  Here, lower ratios are preferable, as they signify lower financial risk.

Indeed, both entities' debt-to-equity and debt ratios are very low, indicating that these companies

have been able to finance their projects largely with equity rather than debt.  (*Id.*)  Schahin

Holding's debt-to-equity ratio █████████████████████████████████████

████████████████████████.  (*Id.* ¶ 19).  Schahin Engenharia's debt-to-equity

ratio █████████████████████████████████████████

████████████████████.  (*Id.* ¶ 20).  Schahin Engenharia's leverage in 2013 increased slightly, but

overall remained low.  Its debt to equity ratio ███████████████████████████

████████████████████.  (*Id.* ¶ 21).  Its debt ratio ████████████████

███████████████████████████████.[5]  (*Id.*)  Although there was some

---

[4]    Leverage is another key component of a company's financial health, and provides an indication of the long-term solvency of the company.  Leverage measures the amount of debt the company has assumed in order to finance its operations.  (Hoffmann Decl. ¶ 18; Steven C. Alberty, *1 Advising Small Businesses* § 12:31 (2013)).  Though companies generally rely on both debt and equity to finance their operations, if the cost of capital from third parties exceeds the company's return on investments, there is an increased financial risk.  (Hoffmann Decl. ¶ 18).  Two common ratios used to evaluate a company's leverage are the debt to equity ratio and the debt ratio.  (*Id.*)  The debt to equity ratio is calculated by dividing total liabilities by equity.  (*Id.*)  It shows the proportion of capital between debt and equity.  (*Id.*)  The debt ratio is calculated by dividing total liabilities by total assets.  It shows the company's ability to honor its obligations in the short and long-term.  (*Id.*)

[5]    As a result of unexpected cost increases under certain engineering contracts with Petrobras in 2013, Schahin Engenharia was forced to increase its debt load, which resulted in a slight increase in leverage.  (Hoffmann Decl. ¶ 21).

slight increase in leverage since 2011 for both entities, these ratios remained low and more favorable than other companies in the same industry. Comparable companies were significantly more leveraged, with a debt to equity ratio of 1.082 to 1.424 and a debt ratio of 0.499 to 0.566, and thus carry greater financial risk. (*Id.* ¶¶ 19, 20).

Although the judgment debtors' overall financial health is strong, they are temporarily suffering from a liquidity shortage which has prevented them from satisfying the Judgment. Liquidity is a measure of a firm's ability to satisfy its short-term obligations, and is calculated by comparing the amount of cash and other assets that can quickly be converted into cash, to the company's cash needs (or current liabilities). (Hoffmann Decl. ¶ 25; *Financial Handbook For Bankruptcy Professionals* § 1.7 (2d ed. 2013)). The current ratio and quick ratio are two common metrics used to measure liquidity. (Hoffmann Decl. ¶ 25; Bob Kulpa, *Being Liquid Doesn't Mean Being All Wet: Measuring Liquidity*, ALA News 29 (Dec. 1993/Jan.1994)). The current ratio measures current assets against current liabilities. (*Id.*) Not all current assets can be converted into cash immediately, however. (*Id.*) Therefore, a more conservative metric is the quick ratio which excludes inventory from the equation since it is the least liquid of all current assets. (Hoffmann Decl. ¶ 25; Steven C. Alberty, *1 Advising Small Businesses* § 12:31 (2013)).

From 2011 to 2012, Schahin Holding's and Schahin Engenharia's liquidity decreased. Schahin Holding's current ratio[6] ███████████████████████, while its quick ratio[7] ████████████████ (Hoffmann Decl. ¶ 26). Schahin

---

[6]   A current ratio measures a company's ability to satisfy its obligations in the short-term by dividing current assets by current liabilities. (Hoffmann Decl. ¶ 23).

[7]   The quick ratio also measures liquidity, though it is more conservative than the current ratio since it excludes inventory from current assets since these may be difficult to convert into cash very quickly. (Hoffmann Decl. ¶ 24).

Engenharia's current ratio and quick ratios (which were identical) ████████████

████████████. (*Id.* ¶ 27).  Schahin Engenharia's liquidity constraints have slowly eased in

2013, as its current and quick ratios ████████████████

████████████. (*Id.* ¶ 27). ████████████████

████████████████████████████

████████████████████████████ (*Id.* ¶¶

26, 27).  Thus, although the judgment debtors have enough assets to satisfy their debts, as

evident by their strong general solvency ratio, it will be difficult for them to satisfy the Judgment

in the near-term without financing because many of these assets cannot be easily converted to

cash.  (*Id.* ¶ 25).

These entities' liquidity constraints are magnified if one only considers their

ability to satisfy their short-term obligations with cash on hand.[8]  (*Id.* ¶ 28).Companies rely on

cash to fund working capital, investments, and applications.  (*Id.*)  A cash ratio assesses the

company's ability to satisfy its short-term obligations with cash. It is calculated by dividing cash

and cash equivalents by current liabilities.  (*Id.*) ████████████████

████████████████████. (*Id.*) ████████

████████████████████████

████████████████████████████

████████████████ (*Id.*)

---

[8]     The cash ratio is therefore the most conservative liquidity ratio.  In considering a
company's liquidity, it excludes all current assets except the most liquid: cash and cash
equivalents.

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

████████████████████████ (Hoffman Decl. Ex. F and ¶ 29). ████████

████████████████████ (*Id.*) ████████

██████████████████████████████████████

████████████████████████ (*Id.*)  As

explained by Fernando Schahin, the significant decrease in Schahin Engenharia's cash position

(from 35.2 million Reais on June 31, 2013 to 5.2 million Reais on August 23, 2013) is directly

attributable to CIMC's enforcement actions, which have severely impaired Respondents' ability

to renew its lines of credit or its ability to access new lines of credit. ( Schahin Decl. ¶ 11).

CIMC's enforcement actions, through its restraining notices and writs of execution, have blocked

payments owed to Schahin Engenharia, further reducing liquidity. (*Id.*)  CIMC's actions have

given rise to a vicious cycle, since with lower liquidity Schahin Engenharia has been unable to

buy materials and equipment that could have been utilized to perform under certain engineering

contracts, which reduced the value of the invoices issued, resulting in less receivables and

therefore liquidity. (*Id.*)  As a result of CIMC's enforcement actions, and their effects on these

entities' cash on hand, they are not able to satisfy the approximately $71 million Judgment while

still maintaining adequate funds to operate, and therefore need financing to satisfy the judgment.

**B.** ████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

(*See* Hessler Aff. ¶¶ 3-10).[9] ██████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████ (Hessler

Aff. ¶ 3).

---

[9]    Because CIMC has expressed sensitivity about the disclosure of settlement communications, Respondents provide only a limited description of the discussions between the parties.  Although Fed. R. Evid. ("FRE") 408 bars the admission of evidence of "conduct or statements made in compromise negotiations" "to prove liability for or invalidity of [a] claim or its amount," it "does not require the exclusion" when the evidence is offered for another purpose.  The Second Circuit has ruled that FRE 408 exemption "clearly intends to exempt from the absolute prohibition of the Rule evidence focused on issues different from the elements of the primary claim in dispute." *PRL USA Holdings, Inc. v. U.S. Polo Ass'n*, 520 F.3d 109, 114 (2d Cir. 2008) (finding that FRE 408 did not apply to the affirmative defense of estoppel).  The description of the settlement communications offered in this memorandum does not go to the validity or invalidity of a claim or its amount, but rather to demonstrate that the Petitioners' enforcement actions are not geared toward recovery of the Judgment and accordingly that a stay is warranted. *See B.D. Int'l Discount Corp. v. Chase Manhattan Bank (In re B.D. Int'l Discount Corp)*, 701 F.2d 1071, 1074 n.4 (2d Cir. 1983) (admitting evidence related to compromise negotiations because parties agreed on the amount of the claim, but were negotiating the payment schedule). While the Respondents have provided only the minimum details necessary, they reserve the right to introduce further evidence should it be required.

**C.     The Petitioners' Aggressive Enforcement Actions Have Impaired the Respondents' Ability to Obtain Traditional Financing to Pay the Judgment**

While the Respondents have sought financing to pay the Judgment, the Respondents' ability to obtain the necessary funds has been stymied by CIMC's hyper-aggressive post-judgment enforcement actions. (Schahin Decl. ¶ 4). For example, since obtaining the Judgment in March and April, CIMC has served approximately fifty-six restraining notices on a number of entities, including numerous financial institutions with which Respondents have never done business. *See* April 29, 2013 Hearing Transcript at 22:1-23:25. CIMC's enforcement actions have been made without regard to existing security and other interests, forcing certain third-parties to seek relief from this Court. This issue was brought before this Court at a hearing on April 29, 2013, during which MS Drillship I noted that CIMC had served its parent corporation, Mitsubishi, despite the fact that Mitsubishi had never had any business contact with the Respondents. *See id.* at 23:1-25. In addition, CIMC has served restraining notices on Banco de Brazil, S.A., Morgan Stanley, and Banco Comercial Portugues, all of whom, like Mitsubishi, have no business relationship with the Respondents. (Schahin Decl. ¶ 3). These numerous restraining notices have impaired the Respondents' ability to obtain traditional financing in order to pay the Judgment, as banks have become increasingly wary of CIMC's post-judgment enforcement actions. (*See id.* ¶ 4).

**D.     Respondents Are In The Process Of Obtaining Financing That Will Permit Full Payment of the Judgment**

Because of the complications in obtaining traditional financing, the Respondents have sought out non-traditional financing ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████ (Hessler Aff. ¶ 4). ███████████████████████

█████████████ (*Id.*). ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ (*Id.* ¶ 5).

█████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ (*Id.* ¶ 6). ██████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████ (*Id.* ¶ 8).

█████████████████████████████████████████████████

██████████████████████████████ (*Id.* ¶ 7).  The parties reached some mutual ground and

arrived at a joint stipulation over August 19 and 20, 2013, requesting, in part, that this Court

extend its turnover deadline to August 23, 2013.  Docket No. 89. ███████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

██████████████ (Hessler Aff. ¶ 8). ████████████████████

████████████████████████████████████████████



(*Id.* ¶ 9).

(*Id.* ¶ 9).

(*Id.* ¶ 10).  The Respondents therefore bring this motion seeking a stay of enforcement ████ That payment schedule, which the Respondents have already begun to implement ████████ ████████, will result in payment of $71 million to the Petitioners this year.  (Schahin Decl. ¶ 23).

## ARGUMENT

**I.   THIS COURT SHOULD EXERCISE ITS EQUITABLE POWER TO STAY ENFORCEMENT TO ALLOW RESPONDENTS TO FINALIZE THE FINANCING NECESSARY TO SATISFY THE JUDGMENT THIS YEAR**

Under Section 5240 of the CPLR, courts have "broad discretionary power to control and regulate the enforcement of a money judgment under article 52 to prevent 'unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or the courts.'" *Guardian Loan Co., Inc. v. Early*, 392 N.E.2d 1240, 1242-43 (N.Y. 1979) (citing Third Preliminary Report of the Advisory Comm. on Practice and Procedure, 1959, at 314).  As discussed above, ██████████████████████████████ ██████████████████████████████████████.  Despite Respondents' good faith efforts, CIMC's demands have continued to present a moving target, and the ongoing enforcement activity has prevented Respondents from satisfying the judgment

more quickly.  Since it has become clear that CIMC is more concerned with continuing to disrupt Respondents' businesses than with collecting on its judgment in a timely manner, the Respondents respectfully request that the Court exercise its discretion to stay enforcement for as long as Respondents adhere to the below payment schedule, which satisfies the Judgment in full this year.

Specifically, Respondents anticipate that Petrobras will soon turn over approximately $4 million in funds that have been restrained due to enforcement actions taken by CIMC; Respondents do not object to this turnover.  (Schahin Decl. ¶ 10).  On August 23, 2013,

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

██████ waterfall.  (*Id*.)  Respondents are additionally prepared to turn over a combined $4.2 million on October 5, 2013, $2 million on November 5, 2013, and $3 million on December 5, 2013.  (*Id*. ¶ 9).  This provides for a total contribution of $21 million directly from the Respondents', and given the available liquidity, seeking more of a direct contribution would severely threaten operations.  (Hofmann Decl. ¶¶ 19-21).  The balance of the Judgment will be satisfied this year, however, once the internal approval process at Petrobras has finalized (in approximately 60 days).  (Schahin  Decl. ¶ 8).  As an advance against services that a third-party Schahin entity is providing, Petrobras will transfer to CIMC $26 million as an up front payment, and $6 million each for September 5, October 5, November 5, and December 5, 2013.  (*Id*.)  The initial $26 million payment will be accompanied by any $6 million installments that are "missed" while the financing agreement is finalized and approved.  (*Id*.)  That is, if the financing

agreement is finalized on October 10, the initial advance will consist of $26 million plus two $6 million installments that would have been paid on the September 5 and October 5.

        CPLR 5240 empowers the Court to stay post-judgment enforcement, particularly if the Respondents are in the process of acquiring financing to pay the judgment. *See 2301 Jerome Ave. Realty Corp. v. Di Paolo*, 737 N.Y.S.2d 816, 818 (Sup. Ct. 2002) (granting a stay of enforcement in light of the fact that mortgagor was able to secure financing to satisfy the accelerated amount due under the mortgage); *Pine St. Assocs., L.P v. Southridge Partners, L.P.*, No. 65109/2010, 2011 WL 10646532, at *3 (N.Y. Sup. Sept. 7, 2011) (providing for a stay of enforcement until the question of whether the judgment was satisfied could be determined). As stated above, the sixty-day requirement is one necessitated by Petrobras, since it must obtain approval from its board of directors and the other two companies that form part of its consortium. (Schahin Decl. ¶ 7).

        CIMC will not suffer any prejudice if this Court were to grant such a stay. A condition of these advances is that Respondents must use the sums to satisfy the Judgment, ensuring that the advances will be used to pay Petitioners. In addition, the Respondents have already submitted the Withdrawal Transfer Certificates requesting a transfer of over $7.8 million of offshore operating expenses to CIMC, when the offshore waterfall runs on September 5, 2013. (Schahin Decl. ¶ 23). The payment on September 5 accounts for a little over 10 percent of the Judgment. In the interim, Petitioners will continue to earn interest of 9 percent per annum on the Judgment. A stay would serve the dual purposes of post-judgment enforcement and CPLR 5240, by ensuring that Petitioners' award is paid by and preventing "unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice" to the Respondents. *Guardian Loan Co.*, 392 N.E.2d at 1242.

14

## CONCLUSION

For the foregoing reasons, the Respondents respectfully request that the Court exercise its discretion to stay further enforcement actions to permit the Respondents to finalize financing and pay the Judgment.

Dated:     New York, New York
           August 27, 2013

Respectfully submitted,

Linklaters LLP

By: _____
        Paul S. Hessler
        Patrick Ashby
        1345 Avenue of the Americas
        New York, NY 10105
        (212) 903-9000
        (212) 903-9100 (fax)

*Attorneys for Respondent Baerfield Drilling
LLC, Soratu Drilling LLC, Black Gold Drilling
LLC, and Schahin Engenharia S.A.*