UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CIMC RAFFLES OFFSHORE (SINGAPORE) PTE.
LTD. AND YANTAI CIMC RAFFLES
OFFSHORE LIMITED,

                          Petitioners,

              v.

SCHAHIN HOLDING S.A., SCHAHIN
ENGENHARIA S.A., SEA BISCUIT
INTERNATIONAL INC., BLACK GOLD
DRILLING LLC, BAERFIELD DRILLING LLC
and SORATU DRILLING LLC,

                          Respondents.

13 Civ. 0052 (JSR)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN OPPOSITION TO CIMC RAFFLES'
MOTION TO HOLD RESPONDENTS (OTHER THAN SEA BISCUIT
INTERNATIONAL INC.) IN CONTEMPT OF COURT AND IN
SUPPORT OF JUDGMENT DEBTORS' MOTION TO STAY
<u>ENFORCEMENT</u>**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

    A.    Respondents Have Made Numerous Attempts to Satisfy the Judgment Only To Be Rebuffed by Petitioners' Ever-Increasing Demands ............................................... 3

    B.    Respondents Are Finalizing Financing To Fully Satisfy the Judgment Despite Petitioners' Aggressive Enforcement Actions That Have Limited Financing Options ...................................................................................................................... 5

ARGUMENT ......................................................................................................................... 6

I.    DUE TO THE HARSHNESS OF CONTEMPT SANCTIONS, CIMC MUST SATISFY A RIGOROUS STANDARD ............................................................................ 6

II.    CONTEMPT SANCTIONS ARE NOT WARRANTED  AGAINST BLACK GOLD, BDL, AND SDL BECAUSE THEY COMPLIED WITH THE COURT'S ORDERS TO THE EXTENT THEY WERE ABLE ....................................................................... 8

III.    THOUGH LIQUIDITY RESTRAINTS PREVENTED SCHAHIN HOLDING AND SCHAHIN ENGENHARIA FROM COMPLYING WITH THE AUGUST 6 ORDER, THEY NONETHELESS MADE DILIGENT ATTEMPTS TO COMPLY AND THEREFORE CANNOT BE HELD IN CONTEMPT ........................................... 10

    A.    Schahin Holding's and Schahin Engenharia's Inability to Comply With the April 6 Order is a Complete Defense to Civil Contempt ........................................... 11

        1.    Inability to comply with an order is a complete defense to civil contempt ...... 11

        2.    Though Schahin Holding and Schahin Engenharia have strong long term financial health, their current liquidity shortage prevents them from satisfying the Judgment immediately without financing ................................. 12

    B.    Despite These Liquidity Constraints, Schahin Holding and Schahin Engenharia Made Diligent Attempts to Comply in a Reasonable Manner ................................... 18

IV.    BECAUSE CIMC'S SOLE MOTIVATION IS TO INFLICT HARM ON RESPONDENTS, CIVIL CONTEMPT IS PLAINLY INAPPROPRIATE ...................... 20

    A.    The Imposition of Civil Contempt Sanctions Will Not Coerce Future Compliance or Remedy Past Compliance and Are Therefore Inappropriate ............. 21

    B.    CIMC Has Sought Civil Contempt Sanctions Only to Inflict Further Harm on the Respondents ....................................................................................................... 22

V.    THE AMOUNT OF FINES SOUGHT BY CIMC IS GROSSLY DISPROPORTIONATE ........................................................................................... 23

VI.   CIMC IS NOT ENTITLED TO ATTORNEYS' FEES BECAUSE RESPONDENTS'
ACTIONS WERE NOT WILLFUL.................................................................................. 25

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adams v. New York State Educ. Dep't*,
No. 08 CIV. 5996VM, 2013 WL 4054875 (S.D.N.Y. Aug. 1, 2013)...........................................18

*Am. Honda Motor Co. v. V.M. Paolozzi Imports, Inc.*,
No. 7:10-CV-955 955 FJS/ATB, 2013 WL 1296421 (N.D.N.Y. Mar. 26, 2013)........................13

*Archer Daniels Midland Co. v. United States*,
917 F. Supp. 2d 1331 (Ct. Int'l Trade 2013) ...................................................................13, 15

*Aspira of N.Y., Inc. v. Bd. of Ed.*,
423 F. Supp. 647 (S.D.N.Y. 1976) ..................................................................................18, 20

*Badgley v. Santacroce*,
800 F.2d 33 (2d Cir. 1986)..............................................................................................11, 21

*Bear U.S.A., Inc. v. Kim*,
71 F. Supp. 2d 237 (S.D.N.Y. 1999), *aff'd*, 216 F.3d 1071 (2d Cir.), *and aff'd sub nom.*,
*Bear U.S.A., Inc. v. Bing Chuan Grp. U.S.A., Corp.*, 216 F.3d 1071 (2d Cir. 2000) ...................25

*Cal. Artificial Stone Paving Co. v. Molitor*,
113 U.S. 609 (1885)...............................................................................................................7

*Capital Ventures Int'l v. Argentina*,
280 F. App'x 14 (2d Cir. 2008) ..............................................................................................8

*Chao v. Gotham Registry, Inc.*,
514 F.3d 280 (2d Cir. 2008)....................................................................................................7

*Cordius Trust v. Kummerfeld Assocs., Inc.*,
658 F. Supp. 2d 512 (S.D.N.Y. 2009)...............................................................................6, 7, 25

*Dole Fresh Fruit Co. v. United Banana Co.*,
821 F.2d 106 (2d Cir. 1987)....................................................................................................24

*Donovan v. Sovereign Sec., Ltd.*,
726 F.2d 55 (2d Cir. 1984).....................................................................................................10

*E.E.O.C. v. Local 638 (3)27 Local 28 of the Sheet Metal Workers' Int'l Ass'n*,
117 F. Supp. 2d 386 (S.D.N.Y. 2000), *aff'd sub nom.*, *E.E.O.C. v. Local 28 of Sheet
Metal Workers Int'l Ass'n*, 247 F.3d 333 (2d Cir. 2001).......................................................14, 15

iii

*Edeh v. Carruthers,*
No. CIV. 10-2860 RJK/JSM, 2011 WL 4808194 (D. Minn. Sept. 20, 2011) ...............................22

*Edeh v. D. Scott Carruthers Attorneys at Law,*
No. CIV. 10-2860 RHK/JSM, 2011 WL 4808191 (D. Minn. Oct. 11, 2011) ...............................22

*Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.,*
No. 06 CIV 0085, 2007 WL 2982295 (S.D.N.Y. Oct. 10, 2007) ...................................25

*Funnekotter v. Republic of Zimbabwe,*
No. 09 CIV. 08168 CM THK, 2011 WL 5517860 (S.D.N.Y. Nov. 10, 2011)......................22, 25

*Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc.,*
341 F.2d 101 (2d Cir. 1965)...............................................................7

*Hicks ex rel. Feiock v. Feiock,*
485 U.S. 624 (1988)...........................................................................11

*IBM Corp. v. United States,*
493 F.2d 112 (2d Cir. 1973)...........................................................20, 24

*Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n,*
389 U.S. 64 (1967)...............................................................................7

*Leadsinger, Inc. v. Cole,*
No. 05 CIV. 5606, 2006 WL 2266312 (S.D.N.Y. Aug. 4, 2006) ...................................22

*Levin v. Tiber Holding Corp.,*
277 F.3d 243 (2d Cir. 2002)...............................................................8

*Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,*
885 F.2d 1 (2d Cir. 1989)...................................................................20

*In re Marc Rich & Co., A.G.,*
736 F.2d 864 (2d Cir. 1984)...............................................................21

*McComb v. Jacksonville Paper Co.,*
336 U.S. 187 (1949)......................................................................18, 20

*Musalli Factory for Gold & Jewelry Co. v. New York Fin. LLC,*
No. 06 CIV. 82, 2010 WL 2382415 (S.D.N.Y. June 14, 2010)...................................20

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.,*
369 F.3d 645 (2d Cir. 2004).........................................................7, 11, 22

*Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.,*
673 F.2d 53 (2d Cir. 1982)...................................................................................24

*S.E.C. v. Contini,*
No. 93 CIV. 4400, 2005 WL 2649092 (S.D.N.Y. Oct. 17, 2005) ................................18

*S.E.C. v. Mattera,*
No. 11 CIV. 8323 PKC, 2012 WL 4450999 (S.D.N.Y. Sept. 26, 2012) ..............7, 8, 10

*S.E.C. v. O'Hagan,*
901 F. Supp. 1476 (D. Minn. 1995) ........................................................................13

*S.E.C. v. Universal Exp., Inc.,*
546 F. Supp. 2d 132 (S.D.N.Y. 2008)......................................................................13

*Schmitz v. St. Regis Paper Co.,*
758 F. Supp. 922 (S.D.N.Y. 1991) ..........................................................................18

*In re Sobol,*
242 F. 487 (2d Cir. 1917)........................................................................................11

*Stringfellow v. Haines,*
309 F.2d 910 (2d Cir. 1962)......................................................................................8

*United States v. Ohle,*
No. S3 08 Cr. 1109, 2012 WL 2861347 (S.D.N.Y. July 6, 2012)................................24

*United States v. Panhandle E. Corp.,*
696 F. Supp. 983 (D. Del. 1988)........................................................................14, 17

*United States v. Rylander,*
460 U.S. 752 (1983)................................................................................................21

*United States v. United Mine Workers of Am.,*
330 U.S. 258 (1947)............................................................................20, 22, 23, 24

*Wella Corp. v. Wella Graphics, Inc.,*
874 F. Supp. 54 (E.D.N.Y. 1994) ..............................................................................7

## STATUTES & RULES

N.Y. C.P.L.R. 5201 .................................................................................................8

Fed. R. Evid. 408 ...................................................................................................3

# <u>OTHER AUTHORITIES</u>

Margaret Meriwether Cordray, *Contempt Sanctions and the Excessive Fines Clause,*
76 N.C. L. Rev. 407 (1998) ................................................................................................24

Respondents Baerfield Drilling LLC ("BDL"), Soratu Drilling LLC ("SDL"), Black Gold Drilling LLC ("Black Gold") and Schahin Engenharia S.A (collectively, "Respondents"), respectfully submit this Memorandum in Opposition to CIMC Raffles' Motion to Hold Respondents (Other Than Sea Biscuit International Inc.) In Contempt of Court and In Support of Judgment Debtors' Motion to Stay Enforcement.

## PRELIMINARY STATEMENT

CIMC[1] asks this Court, in the event that Respondents fully pay the Judgment by the end of this year, with the accruing 9% interest, for a contempt fine of 680 tredecillion, 564 duodecillion, 733 undecillion, 841 decillion, 876 nonillion, 926 octillion, 926 septillion, 749 sextillion, 214, quintillion, 863 quadrillion, 536 trillion, 422 billion, 911 million, five hundred thousand dollars.  As a numeric figure, that is expressed as $680,564,733,841,876,926,926,749,214,863,536,422,911,500,000.  Clearly, CIMC has not brought this motion as a credible attempt to satisfy it's Judgment (Respondents have already made numerous credible proposals to CIMC in this regard), but as yet another mechanism to harass Respondents that CIMC knows do not have the liquid assets to satisfy the Judgment without financing, and whom the Respondents continue to prevent from obtaining such financing through their overly aggressive post-judgment enforcement actions.

The fact remains that the Respondents have complied with this Court's Orders to the fullest extent possible, and when it was clear that the Respondents efforts would fall short of their legal obligations, due to limitations beyond their control, they either stipulated to stay in compliance, or sought leave from the Court so that they might remain in compliance.  Moreover, Respondents have diligently attempted to satisfy this Court's Judgment for months, with credible

---

[1]      Capitalized terms not otherwise defined herein have the meaning given them in Judgment Debtors' Motion to Stay Enforcement.

enough efforts that CIMC even agreed to extend this Court's turnover Order so that settlement talks might continue. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ Respondents have also already taken steps to have approximately $7.8 million turned over to CIMC on September 5, 2013, the *first* waterfall following this Court's August 6 Order.

CIMC may be dissatisfied that the Respondents financial position has changed since May 2012, when Mr. Fernando Schahin last addressed these companies financial position – most importantly, the Respondents' available liquidity has changed, due in no small measure to CIMC's own enforcement activity – and that they are therefore not able to be paid more quickly. But that does not color the financial position of the Respondents today, or the diligent attempts at compliance that the Respondents have made within the realities of their circumstances. CIMC has chosen to ignore this reality, instead requesting contempt fines that will quickly reach 680 tredecillion dollars. That is fine. In the same vein as CIMC's other enforcement activity to date, it may not be helpful for satisfying the Judgment, but Respondents will nevertheless continue to diligently move forward with making payments (despite their liquidity restraints), and finalizing the Petrobras financing, so that a full $71 million is paid to CIMC this year. Under the circumstances, and in accordance with federal law, Respondents cannot be found in contempt.

## STATEMENT OF FACTS

As this Court is well-versed in the relevant facts underlying this motion, which have been set forth previously in Respondents' Opposition to Petitioners' Motion for Post-Judgment Enforcement [Docket No. 40], Portigon AG's Memorandum in Support of Its Motion

2

For Relief From Petitioners' Enforcement Actions [Docket No. 38], Respondents' Opposition to Petitioners' Second Motion for Post-Judgment Enforcement [Docket No. 75], and Respondents' Memorandum in Support of Judgment Debtors' Motion to Stay Enforcement ("Stay Motion") [Docket No. 104], these facts are not recounted here again but rather are incorporated by reference. For purposes of this motion, only a few pertinent facts bear repeating and a few new facts, related to Respondents' diligent efforts at compliance, need to be introduced.

**A.   Respondents Have Made Numerous Attempts to Satisfy the Judgment Only To Be Rebuffed by Petitioners' Ever-Increasing Demands**

As stated in the Stay Motion, Respondents have made numerous attempts to reach an agreement with the Petitioners on a plan to satisfy the Judgment. Stay Motion at 9. Due to CIMC's sensitivities regarding settlement communications, Respondents provided only a limited discussion of these attempts in the Stay Motion. However, CIMC now asserts that Respondents have made only a "belated and half-hearted attempt" to meet their payment obligations, necessitating a more fulsome recounting of the scope of Respondents' efforts.[2] CIMC Raffles' Motion to Hold Respondents (Other Than Sea Biscuit International Inc.) In Contempt of Court ("CIMC Br.") [Docket No. 101] at 3.

On April 16, 2013, certain Respondents made their first appearance in this case, by filing a response to CIMC's motion for post-judgment enforcement. Docket No. 40. ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[2]   Although Fed. R. Evid. ("FRE") 408 bars the admission of evidence of "conduct or statements made in compromise negotiations" "to prove liability for or invalidity of [a] claim or its amount," it "does not require the exclusion" when the evidence is offered for another purpose. The description of the settlement communications offered in this memorandum does not go to the validity or invalidity of a claim or its amount, but rather to demonstrate Respondents' early and persistent attempts to satisfy the Judgment, and Petitioners' equally persistent efforts to retard all conditions necessary for satisfaction of the Judgment.

3

████████████████████████████████████████████

████████████████████████████████████████████

**B.    Respondents Are Finalizing Financing To Fully Satisfy the Judgment Despite Petitioners' Aggressive Enforcement Actions That Have Limited Financing Options**

After the repeated failure to reach an agreement with CIMC that would allow Respondents to satisfy the Judgment, it became clear that CIMC would not ease its post-judgment enforcement actions, even if that impaired (and perhaps because it impaired) Respondents' ability to obtain the necessary financing to satisfy the Judgment.  The impact of CIMC's hyper-aggressive post-judgment enforcement actions on the availability of financing, and Respondents' persistence and creativity in securing non-traditional financing in order to meet their obligations, is detailed more fully in the Stay Motion, and incorporated herein by reference. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████

5

███████████████████████████████████████████████████████

██████████████████████████

       Respondents' persistent good faith efforts to satisfy the Judgment this year refute CIMC's accusation of a "minimalist approach."  CIMC Br. at 9.  Respondents may have placed too much faith in CIMC's motives throughout the settlement process, but as soon as settlement discussions broke down Respondents sought relief from this Court in the form of a stay from enforcement, and Respondents have continued to implement a payment schedule that provides $71 million to the Petitioners this year, ██████████████████████████████ ██████████████████████████████ A Withdrawal Transfer Certificate (WTC) was submitted on August 23, 2013, directing $7.8 million in offshore operating expenses to be paid over to CIMC by September 5, 2013 – the *first* waterfall date following the Court's August 6 Order. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ Satisfying a $71 million judgment this year, despite CIMC's zealous enforcement activity that has severely restricted available financing and squeezed liquidity (already negatively impacted by CIMC's late delivery of the S.S. Amazonia and S.S. Pantanal, by over two years and one year, respectively), is many things, but certainly not "minimalist," "belated," or "half-hearted."  CIMC Br. at 3, 6.

## ARGUMENT

## I.   DUE TO THE HARSHNESS OF CONTEMPT SANCTIONS, CIMC MUST SATISFY A RIGOROUS STANDARD

       Courts have inherent power to hold a party in contempt, which preserves the court's authority and ensures that justice is efficiently and swiftly administered.  *Cordius Trust v. Kummerfeld Assocs., Inc.*, 658 F. Supp. 2d 512, 515 (S.D.N.Y. 2009).  Despite their occasional

necessity, contempt sanctions nonetheless remain a harsh remedy. *Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc.*, 341 F.2d 101, 103 (2d Cir. 1965); *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) ("The judicial contempt power is a potent weapon."); *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885) ("Process of contempt is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct."). As a result, the judicial power to impose sanctions is circumscribed, and movants seeking contempt must satisfy a rigorous standard. *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 291 (2d Cir. 2008); *Wella Corp. v. Wella Graphics, Inc.*, 874 F. Supp. 54, 56 (E.D.N.Y. 1994).[3]

A party may be held in civil contempt for failure to comply with a court order if (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner. *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004). Contemptuous conduct generally includes willful noncompliance with a court order, though a finding of willfulness is not necessary. *Cordius Trust*, 658 F. Supp. 2d at 515-16.

An order is clear and unambiguous if it is specific and definite enough to identify the proscribed conduct. *S.E.C. v. Mattera*, No. 11 CIV. 8323 PKC, 2012 WL 4450999, at *11 (S.D.N.Y. Sept. 26, 2012). *Leadsinger Inc. v. Cole*, No. 05 CIV. 5606, 2006 WL 2266312, at *9 (S.D.N.Y. Aug. 4, 2006) ("A clear and unambiguous order . . . leaves 'no uncertainty in the minds of those to whom it is addressed', who 'must be able to ascertain from the four corners of the order precisely what acts are forbidden.'") (internal citations omitted). The movant bears the

---

[3] Even after a court determines contempt sanctions are warranted, the court must "use the *least possible power* adequate to the end proposed." *Cordius Trust*, 658 F. Supp. 2d at 524 (emphasis added).

burden of proof to establish the offense by "clear and convincing evidence," which is a higher standard than the preponderance of evidence standard applicable in most civil cases. *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002); *Stringfellow v. Haines*, 309 F.2d 910, 912 (2d Cir. 1962) ("[I]n civil contempt, although the reasonable doubt requirement does not prevail, a bare preponderance of the evidence will not suffice. Proof of violation must be clear and convincing."). The clear and convincing standard requires a quantum of proof adequate to demonstrate a "reasonable certainty" that a violation occurred. *Levin*, 277 F.3d at 250. To show a diligent attempt at compliance so as to negate the third element, a defendant must demonstrate that compliance was "factually impossible." *Mattera*, 2012 WL 4450999, at *12.

## II. CONTEMPT SANCTIONS ARE NOT WARRANTED AGAINST BLACK GOLD, BDL, AND SDL BECAUSE THEY COMPLIED WITH THE COURT'S ORDERS TO THE EXTENT THEY WERE ABLE

In partially granting CIMC's motion for turnover against Black Gold, BDL, and SDL, this Court specified two important caveats. First, the April 30 Order clearly stated that any funds held in the encumbered Black Gold project accounts (which represent the entirety of these three entities' assets) were not subject to a turnover order or any other enforcement device. April 30 Order at 7-8. The Court explained that due to various lenders' security interests in the entirety of the project accounts, Black Gold, BDL, and SDL could not "secure, much less assign or transfer" the project accounts, or the funds therein, which meant these funds were unsuitable for enforcement. *Capital Ventures Int'l v. Argentina*, 280 F. App'x 14 (2d Cir. 2008) (collateral in accounts governed by security and pledge agreements was not property against which a judgment may be enforced).[4] Secondly, the Court explained that while they remained in the project accounts, funds earmarked for operating expense reimbursements were also not subject to

---

[4]   N.Y. C.P.L.R. ("CPLR") 5201 ("A money judgment may be enforced against any property which could be assigned or transferred").

enforcement activity.  August 6 Order at 9.  It was only "*[o]nce the funds are paid to Schahin Engenharia*, [that] the senior lenders' lien is released, and the funds are no longer subject to the superior claims of the senior lenders."  April 30 Order at 8 (emphasis added).[5]  Once this occurred, these funds were no longer subject to a security interest and therefore were subject to enforcement.  *Id.*  In its August 6 Order, the Court also made clear that it would not compel the submission of a withdrawal certificate in order to release operating expenses.  August 6 Order at 9 ("[T]he Court is satisfied that the underlying contracts do not require Schahin Engenharia to [submit a withdrawal certificate] for operating expenses in any given month").

      Black Gold, BDL and SDL do not have any liquid assets outside of the Black Gold offshore project accounts and therefore do not have any unencumbered assets which they could turnover.[6]  August 6 Order at 5 ("As security for the loans, BDL, SDL, and Black Gold made broad pledges of collateral to the senior lenders, including a lien on all interests in the offshore project accounts and all funds at any time on deposit in those accounts.").[7]  Nevertheless, and though the August 6 Order made clear that the Respondents were not obliged to do so, on August 23, 2013, Respondents submitted a withdrawal transfer certificate (WTC) to release $7.8 million in accumulated offshore expenses to be paid to CIMC.  Although CIMC asserts that the Respondents could have submitted the WTC earlier, CIMC Br. at 6, as a practical matter that would not have expedited payments of the funds to CIMC.  That is because, pursuant to the Collateral Agency and Security Deposit Agreement, payments from the project accounts are processed only as part of a contractually mandated "waterfall," which is released by the

---

[5]      The Court once more highlighted this distinction between funds in the project accounts, and funds that have been released in the relief granted, which allows CIMC to "restrain and execute on any payments *made to Schahin Engenharia*" as reimbursement for operating expenses under the Offshore waterfall.  April 30 Order at 13 (emphasis added).

[6]      The Black Gold financing documents prohibit Black Gold, BDL, and SDL from having any other accounts besides the project accounts.  (Brenner Dec'l Ex. A.)

[7]      The Court also recognized that the senior lenders had perfected their security interest in this collateral.  August 6 Order at 5.

Administrative Agent only on the 5th of every month.  (Schahin Decl. ¶ 10.)  When the Court

issued its August 6 Order, the August waterfall had already run, and the next will not run until

September 5.   (Schahin Decl. ¶ 10.)  Black Gold, BDL and SDL submitted the WTC – doing all

they could to cause turnover of the funds – by the turnover deadline set by the Court.  (Schahin

Decl. ¶ 9; Ex. A.)

Black Gold's, BDL's, and SDL's actions were consistent with the Orders and they

do not have any unencumbered funds to turnover.  Complete compliance with the Orders is

therefore impossible.  As such, CIMC is unable to satisfy the necessary elements to warrant

contempt sanctions. *Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55, 59 (2d Cir. 1984) ("Inability

to comply is, of course, a 'long-recognized defense to a civil contempt citation.'"); *see infra* at

IIIA.

## III.    THOUGH LIQUIDITY RESTRAINTS PREVENTED SCHAHIN HOLDING AND SCHAHIN ENGENHARIA FROM COMPLYING WITH THE AUGUST 6 ORDER, THEY NONETHELESS MADE DILIGENT ATTEMPTS TO COMPLY AND THEREFORE CANNOT BE HELD IN CONTEMPT

Where a party has shown that compliance is factually impossible, despite diligent

efforts, there can be no finding of contempt. *S.E.C. v. Mattera*, No. 11 CIV. 8323 PKC, 2012

WL 4450999 (S.D.N.Y. Sept. 26, 2012).  Over the last year, partially as a result of CIMC's

hyper-aggressive enforcement activity, Schahin Engenharia and Schahin Holding have

experienced a temporary liquidity shortage, such that they do not currently have enough liquid

assets to satisfy the Judgment without obtaining financing.  (Schahin Decl. ¶ 4.)  Despite these

liquidity constraints, however, Schahin Engenharia and Schahin Holding have made many

diligent attempts to comply with the August 6 Order – proposing an installment payment plan,

pursuing numerous settlement discussions with CIMC, seeking traditional financing, and when

that failed, non-traditional third party financing and, as a final measure, bringing a Motion to

Stay Enforcement on August 27, 2013, so that Respondents can fully satisfy the Judgment this year.  (Schahin Decl. ¶ 13.)

**A.      Schahin Holding's and Schahin Engenharia's Inability to Comply With the April 6 Order is a Complete Defense to Civil Contempt**

**1.      Inability to comply with an order is a complete defense to civil contempt**

A party's inability to comply with an order is a complete defense to civil contempt sanctions.  *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 638 n.9 (1988) ("Our precedents are clear, however, that punishment may not be imposed in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order."); *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir. 1986) ("A party may defend against a contempt by showing that his compliance is 'factually impossible.'").

Courts have long recognized that a company's financial capacity can make compliance impossible, rendering civil contempt sanctions inappropriate.  *Paramedics Electromedicina Comercial, Ltda*, 369 F.3d at 658 ("A contemnor may be excused from the burden of a civil contempt sanction if it lacks the financial capacity to comply"); *In re Sobol*, 242 F. 487, 489 (2d Cir. 1917) ("The law is . . . well settled that inability to comply with an order requiring the payment of money, resulting from poverty, insolvency, or other cause not attributable to the fault of the party charged, will under ordinary circumstances be received as a valid excuse from the consequences of contempt.").  In raising this defense, the defendant bears the burden of production, *Securities & Exchange Commission v. Mattera*, No. 11 CIV. 8323 PKC, 2012 WL 4450999 (S.D.N.Y. Sept. 26, 2012), which here Respondents have met.  *See infra* at IIIA2.

11

      2.      **Though Schahin Holding and Schahin Engenharia have strong long term financial health, their current liquidity shortage prevents them from satisfying the Judgment immediately without financing**

There are many indicators of a company's financial health, including solvency, profitability, leverage, and liquidity. (Hoffmann Decl. ¶ 15.) With the exception of liquidity, Schahin Holding and Schahin Engenharia are strong across all of these dimensions. (Hoffmann Decl. ¶¶ 19, 21, 22, 24.) Though the Judgment Debtors' Motion to Stay Enforcement provided a more thorough discussion of these entities' financial health, *see* Stay Motion, for the Court's convenience, it is briefly restated here, with a few additional facts. ████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████ (Hoffmann Decl. ¶¶ 25,26.) Both companies also have healthy leverage ratios, indicating that they finance projects largely with equity, rather than debt, which is preferable because it carries less financial risk. (Hoffmann Decl. ¶¶ 21,22.) ███████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████

Despite Schahin Holding's and Schahin Engenharia's long-term financial health, their liquidity has decreased in the last year, and as a result, they cannot satisfy the Judgment, or

---

8      For an explanation of the general solvency ratios, and the other financial ratios used herein, *see* Motion to Stay.

any part thereof, without obtaining financing.[9]  Liquidity is a measure of a firm's ability to satisfy its short-term obligations, and is calculated by comparing the amount of cash and other assets that can quickly be converted into cash, to the company's cash needs (or current liabilities)[10]. (Hoffmann Decl. ¶ 27).

In many cases, courts have considered a company's liquidity in evaluating its financial ability to satisfy the judgment and whether contempt sanctions are warranted. *See S.E.C. v. O'Hagan*, 901 F. Supp. 1476, 1481 (D. Minn. 1995) (stating that defendant's lack of liquid assets would be a defense to a future contempt allegation); *S.E.C. v. Universal Express, Inc.*, 546 F. Supp. 2d 132, 135 (S.D.N.Y. 2008) (in assessing financial capacity, noting that many of party's substantial assets were "relatively liquid"); *Am. Honda Motor Co. v. V.M. Paolozzi Imports, Inc.*, No. 7:10-CV-955 FJS/ATB, 2013 WL 1296421 (N.D.N.Y. Mar. 26, 2013) (indicating that lack of cash liquidity, if substantiated by financial documents, is appropriate showing of company's inability to comply with court order); *see also Archer Daniels Midland Co. v. United States*, 917 F. Supp. 2d 1331, 1346 (Ct. Int'l Trade 2013) (to determine a company's financial health, for purposes other than contempt, company's current and quick ratios were compared against those of comparable companies).

---

[9]     Petitioners' brief misstates two important points. First, in the April 30 Order and the August 6 Order, the Court did not already consider and reject the contention that "BDL and SDL . . . lack the ability to comply with the Orders," CIMC Br. at 6, and instead decided a much narrower issue: whether *Schahin Engenharia* could maintain operations without offshore operating expense reimbursements amounting to approximately $1-$2 million per month.  April 30 Order at 9. Secondly, at no point have Respondents contradicted their prior statements of March 2012 during the New York State Supreme Court proceedings regarding their financial health, specifically their "substantial net worth and assets." *See* CIMC Br. at 6. ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████

[10]     There are three common metrics to measure a company's liquidity – the current ratio, quick ratio, and cash ratio – with the main distinction being which assets a ratio considers can be converted into cash quickly. (Hoffmann Decl. ¶¶ 27,38).  The current ratio assumes that all current assets can be converted into cash within a short time (usually a year) in order to pay any expenses or debt.  (Hoffmann Decl. ¶ 27.)  The quick ratio is more conservative than the current ratio because it excludes inventory from the equation, while the cash ratio is the most conservative ratio since it excludes all current assets except truly the most liquid, cash and cash equivalents.  (Hoffmann Decl. ¶ 38.)

To determine whether a company does not have the financial capacity to satisfy a judgment as a result of liquidity shortage, courts are increasingly relying on a "sophisticated analysis" which calculates a company's present liquidity ratio, and then calculates the "new liquidity ratio" if the company had to pay the judgment, or some portion of it. *E.E.O.C. v. Local 638 (3)27 Local 28 of the Sheet Metal Workers' Int'l Ass'n,* 117 F. Supp. 2d 386, 388 (S.D.N.Y. 2000), *aff'd sub nom., E.E.O.C. v. Local 28 of Sheet Metal Workers' Int'l Ass'n,* 247 F.3d 333 (2d Cir. 2001). In *Local 638,* the court hired an independent accounting firm, M.D. Oppenheim to determine the amount, if any, the Union could pay towards the Judgment. The linchpin of M.D. Oppenheim's analysis was that "a [cash] ratio of two to one [2.0] is considered across many different businesses and not-for-profit organizations to be financially healthy." [11] *Local 638 (3)27 Local 28 of the Sheet Metal Workers' Int'l Ass'n,* 117 F. Supp. 2d at 389. A current ratio of 2.0 is also consistent with other courts' treatment of this issue. *See, e.g., United States v. Panhandle E. Corp.,* 696 F. Supp. 983, 984 (D. Del. 1988) ("[T]he general rule of thumb calls for a current ratio of 2 to 1.") (internal citations and quotations omitted);[12] *see also* Hoffman Decl. Ex. H at 9 (showing that of 17 public companies in the construction industry considered, the lowest 10% decile had an average current liquidity ration of 2.1, which the authors characterized as "terrible"). M.D. Oppenheim then worked backwards and determined that the Union could pay up to $1 million, at which point its cash ratio would decrease to 2.0, a ratio

---

[11]     The Court refers to these as "current ratios" when in fact they are actually "cash ratios." This is evident in the Court's explanation: "current ratio compares the amount of *cash assets* to the amount of expected liabilities." *Local 638 (3)27 Local 28 of the Sheet Metal Workers' Int'l Ass'n,* 117 F. Supp. 2d at 388 (emphasis added). Again, current ratios are the least conservative of the liquidity ratios because they consider all current assets, whereas cash ratios only consider cash (and cash equivalents). (Hoffmann Decl. ¶¶ 27, 38.) The Court later acknowledged that "when [M.D. Oppenheim] calculated a current ratio of two to one, this calculation was based on the Union's *cash assets alone.* Under his calculations Local 28 would be healthy even if it had no real estate holdings whatsoever." *Local 638 (3)27 Local 28 of the Sheet Metal Workers' Int'l Ass'n,* 117 F. Supp. 2d at 392 (emphasis added). The current ratio, on the other hand, *would change* if real estate holdings decreased. (*See generally* Hoffmann Decl. ¶ 27.)

[12]     In that case, the court determined that the company's current ratio of 0.87 was "well below the level generally considered *safe*" and noted that the company had a lot of assets in the form of plant, property and equipment which are not readily marketable, further suggesting the company had a "potential liquidity problem." *Panhandle E. Corp.,* 696 F. Supp. at 984.

which was still "financially healthy." *Local 638 (3)27 Local 28 of the Sheet Metal Workers' Int'l Ass'n*, 117 F. Supp. 2d at 389.

In *Local 638*, the court appointed M.D. Oppenheim to determine that 2.0 was a healthy cash ratio,[13] but there are other methods for determining appropriate benchmarks. For example, courts will generate benchmarks for liquidity ratios, considering similarly sized companies in the same industry. *See, e.g., Archer Daniels Midland Co.*, 917 F. Supp. 2d at 1346. Applying such an analysis, the independent accounting firm Martinelli Auditores determined that comparable companies to Schahin Holding and Schahin Engenharia had current ratios ranging from 1.321 to 1.487, quick ratios ranging from 2.0895 to 2.395, and cash ratios ranging from 0.26 to 0.65 (the "Comparables Analysis"). (Hoffmann Decl. ¶¶ 29,38.) Industry reports and financial treatises are also a useful source for identifying appropriate benchmarks. Martinelli Auditores relied on a study by the Federal University of Santa Catarina ("UFSC Study") which found that of 17 publicly held companies in the construction industry (that are similar to Schahin Holding and Schahin Engenharia), the lowest 10% decile had current liquidity ratios of 2.1. (Hoffmann Decl. ¶ 28 and Ex. H; Hessler Decl. Ex. 12.) Using the most conservative of these sources, 2.0 is an appropriate benchmark for determining the minimum current ratio a company needs to sustain operations ("Minimum Current Ratio").

---

[13]    M.D. Oppenheim testified that a 2:1 cash ratio was a "good indication that a business is financially strong." *Local 638 (3)27 Local 28 of the Sheet Metal Workers' Int'l Ass'n*, 117 F. Supp. 2d at 389 n.7. While the Respondents would of course prefer to be "financially strong," they recognize that the appropriate inquiry should be "financial ability," which is the amount that a business could pay before it is in jeopardy, which is why Respondents' proposal – as outlined in their Motion to Stay Enforcement – contemplates substantial contributions from Respondents despite their liquidity restraints. *See generally* Stay Motion. And indeed, the court had the opportunity to note this distinction in *Local 638*. The Union disagreed with M.D. Oppenheim's calculation of its cash ratio after it paid the $1 million towards its outstanding judgment, claiming this would cause its "cash ratio" to decrease to be 1.7, rather than 2. *Local 638 (3)27 Local 28 of the Sheet Metal Workers' Int'l Ass'n*, 117 F. Supp. 2d at 389 n.7. The court explained that though M.D. Oppenheim testified about the 2.0 ratio, "he never contended that anything less that that would indicate that a business was in jeopardy." *Id.* The court then concluded that the company would be economically secure contributing $1 million, even if its cash ratio was *slightly less* than 2:1. *Id.* at 390.

Applying the methodology of *Local 38*, it is apparent that Schahin Holding and Schahin Engenharia do not have the financial capacity to satisfy the judgment or any part thereof, without financing.  (Hoffmann Decl. ¶¶ 33, 36.) ███████████████

████████████████████████████████████████████████████████████

██████████████ █ ▌Hoffmann Decl. ¶¶ 29, 38.) ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

Schahin Holding and Schahin Engenharia do not have the liquidity to satisfy any portion of the $72 million judgment without financing.[15]  (Hoffmann Decl. ¶¶ 33, 36.) ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ █ ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ █

████████████████████████████████████████ These

---

[14]   2013 consolidated liquidity ratios are not available for Schahin Holding since any 2013 financial statements were unconsolidated (which represents only a small fraction of Schahin Holding's consolidated revenues).

[15]   ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[16]   This calculation is based on 2012 financials for Schahin Holding since this is the last date for which consolidated information is available.

[17]   These are also based off 2012 financials for Schahin Engenharia.

16

liquidity ratios are "well below the level generally considered safe."  *Panhandle E. Corp.*, 696

F. Supp. at 984 (stating that a liquidity ratio of 0.87 was "well below the level generally

considered safe.").



In such circumstances, a claim of contempt cannot be heard.

---

18      On average, it generally takes 6-12 months to convert inventories to cash, 12 months to convert taxes recoverable to cash, and 4 months to convert account receivables to cash.  (Hoffmann Decl. ¶ 34.)

19      This is based on Q2 2013 financials.

**B.    Despite These Liquidity Constraints, Schahin Holding and Schahin Engenharia Made Diligent Attempts to Comply in a Reasonable Manner**

It is a sufficient defense to contempt sanctions if the party "ha[s] been reasonably diligent and energetic in attempting to accomplish what was ordered." *Aspira of N.Y., Inc. v. Bd. of Ed.*, 423 F. Supp. 647, 654 (S.D.N.Y. 1976) (noting that "reasonable diligence," and not "utmost diligence," is required).  In order to determine if a defendant exercised reasonable diligence, a court will examine its actions and consider whether they were based on a good faith and reasonable interpretation of the order. *Schmitz v. St. Regis Paper Co.*, 758 F. Supp. 922, 927 (S.D.N.Y. 1991).  In making this determination, courts have viewed the following efforts positively: whether the party mobilized its resources, asserted its own authority, demanded cooperation from subordinate individuals and agencies, arranged alternate financing or installment plans, and promptly sought relief from the Court. *S.E.C. v. Contini*, No. 93 CIV. 4400 (RWS), 2005 WL 2649092 (S.D.N.Y. Oct. 17, 2005); *Aspira of N.Y., Inc.*, 423 F. Supp. at 654; *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (194

As described in detail in the Statement of Facts, Schahin Engenharia and Schahin Holding have made numerous attempts to comply with this Court's Orders.  Aware of their liquidity restraints, Respondents made diligent efforts to arrange a reasonable installment plan with CIMC.  (Schahin Decl. ¶ 13.)  When this failed, they continued to negotiate for 6 months, meeting CIMC's continuously increasing demands, and even offering concessions related to other proceedings.  (Hessler Decl. Ex. 10.)  Courts have viewed such efforts favorably in determining if sanctions were warranted.  *See e.g.*, *See Adams v. New York State Educ. Dep't*, No. 08 CIV. 5996 VM, 2013 WL 4054875 (S.D.N.Y. Aug. 1, 2013) (suggesting that party could have avoided contempt sanctions if it offered a reasonable installment plan); *S.E.C. v. Contini*, No. 93 CIV. 4400 (RWS), 2005 WL 2649092 (S.D.N.Y. Oct. 17, 2005) (as a result of party's

18

lump sum payment and regular monthly payments made towards outstanding judgment, court determined party was not in contempt).

Throughout these proceedings, Respondents have also made efforts to obtain traditional financing to satisfy the Judgment.  (Schahin Decl. ¶ 4.)  While these efforts were ultimately unsuccessful, that was in large part as a result of CIMC's hyper-aggressive enforcement activity, which made banks wary of extending financing.[20]  (Schahin Decl. ¶ 4.)

███████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████  On August 23, 2013, immediately after negotiations with the Petitioners broke down, Respondents made one final attempt to comply with this Court's Orders and sought permission to file the Motion to Stay Enforcement, which is *sub judice*.  [Docket No. 104].  Courts are much less likely to impose sanctions when a

---

[20]    To date, CIMC has served approximately fifty-six restraining notices on a number of entities, including numerous financial institutions with which Respondents have never done business.  *See* April 29, 2013 Hearing Transcript at 22:1-23:25.

party has affirmatively sought relief from the court, rather than allow for long periods of nonperformance. *See, e.g., McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949) (Court indicated that if a decree proved too burdensome in operation, a party should petition the Court for a modification); *Aspira of N.Y., Inc.*, 423 F. Supp. at 654 (rebuking defendants who allowed deadlines to pass and awaited complaints from plaintiffs, instead of affirmatively seeking assistance from the Court).

## IV.   BECAUSE CIMC'S SOLE MOTIVATION IS TO INFLICT HARM ON RESPONDENTS, CIVIL CONTEMPT IS PLAINLY INAPPROPRIATE

The sole purposes of civil contempt are to secure future compliance with court orders and to compensate the party that has been wronged. *Musalli Factory for Gold & Jewelry Co. v. New York Fin. LLC*, No. 06 CIV. 82 (AKH), 2010 WL 2382415, at *3 (S.D.N.Y. June 14, 2010) ("The imposition of civil contempt sanctions, which must be remedial and compensatory, not punitive, is designed to secure future compliance with court orders."). *IBM Corp. v. United States*, 493 F.2d 112, 115 (2d Cir. 1973) ("The hallmark of civil contempt is that the sanction imposed is *only* contingent and coercive.") (emphasis added). Civil contempt proceedings cannot be used punitively.[21] *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir. 1989). Because the imposition of civil contempt sanctions against Respondents cannot further either of these goals, it is clear that CIMC has pursued civil contempt proceedings in order to inflict harm on the Respondents and to gain additional leverage in pending proceedings abroad.

---

[21]   In contrast to the goals of civil contempt, the purpose of criminal contempt is punitive, as they are imposed to vindicate the authority of the court. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 302 (1947).

**A.     The Imposition of Civil Contempt Sanctions Will Not Coerce Future Compliance or Remedy Past Compliance and Are Therefore Inappropriate**

As explained in more detail *infra* at IIIA, at present, Respondents have a temporary liquidity shortage, such that they do not have enough liquid assets to satisfy the judgment without obtaining financing. ████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

████████████████████████ Therefore, civil contempt sanctions can have no coercive effect and are thus inappropriate. *United States v. Rylander*, 460 U.S. 752, 757 (1983) ("Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action."); *In re Marc Rich & Co.*, A.G., 736 F.2d 864, 866 (2d Cir. 1984) ("Civil contempt is a coercive sanction, and thus a person held in civil contempt must be able to comply with the court order at issue."); *Badgley v. Santacroce*, 800 F.2d 33, 37 (2d Cir. 1986) ("In all these situations, the contempt is excused because compliance is literally impossible and, as a result, any attempts at coercion are pointless.)."

Further, civil contempt sanctions are not needed to compensate CIMC for noncompliance, as CIMC is already compensated at 9% interest under the ECA Agreements.

21

Regardless, CIMC cannot recover compensatory damages since it has not offered any evidence

of loss or injury, a necessary prerequisite.  Because compensatory sanctions are imposed to

reimburse a party for actual damages, they may not be imposed absent proof of actual loss.

*United Mine Workers*, 330 U.S. at 304; *Paramedics Electromedicina Comercial, Ltda*, 369 F.3d

at 658 ("[S]ome proof of loss must be present to justify its compensatory aspects.").  *Leadsinger,*

*Inc. v. Cole*, No. 05 CIV. 5606(HBP), 2006 WL 2266312, at *16 (S.D.N.Y. Aug. 4, 2006)

("Compensatory sanctions should reimburse the injured party for its actual damages . . . [A]ctual

damages must be established by competent evidence and the amount must not be arrived at by

mere speculation or conjecture.").

**B.     CIMC Has Sought Civil Contempt Sanctions Only to Inflict Further Harm**
**on the Respondents**

Because imposing sanctions on the Respondents would not secure future

satisfaction of the Judgment (since this is dependent on Respondents finalizing third party

financing) or compensate CIMC for actual harm suffered, it is clear that CIMC's only motivation

in initiating civil contempt proceedings is to punish the Respondents.  *Edeh v. Carruthers*, No.

CIV. 10-2860 RJK/JSM, 2011 WL 4808194, at *3 (D. Minn. Sept. 20, 2011), *report and*

*recommendation adopted sub nom. Edeh v. D. Scott Carruthers Attorneys at Law*, No. CIV. 10-

2860 RHK/JSM, 2011 WL 4808191 (D. Minn. Oct. 11, 2011) ("However, when civil contempt

sanctions lose their coercive effect, they become punitive and violate the contemnor's due

process rights.").  Such an objective is plainly impermissible.  Civil sanctions cannot be imposed

as a punitive measure.  *Funnekotter v. Republic of Zimbabwe*, No. 09 CIV. 08168 CM THK,

2011 WL 5517860, at *2 (S.D.N.Y. Nov. 10, 2011) ( "[C]ivil contempt sanctions are remedial

and compensatory, not punitive.") (internal citations and quotations omitted); *Edeh*, 2011 WL

4808194, at *3 ("Thus, a punitive sanction is inappropriate for civil contempt.").

22

That CIMC would pursue punitive damages against Respondents should come as no surprise to anyone familiar with these proceedings, in which CIMC has consistently pursued roughshod, poorly tailored enforcement tactics without regard to their chance of success or to Respondents' reputation in the market, including issuing restraining notices on financial institutions with which Respondents have never even done business. *See supra* Statement of Facts.

## V.   THE AMOUNT OF FINES SOUGHT BY CIMC IS GROSSLY DISPROPORTIONATE

CIMC seeks an enormous fine of $500,000 on the first day after entry of order on this motion, with this amount doubling daily until the Judgment is paid in full. CIMC Br. at 8. By the end of 2013, Respondents will have repaid $72 million to CIMC. (Schahin Decl. ¶ 11.) In the interim, however, this daily fine would exponentially increase, such that by the end of the year, Respondents would owe a total fine of 680,564,733,841,876,926,926,749,214,863,536, 422,911,500,000 or over *680 tredecillion dollars*.[22] To put this number into context, CIMC's annual net profit in 2012 was approximately $310,252,960. Yet, CIMC proposes to impose sanctions which, over the next three months, would amount to 219,358,014,776,676,724,349,946 *times* its 2012 *annual* earnings.

CIMC does not even attempt to justify this request for sanctions, or to address the three factors identified by the Supreme Court in *United Mine Workers* to assess the appropriate amount of coerceive fines: (1) the character and magnitude of the harm threatened by continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about the result desired, and (3) the amount of the defendant's financial resources and the consequent seriousness of the burden to that particular defendant. *United Mine Workers*, 330 U.S. at 304; *Dole Fresh*

---

[22]   This number was calculated with the following equation, where x= number of days that Respondents would be in contempt until full satisfaction of the award (129 days): $2^x - \frac{1}{2}$.

*Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir. 1987) (stating that "[t]hough fines may be appropriate coercive measures in this case, under [the court's precedent], the court must before imposing them explicitly consider the [*United Mine Workers* factors.],'" and vacating contempt order because district court did not consider these factors. ).  Instead, CIMC simply states and repeats that the *first* $500,000 payment is "well under 1% of the principal amount of the outstanding judgment."  CIMC Br. at 8, 1.

       Not only are CIMC's proposed sanctions patently unreasonable, they are also grossly disproportionate[23] to the amount of sanctions awarded in other cases.  For other cases imposing contempt sanctions, including those cited by Petitioners, fines were significantly lower, such as $1,000 or $5,000 per day, with this amount doubling until the contempt was purged.  *See, e.g., United States v. Ohle*, No. S3 08 Cr. 1109, 2012 WL 2861347 (S.D.N.Y. July 6, 2012) (imposing $1,000 per day in sanctions, with amount doubling); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, Inc., 673 F.2d 53 (2d Cir. 1982) (imposing $5,000 per day in sanctions, reasoning that the fine would induce compliance without being confiscatory).[24]

---

[23]    To the extent the Court needs further grounds, applying the three factors from *United Mine Workers*, 330 U.S. at 304, it is plain that this proposed fine would also fail any proportionality analysis and violate the Eight Amendment Excessive Fines Clause.  *See* Margaret Meriwether Cordray, *Contempt Sanctions and the Excessive Fines Clause*, 76 N.C. L. Rev. 407, 457 (1998) (arguing that both criminal and contempt sanctions would trigger application of the Excessive Fines Clause and applying the three *United Mine Workers* factors to assess proportionality).

[24]    Even after assessing those cases in which sanctions initially appeared at the high end of the spectrum, upon applying the court's reasoning to the instant facts, any fine would be nominal.  In one such case, for example, the Court imposed a $150,000 per day fine (not doubling) on IBM until compliance, explaining that while this was a "substantial sum, in reference to IBM's financial resources and the consequent seriousness of the burden to IBM, the sum represents only 5% of any given day's earnings."  *IBM Corp.*, 493 F.2d at 116.  The Court explained that IBM had earned $1,279,000,000 in the prior year, which equated to $3,503,109 per day.  *Id.*  The $150,000 daily fine represented only 5% of IBM's $3.5 million daily earnings, and is therefore reasonable when understood in context.  By comparison, in fiscal year 2012, Schahin Engenharia had 20,395,995 Brazilian Reais in net income, or 55,879 Brazilian Reais in net income each day (which translates to approximately US $23,557 per day).  Five percent of these daily earnings, applying the rule of *International Business Machines Corp.*, would equate to a daily fine of $1,177 per day (which would not double), or $151,833 by the end of 2013, a sum that is significantly less than the figure proposed by CIMC.

**VI.   CIMC IS NOT ENTITLED TO ATTORNEYS' FEES BECAUSE RESPONDENTS' ACTIONS WERE NOT WILLFUL**

Attorneys' fees will not be awarded unless the party's conduct was willful. *Bear U.S.A., Inc. v. Kim*, 71 F. Supp. 2d 237, 249 (S.D.N.Y. 1999), *aff'd*, 216 F.3d 1071 (2d Cir. 2000), *and aff'd sub nom.*, *Bear U.S.A., Inc. v. Bing Chuan Grp. U.S.A., Corp.*, 216 F.3d 1071 (2d Cir. 2000). A willful contempt is one where "the contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply." *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, No. 06 CIV. 0085 (LBS), 2007 WL 2982295, at *4 (S.D.N.Y. Oct. 10, 2007). CIMC cannot satisfy three of the four-prong definition of willful since (i) the Respondents could not comply with the Orders, *see supra* at IIIA, (ii) they nevertheless made a good faith effort to comply, *see supra* at IIIB, and (iii) they filed a Motion to Stay on Monday, August 27, 2013 which is *sub judice*.

Regardless, CIMC could not recoup attorneys' fees and costs as it did not submit contemporaneous records documenting fees. *Funnekotter*, 2011 WL 5517860, at *4 ("Nevertheless, it is a well-established rule in this Circuit that absent unusual circumstances attorneys are required to submit contemporaneous records with the fee applications."); *Cordius Trust*, 658 F. Supp. 2d at 524 (explaining that party seeking attorneys' fees and costs carries the burden of proof as to those damages, and must establish the reasonableness and necessity of the hours spent must be established).

## CONCLUSION

For the foregoing reasons, the Respondents respectfully request that the Court exercise its discretion to stay further enforcement actions to permit the Respondents to finalize financing and pay the Judgment.

Dated:     New York, New York
           September 3, 2013

                                    Respectfully submitted,

                                    Linklaters LLP

                                    By: _____
                                         Paul S. Hessler
                                         Patrick Ashby
                                         1345 Avenue of the Americas
                                         New York, NY 10105
                                         (212) 903-9000
                                         (212) 903-9100 (fax)

                                    *Attorneys for Respondent Baerfield Drilling*
                                    *LLC, Soratu Drilling LLC, Black Gold Drilling*
                                    *LLC, and Schahin Engenharia S.A.*